ORAL ARGUMENT NOT YET SCHEDULED

No. 17-5171

**IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

_____

ELECTRONIC PRIVACY INFORMATION CENTER

*Plaintiff-Appellant,*

v.

PRESIDENTIAL ADVISORY COMMISSION
ON ELECTION INTEGRITY, *et al.*,

*Defendants-Appellees.*

_____

**On Appeal from an Order of the
U.S. District Court for the District of Columbia
Case No. 17-cv-1320(CKK)**

_____

# BRIEF FOR APPELLANT

_____

Marc Rotenberg
Alan Butler
Caitriona Fitzgerald
Jeramie Scott
John Davisson
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff-Appellant*

i

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), undersigned counsel for Appellant hereby provides the following information:

**I.    PARTIES AND *AMICI* APPEARING BELOW**

The parties and *amici* who appeared before the U.S. District Court were:

1. Electronic Privacy Information Center, *Plaintiff-Appellant*.

2. Presidential Advisory Commission on Election Integrity; Michael Pence, in his official capacity as Vice Chair of the Presidential Advisory Commission on Election Integrity; Kris Kobach, in his official capacity as Vice Chair of the Presidential Advisory Commission on Election Integrity; Charles C. Herndon, in his official capacity as Director of White House Information Technology; Executive Office of the President of the United States; Office of the Vice President of the United States; General Services Administration; United States Department of Defense; United States Digital Service; Executive Committee for Presidential Information Technology, *Defendants-Appellees*.

**II.    PARTIES AND *AMICI* APPEARING IN THIS COURT**

1. Electronic Privacy Information Center, *Plaintiff-Appellant*.

2. Presidential Advisory Commission on Election Integrity; Michael Pence, in his official capacity as Vice Chair of the Presidential Advisory Commission on Election Integrity; Kris Kobach, in his official capacity as

ii

Vice Chair of the Presidential Advisory Commission on Election Integrity; Charles C. Herndon, in his official capacity as Director of White House Information Technology; Executive Office of the President of the United States; Office of the Vice President of the United States; General Services Administration; United States Department of Defense; United States Digital Service; Executive Committee for Presidential Information Technology, *Defendants-Appellees.*

## III.   RULINGS UNDER REVIEW

The ruling under review in this case is United States District Court Judge Colleen Kollar-Kotelly's July 24, 2017, Order and Memorandum Opinion denying Appellant's Motion for a Temporary Restraining Order and Preliminary Injunction. *EPIC v. Presidential Advisory Comm'n on Election Integrity et al.*, No. 17-1320 (D.D.C. July 24, 2017).

## IV.   RELATED CASES

Apart from the proceedings in the court below, this case has not previously been filed with this Court or any other court. Counsel is aware of the following cases qualifying as "related" under Circuit Rule 28(a)(1)(C):

- *ACLU v. Trump*, No. 17-1351 (D.D.C. filed July 10, 2017)

- *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1354 (D.D.C. filed July 10, 2017)

- *Common Cause v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1398 (D.D.C. filed July 14, 2017)

- *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-5167 (D.C. Cir. filed July 21, 2017)

## V.    CORPORATE DISCLOSURE STATEMENT

EPIC is a 501(c)(3) non-profit corporation. EPIC has no parent, subsidiary, or affiliate. EPIC has never issued shares or debt securities to the public.

Respectfully Submitted,

*/s/ Marc Rotenberg*
MARC ROTENBERG
EPIC President and Executive Director

Dated: August 18, 2017

iv

# TABLE OF CONTENTS

Table of Authorities ................................................................. vii

Glossary ................................................................................. xi

Introduction ........................................................................... 1

Jurisdictional Statement .......................................................... 3

Pertinent Statutory Provisions ................................................ 3

Statement of Issues for Review ............................................... 3

Statement of the Case ............................................................ 4

    I.    The President created the Commission as an authority within the Executive Office of the President ........................................ 4

    II.    The Commission's efforts to obtain millions of state voter records are an exercise of substantial authority that subjects the Commission to judicial review ........................................ 6

    III.    The Commission ordered the Director of White House Information Technology to create a system of records and to collect sensitive voter data, even though the General Services Administration is designated under the Executive Order and the Commission Charter to provide "facilities," "equipment," and "administrative services" to the Commission ................................................ 9

    IV.    The Defendants failed to conduct and publish a Privacy Impact Assessment prior to the collection of personal data in a government system of records ................................................ 12

    V.    States election officials, election experts, and more than 150 members of the Congress have opposed the Commission's attempt to collect voter data ................................................ 14

Summary of the Argument ..................................................... 17

Argument .............................................................................. 18

    I.    This Court should enter a preliminary injunction because all four factors favor EPIC ........................................................ 18

    II.    The lower court erred in concluding that the Commission's collection of voter data is not reviewable under the APA ........ 25

A.    The Defendants are "agencies" as defined in the APA's judicial review chapter, which does not incorporate the "substantial independent authority" test established in *Soucie*.................................................................... 26

B.    The Defendant EOP and its subcomponents are also agencies under the *Soucie* test. ............................................ 39

C.    The Defendant GSA, which is an agency, has a mandatory, nondiscretionary duty to participate in the Commission's collection activities. ..................................... 42

III.    The lower court erred in concluding that the irreparable harm, equitable and public interest factors do not favor EPIC..................... 44

Conclusion .............................................................................................. 46

# TABLE OF AUTHORITIES[*]

**Cases**

* *Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991)............................................................ 26, 29, 35, 36

*Armstrong v. Exec. Office of the President*,
  810 F. Supp. 335 (D.D.C. 1993)........................................................ 36

*Armstrong v. Exec. Office of the President*,
  90 F.3d 553 (D.C. Cir. 1996)............................................................ 29

*AT&T Info. Sys., Inc. v. GSA*,
  810 F.2d 1233 (D.C. Cir. 1987)........................................................ 43

*Beverly Health & Rehab. Servs., Inc. v. Thompson*,
  223 F. Supp. 2d 73 (D.D.C. 2002)..................................................... 37

*Byrd v. EPA*,
  174 F.3d 239 (D.C. Cir. 1999).......................................................... 45

*Citizens for Responsibility & Ethics in Washington (CREW) v. Office of Admin.*,
  559 F. Supp. 2d 9 (D.D.C. 2008), *aff'd*, 566 F.3d 219 ..................... 42

* *Citizens for Responsibility & Ethics in Washington v. Exec. Office of President
  (CREW)*,
  587 F. Supp. 2d 48 (D.D.C. 2008) ................................................... 30, 37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ....................................................................... 27

*Ctr. for Biological Diversity v. Tidwell*, No. CV 15-2176 (CKK),
  2017 WL 943902 (D.D.C. Mar. 9, 2017) ......................................... 38

* *Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997)............................... 30, 31, 32, 33, 34, 39

*Energy Research Foundation v. Def. Nuclear Facilities Safety Bd.*,
  917 F.2d 581 (D.C. Cir. 1990).......................................................... 41

*EPIC v. DOJ*,
  416 F. Supp. 2d 30 (D.D.C. 2006)..................................................... 45

*Fanin v. Dep't of Veteran Affairs*,
  572 F.3d 868 (11th Cir. 2009) ......................................................... 22, 43

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ....................................................................... 37

*Hamandi v. Chertoff*,
  550 F. Supp. 2d 46 (D.D.C. May 6, 2008) ....................................... 42

---

[*] Authorities principally relied upon are designated by an asterisk (*).

*Indian River Cty. v. Rogoff*,
  201 F. Supp. 3d 1 (D.D.C. 2016)....................................................... 37
* *Kissinger v. Reporters Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) ................................................................ 28, 32
* *League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)................................................ 18, 19, 46
*Legal Aid Soc. of Alameda County v. Brennan*,
  608 F.2d 1319 (9th Cir. 1979) ...................................................... 43
*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993)..................................................... 39
*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993) (Wald, J., dissenting) ................... 35
* *Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ..................................................................... 38
*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980)....................................................... 37
*Nat'l Parks & Conservation Ass'n v. Kleppe*,
  547 F.2d 673 (D.C. Cir. 1976)....................................................... 28
*Nat'l Wildlife Fed'n v. Burford*,
  835 F.2d 305 (D.C. Cir. 1987)....................................................... 37
* *Norton v. S. Utah Wildlife Alliance*,
  542 U.S. 55 (2004) ................................................................. 22, 43
*Payne Enters, Inc. v. United States*,
  837 F.2d 486 (D.C. Cir. 1988)....................................................... 45
* *Perkins v. Dep't of Veteran Affairs*,
  No. 07-310 (N.D. Ala. Apr. 21, 2010) ...................................... 23, 25
*Pub. Citizen Health Research Grp. v. Dep't of Health, Ed. & Welfare*,
  668 F.2d 537 (D.C. Cir. 1981) (Mikva, J., dissenting)..................... 18
*Pub. Citizen v. Carlin*,
  2 F. Supp. 2d 1 (D.D.C. 1997)....................................................... 33
*Pub. Citizen v. U.S. Trade Representative*,
  5 F.3d 549 (D.C. Cir. 1993)...................................................... 30, 36
* *Soucie v. David*,
  448 F.2d 1067 (D.C. Cir. 1971)..................................... 2, 17, 25, 29, 31, 39
*Washington Legal Found. v. U.S. Sentencing Comm'n*,
  17 F.3d 1446 (D.C. Cir. 1994)....................................................... 27
*Washington Post v. DHS*,
  459 F. Supp. 2d 61 (D.D.C. 2006).................................................. 45
*Washington Research Proj., Inc. v. HEW*,
  504 F.2d 238 (D.C. Cir. 1974)....................................................... 39

*Winter v. NRDC*,
    555 U.S. 7 (2008) ............................................................. 18

**Statutes**
    28 U.S.C. § 1292(a)(1) ...................................................... 3
    28 U.S.C. § 1331 ................................................................ 3
    40 U.S.C. § 11101(6) ....................................................... 23
    44 U.S.C. § 3502(9) ......................................................... 23
* E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 ................. 12, 43
*    § 2(b)(9) ................................................................... 46
*    § 201 ...................................................................... 23
*    § 208 (codified at 44 U.S.C. § 3501 note) ................... 12, 17, 19
*    § 208(b)(1)(A)(ii) .................................................. 21, 23
*    § 208(b)(1)(B) ........................................................ 22
*    § 208(b)(2)(B)(ii) .................................................... 13
*    § 208(d) ................................................................. 23
    Federal Advisory Committee Act, 5 U.S.C. app. 2 ..................... 5, 13
    5 U.S.C. app. 2 § 10(b) ................................................... 7
    Federal Register Act, Pub. L. No. 74-220, 49 Stat. 500 (1935) ............ 27
    Federal Reports Act of 1942, Pub. L. No. 77-831, 56 Stat. 1078, (1942) ........... 27
* Freedom of Information Act, Pub. L. 93-502, 88 Stat. 1561 (1974) .................. 28
*    5 U.S.C. § 552(f) ........................................ 2, 26, 30, 32, 40
* Government Organization and Employees, Pub. L. 89-554, 80 Stat. 387 (1966) 28
*    5 U.S.C. § 551(1) ...................................................... 2, 26
*    5 U.S.C. § 701(b)(1) ...................................... 2, 17, 25, 26, 32, 33
    5 U.S.C. § 702 ......................................................... 3, 19
    5 U.S.C. § 704 ......................................................... 3, 19
    5 U.S.C. § 706(1) .................................................. 22, 42, 43
    5 U.S.C. § 706(2) .................................................... 20, 22

**Other Authorities**
* Administrative Procedure Act, Legislative History, S. Doc. No. 248 (1946) ...... 27
    By-Laws and Operating Procedures, Presidential Advisory Commission on
        Election Integrity ............................................................. 10
* Charter, Presidential Advisory Commission on Election Integrity ............ 5, 10, 43
* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ......... 4, 5, 9, 25, 43
    *Executive Office of the President*, The White House (2017) ........................ 33, 38
    H.R. Rep. No. 93-1380 (1974) ....................................................... 32
* Joshua B. Bolten, Director, Office of Mgmt. & Budget, Executive Office of the
    President, M-03-22, Memorandum for Heads of Executive Departments and
    Agencies, Attachment A (Sept. 26, 2003) ............................... 21, 25

* Memorandum on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015) .............. 40, 41

Office of Privacy & Civil Liberties, U.S. Dep't of Justice, *E-Government Act of 2002* (June 18, 2014)....................................................................................... 20

U.S. Census Bureau, Voting and Registration in the Election of November 2016 (May 2017)..................................................................................................... 35

*White House Officials Tricked by Email Prankster*, CNN (Aug. 1, 2017)............ 7

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Commission | Presidential Advisory Commission on Election Integrity |
| D-WHIT | Director of White House Information Technology |
| E-Government Act | E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 |
| EOP | Executive Office of the President |
| EPIC | Electronic Privacy Information Center |
| FOIA | Freedom of Information Act |
| GSA | General Services Administration |
| JA ___ | Citation to the Joint Appendix |
| NSC | National Security Council |
| OMB | Office of Management and Budget |
| OVP | Office of the Vice President |
| PIA | Privacy Impact Assessment |

## INTRODUCTION

The failure to safeguard personal data gathered by government agencies is a national crisis. The breach of the Office of Personnel Management in 2015 exposed millions of government employees, their families, and their friends to identity theft and fraud. Federal agencies are required to undertake extensive Privacy Impact Assessments prior to data collection to mitigate privacy risks. In some instances, a Privacy Impact Assessment may yield the conclusion that that the program proposed is simply too risky to pursue. In other instances, a PIA will lead to refinements and improvements. Yet despite the well documented dangers to the privacy of Americans, a government authority established by the President undertook to collect state voter records from state election officials across the country without first completing the required Privacy Impact Assessment. This is an exercise of government authority, subject to the Administrative Procedure Act, that is contrary to law and must be enjoined.

The court below erred when it misapplied the *Soucie* test to shield a government authority from judicial review under the Administrative Procedure Act. 5 U.S.C. §§ 701 *et seq*. And the court erred when it failed to require the General Services Administration to manage the data collection undertaken by the Commission, as mandated by the Executive Order and the Commission Charter. We

respectfully ask this Court to issue a preliminary injunction halting the Commission's collection of state voter data.

EPIC's case comes before this Court on expedited review following denial of a motion for a preliminary injunction to prohibit the Commission from collecting personal voter data before completing and publishing a Privacy Impact Assessment as required under the E-Government Act. The lower court denied EPIC's motion on the grounds that neither the Commission nor any of the other named Defendants are subject to judicial review under the APA. The lower court concluded that the "substantial independent authority" test adopted in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), and the subsequent line of cases concerning the interpretation of "agency" in 5 U.S.C. §§ 552(f) and 551(1) should apply to the APA Judicial Review Chapter, 5 U.S.C. §§ 701 *et seq*. This conclusion runs contrary to established precedent and must be reversed because the definition of "agency" in 5 U.S.C. § 701(b)(1) is not construed so narrowly. This Court has subjected government authorities to judicial review under the APA even where those entities do not meet the *Soucie* "substantial independent authority" test.

Given that the Commission and its codefendants are engaged in a "collection of information" triggering the Privacy Impact Assessment requirements of the E-Government Act, EPIC has established a substantial likelihood of success on the merits of its statutory claims. And because EPIC has established that the Defendants

2

have violated their statutory obligation to conduct and publish a Privacy Impact Assessment prior to initiating collection of the voter data, EPIC is likely to suffer an irreparable harm absent an order requiring the agencies to comply with the E-Government Act. Both the public interest and the balance of the equities also clearly favor an injunction requiring the Defendants to comply with their statutory obligations and inform the public about the nature and scope of their proposed data collection.

## JURISDICTIONAL STATEMENT

Appellant filed a motion for a temporary restraining order and preliminary injunction in the United States District Court for the District of Columbia pursuant to Fed. R. Civ. P. 65. The lower court had jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, and 5 U.S.C. § 704. This Court has jurisdiction to review the lower court's decision denying a preliminary injunction. 28 U.S.C. § 1292(a)(1).

## PERTINENT STATUTORY PROVISIONS

The full text of the pertinent federal statutes is reproduced in the addendum to this brief.

## STATEMENT OF ISSUES FOR REVIEW

This case involves the following issues:

1. Whether the District Court erred in holding that this Court's interpretation of "agency" in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), controls the meaning of "agency" under Chapter 7 of the

Administrative Procedure Act, 5 U.S.C. § 701, even though this Court

has previously found that section 701 applies to agencies that do not

have "substantial independent authority" under *Soucie.*

2. Whether the District Court erred in holding that APA review is

    unavailable for the collection of state voter data by Defendant

    Presidential Advisory Commission on Election Integrity.

3. Whether the plain text of the Executive Order and the Commission

    Charter require the Defendant General Services Administration to

    provide all the services, funds, facilities, staff, and equipment

    necessary to carry out the Commission's collection of state voter data.

## STATEMENT OF THE CASE

**I.     The President created the Commission as an authority within the Executive Office of the President.**

The Presidential Advisory Commission on Election Integrity was

"established within the Executive Office of the President and is chaired by the Vice

President." Declaration of Kris W. Kobach ¶ 3, JA 50; *see also* Exec. Order No.

13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("Order"), JA 54–56. The Commission

is "composed of not more than 15 additional members" appointed by the President,

and the Vice President may select a Vice Chair of the Commission from among the

members. Order § 2, JA 55. Vice President Pence named Kansas Secretary of State

Kris Kobach to serve as Vice Chair of the Commission. Kobach Decl. ¶ 1, JA 50.

4

The Commission is authorized to "study the registration and voting processes used in Federal elections" and is responsible for preparing and submitting a report on specified election issues. Order § 3, JA 55.

The Commission reports to the President; will receive support services, including "administrative services," "facilities," and "equipment," from the General Services Administration ("GSA"); will have an annual operating budget of $250,000; and will have approximately three full-time equivalent employees plus a Designated Federal Officer ("DFO"). Charter, Presidential Advisory Commission on Election Integrity ¶¶ 5–8, JA 58–59. The Vice President "may also select an executive director and any additional staff he determines necessary to support the Commission." *Id*. ¶ 11, JA 59. The Chair of the Commission is authorized "in consultation with the DFO" to "create subcommittees as necessary to support the Commission's work." *Id*., JA 59. The records of the Commission "shall be maintained" both pursuant to both the Presidential Records Act of 1978, 44 U.S.C. §§ 2201–2207, and the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1–16. Charter ¶ 13, JA 59. The Administrator of General Services is responsible for performing any FACA functions on behalf of the Commission "except for those in section 6 of the Act." Order § 7(c), JA 56.

## II.    The Commission's efforts to obtain millions of state voter records are an exercise of substantial authority that subjects the Commission to judicial review.

The Commission was chartered to "study" election integrity. Yet the Vice Chair Kobach initiated a controversial collection of state voter data from state election officials shortly after the Commission was created. On June 28, 2017, Mr. Kobach undertook an unprecedented effort to obtain detailed personal information on voters nationwide. He sent letters to election officials in all fifty states and the District of Columbia demanding:

> the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

*See, e.g.*, Letter from Kris Kobach, Vice Chair, Presidential Advisory Comm'n on Election Integrity, to Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), JA 221 ("Commission Letter").[2] Kobach warned that "any documents that are submitted to the full Commission w[ould] also be made available to the public." *Id.*, JA 222. Indeed, under the FACA all "records, reports, transcripts, minutes,

---

[2] *See* Remarks at a Meeting of the Presidential Advisory Commission on Election Integrity, 2017 Daily Comp. Pres. Doc. 476 (July 19, 2017) ("[M]ore than 30 States have already agreed to share the information with the Commission. And the other States, that information will be forthcoming.").

appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be made available for public inspection." 5 U.S.C. app. 2 § 10(b).

The Commission demanded a response from the states by July 14, 2017—approximately ten business days after the date of the initial request—and instructed state election officials to submit state voter data "electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange" system. Commission Letter, JA 222.

Neither the email address nor the file exchange system proposed by the Commission provided a secure mechanism for transferring sensitive personal information. In fact, an attempt to access the File Exchange system linked in the letter led to a warning screen with a notification that the site is insecure. *See* Screenshot: Google Chrome Security Warning for Safe Access File Exchange ("SAFE") Site (July 3, 2017 12:02 AM), JA 223. Email is also not a secure way to transfer personal information and leaves the Commission open to receiving fake data from a sender purporting to be a state election official. *See, e.g.*, *White House Officials Tricked by Email Prankster*, CNN (Aug. 1, 2017).[3] The Commission had originally planned to "download the files from SAFE onto White House computers"

---

[3] http://www.cnn.com/2017/07/31/politics/white-house-officials-tricked-by-email-prankster/.

after the states had uploaded the personal voter data to the Defense Department File Exchange system. Second Kobach Decl. ¶ 5, JA 65. However, the File Exchange system was not only insecure: it was not even certified to be used to "collect, maintain, use, and/or disseminate" personally identifiable information from "members of the general public." U.S. Dep't of Def., Privacy Impact Assessment for the Safe Access File Exchange Privacy Impact Assessment, JA 209.

After EPIC submitted a copy of the File Exchange PIA to the lower court demonstrating the failure to safeguard the personal data sought and filed an amended complaint adding the Department of Defense as a defendant, the Commission abandoned its initial plan. First, the Commission contacted state election officials and instructed that the "states not submit any data until [the lower court] rule[d] on th[e] TRO motion." Third Kobach Decl. ¶ 2, JA 130. Second, the Commission announced that it "no longer intend[ed] to use the DOD SAFE system to receive information from the states." *Id.* ¶ 1, JA 129. Third, the Commission stated that it would "not download the data that Arkansas already transmitted" to the Defense Department website and that the data would be "deleted from the site." *Id.* ¶ 3, JA 130.

But the Commission pressed on. Following the lower court's denial of EPIC's motion for a preliminary injunction, the Commission sent another letter to state election officials "to renew the June 28 request" and to urge officials to turn

over state voter records to the Commission. *See, e.g.*, Letter from Kris Kobach,

Vice Chair, Presidential Advisory Comm'n on Election Integrity, to Alex Padilla,

Cal. Sec'y of State (July 26, 2017), ADD 38–39. The July 26 letter raised new

concerns about possible misuses of the personal data sought by the Commission, as

well as uncertainty about the future handling of the data: "Once the Commission's

analysis is complete, the Commission will dispose of the data as permitted by

federal law." *Id.* at 2. The Commission's July 26 letter did not indicate whether in

fact the data will be deleted, who will have access to the data collected while in

possession of the Commission, why the data is being collected, for what purposes

the data will be used, how the data will be secured, whether a Privacy Act notice

will be pursued, whether individuals will have the opportunity to "opt out" of the

data collection, whether the data will be retained, or how any conclusions drawn

from the Commission's "analysis" may be contested.

**III.    The Commission ordered the Director of White House Information Technology to create a system of records and to collect sensitive voter data, even though the General Services Administration is designated under the Executive Order and the Commission Charter to provide "facilities," "equipment," and "administrative services" to the Commission.**

Under the text of the Executive Order and the Charter of the Commission, the

General Services Administration ("GSA") is designated as the "Agency

Responsible for Providing Support" to the Commission. Order § 7(a), JA 56;

Charter ¶ 6, JA 58; By-Laws and Operating Procedures, Presidential Advisory

Commission on Election Integrity at sec. VII, ADD 37. The GSA was specifically tasked with providing the Commission, *inter alia*, "administrative services," "facilities," "equipment" and "other support services as may be necessary to carry out its mission . . ." Order § 7(a), JA 56. The only derogation from the assignment of these responsibilities to the GSA is a single provision stating that "the President's designee will be responsible for fulfilling the requirements of subsection 6(b) of the FACA." Charter ¶ 6, JA 58. As the "Agency Responsible for Providing Support" to the Commission, the GSA is required to manage the collection and storage of any data that the Commission might obtain. The GSA routinely conducts and publishes Privacy Impact Assessments when it collects, maintains, and uses personal information on individuals. *See* Gen. Serv. Admin, Privacy Impact Assessments (PIA), JA 231.

Nevertheless, the Commission contends that "the White House is responsible for collecting and storing data for the Commission." Second Kobach Decl. ¶ 5, JA 65. The Vice Chair stated, in response to the lower court's inquiry, that the "Commission's Designated Federal Officer (an employee within the Office of the Vice President) will work with White House Information Technology staff to facilitate collection and storage" of personal voter data. *Id*., JA 65. Following the Commission's abrupt decision to discontinue use of the Department of Defense File Exchange system, the Vice Chair declared that "the Director of White House

10

Information Technology [was] repurposing an existing system" within the White House, which he indicated would be "fully functional by 6:00 p.m. Eastern [that same day]." Third Kobach Decl. ¶ 1, JA 129.

The Director of White House Information Technology ("D-WHIT") was established in 2015 and has "the primary authority to establish and coordinate the necessary policies and procedures for operating and maintaining the information resources and information systems provided to the President, Vice President, and EOP." Memorandum on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology § 1, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015), JA 215. This authority includes:

> providing "policy coordination and guidance for, and periodically review[ing], all activities relating to the information resources and information systems provided to the President, Vice President, and EOP by the Community, including expenditures for, and procurement of, information resources and information systems by the Community. Such activities shall be subject to the Director's coordination, guidance, and review in order to ensure consistency with the Director's strategy and to strengthen the quality of the Community's decisions through integrated analysis, planning, budgeting, and evaluating process.

*Id.* § 2(c), JA 216. The D-WHIT may "advise and confer with appropriate executive departments and agencies, individuals, and other entities as necessary to perform the Director's duties under this memorandum." *Id.* § 2(d), JA 216. The D-WHIT also has the authority to oversee and "provide the necessary advice, coordination,

11

and guidance to" the Executive Committee for Presidential Information Technology, which "consists of the following officials or their designees: the Assistant to the President for Management and Administration; the Executive Secretary of the National Security Council; the Director of the Office of Administration; the Director of the United States Secret Service; and the Director of the White House Military Office." *Id.* § 3, JA 216.

Following the Commission's announcement that the D-WHIT was creating a new system of records to collect personal voter data, EPIC filed a Second Amended Complaint naming the Director and the Executive Committee for Presidential Information Technology as codefendants. Second Am. Compl. ¶¶ 10, 13, JA 134.

## IV.    The Defendants failed to conduct and publish a Privacy Impact Assessment prior to the collection of personal data in a government system of records.

Section 208 of the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, requires that any federal agency "initiating a new collection of information that (I) will be collected, maintained, or disseminated using information technology; and (II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual" complete a Privacy Impact Assessment *before* initiating such collection. E-Government Act § 208 (codified at 44 U.S.C. § 3501 note).

A Privacy Impact Assessment includes:

(I) what information is to be collected;
(II) why the information is being collected;
(III) the intended use of the agency of the
information;
(IV) with whom the information will be shared;
(V) what notice or opportunities for consent would be provided to
individuals regarding what information is collected and how that
information is shared;
(VI) how the information will be secured; and
(VII) whether a system of records is being created under section 552a
of title 5, United States Code, (commonly referred to as the ''Privacy
Act'').

*Id.* § 208(b)(2)(B)(ii).

Given the sensitivity of voter data and the fact that adversaries have targeted

U.S. voter registration records, a Privacy Impact Assessment may well have led to

the conclusion that the Commission simply should not collect state voter record

information as proposed. A PIA would also have triggered obligations under the

federal Privacy Act that would have established procedural safeguards against

adverse determinations arising from computer matching programs undertaken by a

federal agency. Moreover, under the Federal Advisory Committee Act, the

Commission would have been required to make available the PIA to the public. 5

U.S.C. app. 2 § 10(b).

None of the defendant agencies have conducted a Privacy Impact Assessment

for the Commission's proposed collection of state voter data. None of the defendant

13

agencies have ensured review of a PIA by any Chief Information Officer or

equivalent official. The Commission has not made any PIA available to the public.

**V.     States election officials, election experts, and more than 150 members of the Congress have opposed the Commission's attempt to collect voter data.**

The vast majority of states have refused to turn over the voter data the

Commission is seeking. *Forty-four states and DC have refused to give certain voter*

*information to Trump commission,* CNN (July 5, 2017).[4] California Secretary of

State Alex Padilla stated on June 29, 2017, that "[t]he President's commission has

requested the personal data and the voting history of every American voter–

including Californians. As Secretary of State, it is my duty to ensure the integrity of

our elections and to protect the voting rights and privacy of our state's voters."

Press Release, Secretary of State Alex Padilla Responds to Presidential Election

Commission Request for Personal Data of California Voters (June 29, 2017).[5]

Nebraska Secretary of State John Gale stated on July 6, 2017: "I also have a

concern about data privacy. I have no clear assurances about the security that this

national database will receive. In light of the domestic and foreign attacks in 2016

on state voter registration databases, the commission will need to assure my office

---

[4] http://www.cnn.com/2017/07/03/politics/kris-kobach-letter-voter-fraud-commission-information/index.html.

[5] http://www.sos.ca.gov/administration/news-releases-and-advisories/2017-news-releases-and-advisories/secretary-state-alex-padilla-responds-presidential-election-commission-request-personal-data-california-voters/.

of a high level of security." Press Release, Sec. Gale Issues Statement on Request

for NE Voter Record Information (July 6, 2017).[6] And on July 3, 2017, Arizona

Secretary of State Michele Reagan said:

> I share the concerns of many Arizona citizens that the Commission's request implicates serious privacy concerns. […] Since there is nothing in Executive Order 13799 (nor federal law) that gives the Commission authority to unilaterally acquire and disseminate such sensitive information, the Arizona Secretary of State's Office is not in a position to fulfill your request.
>
> […]
>
> Centralizing sensitive voter registration information from every U.S. state is a potential target for nefarious actors who may be intent on further undermining our electoral process. […] Without any explanation how Arizona's voter information would be safeguarded or what security protocols the Commission has put in place, I cannot in good conscience release Arizonans' sensitive voter data for this hastily organized experiment.

Letter from Michele Reagan, Arizona Sec. of State, to Kris Kobach (July 3, 2017).

The Commission's plan to aggregate all state voter roll data is contrary to

efforts underway in the states to establish safeguards for state voter records. Indeed,

the Georgia state Director of Elections said in response to the Commission's June

28, 2017, letter that the Commission's instructions were not consistent with state

"security protocol." Letter from Chris Harvey, Director of Elections, Georgia

---

[6] http://www.sos.ne.gov/admin/press_releases/pdf-2017/nr-20170707.pdf.

Secretary of State's Office, to Kris W. Kobach, Vice Chair, Presidential Advisory

Commission on Election Integrity (July 3, 2017), JA 228.

The Commission has ignored calls from state election officials, experts in

election system security, twenty-four members of the United States Senate, and

over seventy members of the United States House of Representatives to withdraw

its request for voter data. *See* Press Release, Senator Amy Klobuchar, *Klobuchar,*

*Reed, Senators Demand that Presidential Advisory Commission Rescind Request*

*for State Election Officials' Voter Roll Data* (July 6, 2017) ("This request is

unprecedented in scope and raises serious privacy concerns. The requested data is

highly sensitive and after recent data breaches and cyber-attacks targeting our

election infrastructure, we are deeply concerned about how the Commission will

maintain the security and privacy of the data.");[7] *see also* Letter from

Representative Anna G. Eshoo, et al. to Kris Kobach (July 18, 2017) ("The federal

government has an obligation to protect the personally identifiable information of

the American people. We believe your June 28 request to the States would do the

opposite by ignoring the critical need for robust security protocols when

---

[7] https://www.klobuchar.senate.gov/public/index.cfm/2017/7/klobuchar-reed-
senators-demand-that-presidential-advisory-commission-rescind-request-for-state-
election-officials-voter-roll-data.

transmitting and storing sensitive personally identifiable information and by

centralizing it in one place.").[8]

## SUMMARY OF THE ARGUMENT

The lower court denied EPIC's motion for a preliminary injunction in this

case because it held, incorrectly, that the "substantial independent authority" test

established in *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971), determines

the meaning of "agency" under the APA's Judicial Review Chapter, 5 U.S.C. §§

701 *et seq*. This Court should reverse the decision below and enter a preliminary

injunction because the court below erred when it applied *Soucie* and because EPIC

has established that all four factors favor injunctive relief in this case. First, EPIC

has demonstrated a substantial likelihood of success on the merits because the

Commission and its codefendants have initiated a collection of personal information

without first complying with Section 208 of the E-Government Act. Second, the

Defendants are agencies within the definition of 5 U.S.C. § 701(b)(1) because they

are each an "authority of the Government of the United States." This Court has

previously found that agencies are subject to judicial review under the APA even

where they do not meet the *Soucie* "substantial independent authority" test. If it

were otherwise, the President "could set up 'fronts' to carry out all sorts of

---

[8] http://eshoo.house.gov/wp-content/uploads/2017/07/7.18.17-Letter-to-Election-Integrity-Commission-re-voter-data-request.pdf.

17

functions, while retaining practically total control over their operations . . . merely

to circumvent" federal law. *Pub. Citizen Health Research Grp. v. Dep't of Health,*

*Ed. & Welfare*, 668 F.2d 537, 547 (D.C. Cir. 1981) (Mikva, J., dissenting). But even

under the *Soucie* test, EPIC would have a substantial likelihood of success because

of the actions taken by the Commission and because the General Services

Administration has a mandatory duty to take part in the Commission's data

collection. And third, EPIC has shown that it will suffer irreparable harm as a result

of the Commission's failure to conduct and release a Privacy Impact Assessment

prior to collecting voter data and that both the equitable and public interest factors

favor injunctive relief.

## ARGUMENT

## I.    This Court should enter a preliminary injunction because all four factors favor EPIC.

A party seeking a preliminary injunction must show "that four factors, taken

together, warrant relief: likely success on the merits, likely irreparable harm in the

absence of preliminary relief, a balance of the equities in its favor, and accord with

the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir.

2016); *see also Winter v. NRDC*, 555 U.S. 7, 20–22 (2008). On appeal from a lower

court's denial of a preliminary injunction, this Court can "independently grant an

injunction after considering the proper factors." *League of Women Voters*, 838 F.3d

at 7 (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305

18

(D.C. Cir. 2006)). The independent entry of a preliminary injunction by this Court is especially appropriate where, as here, "time is of the essence." *League of Women Voters*, 838 F.3d at 7.

This case turns on the application of the first factor—likelihood of success on the merits. In particular, the case turns on a question of law: whether the Commission's collection of Americans' voter data involves "agency action" reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and "collection of information" by an "agency" under Section 208 of the E-Government Act (codified at 44 U.S.C. § 3501 note). The lower court found that EPIC had both informational and organizational standing to bring the APA and E-Government Act claims. Mem. Op. 16–26, JA 29–39. The lower court also found that "the non-disclosure of information to which a plaintiff is entitled, under certain circumstances itself constitutes an irreparable harm; specifically, where the information is highly relevant to an ongoing and highly public matter." Mem. Op. 34, JA 47. However, the lower court denied EPIC's motion for a preliminary injunction because it found that no "'agency' is implicated in this case and that there was no 'agency action' subject to this Court's review." Mem. Op. 26, JA 39.

The lower court erred in denying EPIC's motion for a preliminary injunction for three reasons. First, the court incorrectly concluded that the Commission is not an "agency" under the APA. Second, the court incorrectly concluded that the GSA

is not implicated in the Commission's collection of voter data. And third, the court incorrectly concluded that the irreparable harm, equitable, and public interest factors do not favor EPIC because the Commission is not an agency.

Because the Commission's collection of voter data involves both "agency action" under the APA and the "collection of information" by an "agency" under the E-Government Act, EPIC is likely to succeed on the merits of its statutory claims. The Defendants have made no attempt to comply with the Privacy Impact Assessment requirements of Section 208 of the E-Government Act, which are clearly applicable to the collection of sensitive, personal information from state voter databases. The Defendants' actions therefore violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

As the Department of Justice has explained, "Privacy Impact Assessments ("PIAs") are required by Section 208 of the E-Government Act for all Federal government agencies that develop or procure new information technology involving the collection, maintenance, or dissemination of information in identifiable form or that make substantial changes to existing information technology that manages information in identifiable form." Office of Privacy & Civil Liberties, U.S. Dep't of Justice, *E-Government Act of 2002* (June 18, 2014).[9] A Privacy Impact Assessment is "an analysis of how information is handled: (i) to ensure handling conforms to

---

[9] https://www.justice.gov/opcl/e-government-act-2002.

applicable legal, regulatory, and policy requirements regarding privacy, (ii) to determine the risks and effects of collecting, maintaining and disseminating information in identifiable form in an electronic information system, and (iii) to examine and evaluate protections and alternative processes for handling information to mitigate potential privacy risks." Joshua B. Bolten, Director, Office of Mgmt. & Budget, Executive Office of the President, M-03-22, Memorandum for Heads of Executive Departments and Agencies, Attachment A (Sept. 26, 2003) [hereinafter Bolten Memo], JA 149.

The E-Government Act requires that an agency "shall take actions described under subparagraph (B)" of Section 208 "before . . . initiating a new collection of information that—(I) will be collected, maintained, or disseminated using information technology; and (II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." E-Government Act § 208(b)(1)(A)(ii). The actions described in subparagraph (B), which the Commission must take *before* collecting this information, include "(i) conduct[ing] a privacy assessment; (ii) ensur[ing] the review of the privacy impact assessment by the Chief Information Officer, or equivalent official, as determined by the head of the agency; and (iii) if practicable,

21

after completion of the review under clause (ii), mak[ing] the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means." E-Government Act § 208(b)(1)(B).

The Commission has already "initiated a new collection" of personal information, but it has not complied with any of these requirements. The APA prohibits federal agencies from taking any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Commission's actions are "not in accordance with law." The APA authorizes this Court to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Such a claim may proceed "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wildlife Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). An agency's failure to comply with the PIA requirements of the E-Government Act is reviewable under both provisions of APA § 706. *Fanin v. Dep't of Veteran Affairs*, 572 F.3d 868, 875 (11th Cir. 2009).

The E-Government Act defines "information technology" as "any equipment or interconnected system . . . used in the automatic acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by the executive agency, if the equipment is used by the executive agency directly . . . ." 40 U.S.C. §

22

11101(6); *see* E-Government Act § 201 (applying definitions from 44 U.S.C. §§ 3502, 3601); 44 U.S.C. § 3502(9) (applying the definition of 40 U.S.C. § 11101(6)). Courts have found that a "minor change" to "a system or collection" that does not "create new privacy risks," such as the purchasing of a new external hard drive, would not require a PIA. *Perkins v. Dep't of Veteran Affairs*, No. 07-310, at *19 (N.D. Ala. Apr. 21, 2010) (quoting Bolten Memo § II.B.3.f). However, an agency is obligated to conduct a PIA before initiating a new collection of data that will be "collected, maintained, or disseminated using information technology" whenever that data "includes any information in identifiable form permitting the physical or online contacting of a specific individual" and so long as the questions have been posed to 10 or more persons. E-Government Act § 208(b)(1)(A)(ii). The term "identifiable form" means "any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means." E-Government Act § 208(d).

There is no question that the PIA requirement applies in this case. The Commission's decision to initiate collection of comprehensive voter data by requesting personal information from Secretaries of State of all fifty states and the District of Columbia, including sensitive, personal information about hundreds of millions of voters, triggers the obligations of the E-Government Act § 208(b)(1)(A)(ii). The letter sent by Commission Vice Chair Kobach requests that

the Secretary of State provide "voter roll data" including "the full first and last

names of all registrants, middle names or initials if available, addresses, dates of

birth, political party (if recorded in your state), last four digits of social security

number if available, voter history (elections voted in) from 2006 onward,

active/inactive status, cancelled status, information regarding any felony

convictions, information regarding voter registration in another state, information

regarding military status, and overseas information." Commission Letter 1–2, JA

221–222. The states are instructed to submit their "responses *electronically* to

ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange

("SAFE")," a government website used to transfer files. *Id.* (emphasis added).[10]

This sensitive voter roll data is precisely the type of "personal information" in

"identifiable form" that the PIA provision was intended to protect, and the transfer

of large data files via email or otherwise clearly involves the use of information

technology.

    As the court explained in *Perkins*, PIAs are necessary to address "(1) what

information is collected and why, (2) the agency's intended use of the information,

(3) with whom the information would be shared, (4) what opportunities the

[individuals] would have to decline to provide information or to decline to share the

---

[10] The government file exchange website is not actually "safe." In fact, any user
who follows the link provided in the Commission Letter will see a warning that the
site is insecure. *See* JA 223.

information, (5) how the information would be secured, and (6) whether a system of records is being created." *Perkins v. Dep't of Veteran Affairs*, No. 07-310, at *19 (N.D. Ala. Apr. 21, 2010); *see* E-Government Act § 208(b)(2)(B); Bolten Memo § II.C.1.a. These types of inquiries are "certainly appropriate and required" when an agency "initially created" a new database system and "began collecting data." *Perkins*, No. 07-310, at *19–20.

## II.    The lower court erred in concluding that the Commission's collection of voter data is not reviewable under the APA.

The lower court erred in finding that the Commission, the Executive Office of the President ("EOP"), and the D-WHIT are exempt from APA judicial review because they do not qualify as "agencies" under 5 U.S.C. § 701(b)(1). To the contrary: all three entities fit squarely within the APA's broad definition of an "agency"—a definition which has not been narrowed by the FOIA-specific "substantial independent authority" test of *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971). But even under the *Soucie* test, the Commission and other subcomponents of the EOP are agencies because they exercise substantial independent authority. Moreover, the Executive Order assigns to the GSA a mandatory duty to provide "facilities," "equipment," and "other support services" as "may be necessary to carry out [the Commission's] mission." Order § 7(a), JA 56. It is thus the GSA—indisputably an agency subject to APA judicial review— that is obligated to host any voter data the Commission may collect.

**A.      The Defendants are "agencies" as defined in the APA's judicial review chapter, which does not incorporate the "substantial independent authority" test established in *Soucie*.**

The Executive Office of the President and its constituent offices are "agenc[ies]" within the meaning of the Administrative Procedure Act's judicial review provisions, 5 U.S.C. §§ 701 *et seq*. The lower court, in reaching the opposite conclusion, erroneously assumed that cases interpreting the term "agency" under 5 U.S.C. §§ 552(f) and 551(1) control the meaning of that term under 5 U.S.C. § 701(b)(1). Not so: the precedents of this Court and the legislative history of the APA plainly demonstrate that "agency" carries distinct meanings in these two separate chapters.

In the APA Judicial Review chapter, 5 U.S.C. §§ 701 *et seq.*, "each authority of the Government of the United States" is an agency "whether or not it is within or subject to review by another agency[.]" 5 U.S.C. § 701(b)(1). The broad scope of the term "agency" in §706(b)(1) is confirmed by the legislative history of the statute, "which indicates that Congress wanted to avoid a formalistic definition of 'agency' that might exclude any authority within the executive branch that should appropriately be subject to the requirements of the APA." *Armstrong v. Bush* (*Armstrong I*), 924 F.2d 282, 291 (D.C. Cir. 1991). The APA empowers a court to review the actions of a government authority unless there is a "showing of clear and convincing evidence of a legislative intent to restrict access to judicial review."

26

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quotation marks omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). And the APA's legislative history reveals no intent to shield the actions of the EOP and its subcomponents from APA judicial review—quite the opposite.

As Congress explained when it first enacted the APA, the term "agency" is "defined substantially" as it was in the Federal Reports Act of 1942, Pub. L. No. 77-831, § 7(a), 56 Stat. 1078, 1079–80 (1942) (current version at 44 U.S.C. § 3502), and the Federal Register Act, Pub. L. No. 74-220, § 4, 49 Stat. 500, 501 (1935) (current version at 44 U.S.C. § 1501). Administrative Procedure Act, Legislative History, S. Doc. No. 248, at 12–13 (1946); *see also Washington Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994). The Federal Reports Act defined "agency" in exceptionally broad terms: "any executive department, *commission*, independent establishment, corporation owned or controlled by the United States, board, bureau, division, service, *office*, authority, or administration in the executive branch of the Government . . . ." § 7(a), 56 Stat. at 1079–80 (emphases added). The Federal Register Act's definition of "agency" even encompassed "the President of the United States," as well as "any executive department, independent board, establishment, bureau, agency, institution, *commission*, or *separate office* of the administrative branch of the Government of the United States[.]" § 4, 49 Stat. at 501 (emphases added).

Congress subsequently split the APA into separate subchapters with separate definitions for the "Administrative Procedure" provisions in 5 U.S.C. § 551 *et seq.* and the "Judicial Review" provisions in 5 U.S.C. § 701 *et seq*. Government Organization and Employees, Pub. L. 89-554, 80 Stat. 387 (1966). Congress further modified the definition of "agency" under the Freedom of Information Act, Pub. L. 93-502, 88 Stat. 1561 (1974), incorporating the *Soucie* test into that modified definition. *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (noting that even though the FOIA's definition explicitly includes the Executive Office of the President, the Conference Report "indicates that 'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President' are not included within the term 'agency' under the FOIA"). But the definition of "agency" in the APA's judicial review sections has retained its broad scope, and this Circuit has never applied the *Soucie* test to those sections.

In *Soucie*, this Court held that a subcomponent of the EOP, the Office of Science and Technology ("OST"), was an agency subject to the FOIA because it possessed "substantial independent authority in the exercise of specific functions."[11]

---

[11] In the early years of the FOIA, the statute was sometimes characterized as a subpart of the APA. *E.g., Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 678 n.16 (D.C. Cir. 1976) (citing Statement by the President Upon Signing Bill

*Soucie*, 448 F.2d at 1073, 1075. Wary of potential conflicts between the FOIA's

presumption of openness and the President's power to assert executive privilege,

the Court added a narrow caveat in dicta: "If the OST's sole function were to advise

and assist the President, that might be taken as an indication that the OST is part of

the President's staff and not a separate agency." *Id.* at 1071 n.9, 1075 (emphasis

added).

Yet the *Soucie* test, which was adopted in a case concerning the APA records

provision and subsequently incorporated into the FOIA definition, has no bearing

on the availability of judicial review under APA §§ 702, 704, and 706. As this

Court's precedents illustrate, a subcomponent of the Executive Office of the

President may be sued under the APA even if it does not have "substantial

independent authority" under the *Soucie* test. *Compare Armstrong I*, 924 F.2d at

297 ("[W]e affirm the district court's decision that the APA authorizes judicial

review of plaintiffs' claim that the [National Security Council] ("NSC")

recordkeeping guidelines and directives are arbitrary and capricious."), *with*

*Armstrong v. Exec. Office of the President* (*Armstrong III*), 90 F.3d 553, 557–66

(D.C. Cir. 1996) (holding that the NSC is not an "agency" under the FOIA because

it fails the *Soucie* test). This Court's holdings in *Armstrong I* and *Armstrong III*

---

Revising Public Information Provisions of the Administrative Procedure Act,
Weekly Comp. Pres. Doc. 895 (July 4, 1966)).

would be logically impossible if—as the lower court assumed—the *Soucie* test limited APA judicial review of EOP subcomponents. It does not.

Following in *Armstrong I*'s footsteps, this Court has repeatedly declined to apply the *Soucie* test in APA suits against the EOP or to otherwise exempt EOP offices from judicial review. *See, e.g.*, *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 550 (D.C. Cir. 1993) (subjecting the U.S. Trade Representative ("USTR") to APA judicial review without invoking *Soucie* test); *Citizens for Responsibility & Ethics in Washington v. Exec. Office of President* (*CREW*), 587 F. Supp. 2d 48, 57–58, 63 (D.D.C. 2008) (subjecting the EOP to APA judicial review without invoking *Soucie* test); *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013, 1023 (D.D.C. 1989) (applying APA judicial review to the Office of Management and Budget ("OMB") without invoking *Soucie* test).

*Dong v. Smithsonian Institution*, a subsequent case in which this Court invoked the *Soucie* test, is not to the contrary. First, *Dong* concerned the definition of "agency" for the purposes of the Privacy Act, which happens to borrow its meaning from 5 U.S.C. § 552(f) and 5 U.S.C. § 551(1). *Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997). But this case—like *Armstrong I*—concerns the term "agency" as it is defined in 5 U.S.C. § 706(1), a separate provision found in the Judicial Review chapter of the APA. Second, the *Dong* Court invoked the *Soucie* test to determine whether the Smithsonian Institution exercised any

30

governmental authority *at all*, or whether it was instead analogous to a "private research university" or "private museum." *Id.* at 882. As the Court explained:

> In the most literal sense, of course, the Smithsonian's broad, Congressionally-granted latitude over spending its federally allocated funds and over its own personnel and collections indicates that it possesses "authority in law to make decisions." But every private organization possesses the power to order its own affairs and carry out transactions with others within the limits set by law. To the extent the Smithsonian exercises anything approaching public authority, that authority appears to be entirely ancillary to its cultural and educational mission. Authority must be governmental in nature to count for § 551(1) purposes.

*Id.* That is not the issue confronting the Court today. The EOP, the Commission, and the D-WHIT unquestionably exercise *governmental* authority—indeed, they carry out functions at the very "[epi]center of gravity in the exercise of administrative power." *Id.* at 881–82 (quoting *Lombardo*, 397 F. Supp. at 796). *Dong* is thus irrelevant to the rule set by *Armstrong I* and—like *Soucie*—inapposite to this case.

Moreover, application of the *Soucie* test to the APA judicial review provisions is inconsistent with the underlying purpose of the *Soucie* test. The *Soucie* Court was concerned with the EOP's nondisclosure of records under FOIA and the "[s]erious constitutional questions [that] would be presented by a claim of executive privilege as a defense to a suit under the Freedom of Information Act." *Soucie*, 448 F.2d at 1071. *Soucie* was thus about the public availability of EOP records and the President's qualified privilege to withhold them. By contrast, this case seeks APA

review of substantive EOP conduct that "affect[s] the rights and obligations of individuals," such as the mass collection of personal voter data. The two interests are distinct. *See Dong*, 125 F.3d at 881.

Congress sharpened this distinction when it passed the 1974 FOIA amendments, formally separating the FOIA's definition of "agency" from that of the APA. *Compare* 5 U.S.C. § 701(b)(1), *and* 5 U.S.C. § 551(1), *with* 5 U.S.C. § 552(f)(1). Though Congress sharpened the textual definition of "agency" under the FOIA in several ways—e.g., making it explicit that the "Executive Office of the President" is subject to the statute—Congress also adopted the *Soucie* court's narrowing construction:

> With respect to the meaning of the term "Executive Office of the President" the conferees intend the result reached in *Soucie v. David* . . . . The term is not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.

H.R. Rep. No. 93-1380, at 232 (1974) (Conf. Rep.); *see also Kissinger*, 445 U.S. at 156 (interpreting the House report to mean that the words "Executive Office" in the FOIA did "not include the Office of the President"). The FOIA amendments were entirely unrelated to the APA's judicial review provision definitions, and the definition of "agency" in § 701 remains as it was before *Soucie* was decided.

Thus, applying the APA's expansive definition of "agency": the EOP is emphatically an "authority of the government" for "getting the business of

32

government done." 5 U.S.C. § 701(b)(1); *Meyer v. Bush*, 981 F.2d 1288, 1304 (D.C. Cir. 1993); *see Executive Office of the President*, The White House (2017)[12] ("The EOP has responsibility for tasks ranging from communicating the President's message to the American people to promoting our trade interests abroad."). The EOP consists of at least a dozen major subcomponents that oversee and carry out vital government functions, including the NSC (charged with "integrating all aspects of national security policy as it affects the United States"); the Office of Management and Budget (charged with "supervis[ing] and control[ling] the administration of the budget"); and the Office of the United States Trade Representative (an office headed by a "Cabinet-level official" who "acts as the chief representative of the United States in all General Agreement on Tariffs and Trade activities"). *The Executive Office of the President*, The United States Government Manual.[13] The EOP is unquestionably a "center of gravity in the exercise of administrative power," and thus an "agency" under the APA. *See Dong v*, 125 F.3d at 881–82; *cf. Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 9 (D.D.C. 1997), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999) ("The EOP's status as an agency is also evidenced by the authority it possesses to impose requirements on all of the EOP components in certain matters.").

---

[12] https://www.whitehouse.gov/administration/eop.
[13] https://www.usgovernmentmanual.gov/Agency.aspx?EntityId=p0fnvDxExm Y=&ParentEId=+klubNxgV0o=&EType=jY3M4CTKVHY=.

33

The EOP subcomponents named in EPIC's suit are likewise "agenc[ies]" under the APA. The Commission, which includes both the Vice President and a principal member of the Election Assistance Commission, is authorized to "study[] registration and voting processes" and to identify "which laws, rules, policies, activities, strategies, and practices that enhance or undermine Americans' confidence in the integrity of the federal election process." First Kobach Declaration ¶¶ 1, 3, JA 50–51; Second Kobach Declaration, JA 63. In practice, the Commission has gone well beyond its mandate to engage in substantive conduct that "affect[s] the rights" of individuals. *Dong*, 125 F.3d at 881 (quoting James O. Freedman, *Administrative Procedure and the Control of Foreign Direct Investment*, 119 U. Pa. L. Rev. 1, 9 (1970)).

In June 2017, the Presidential Advisory Commission on Election Integrity undertook to assemble a database of personal voter information that directly implicates the privacy rights of least 157 million registered voters across fifty states and the District of Columbia. Kobach Decl. ¶ 4, JA 51; U.S. Census Bureau, Voting and Registration in the Election of November 2016 at tbl. 4a (May 2017).[14] This sweeping depository of personal data would put the Internal Revenue Service—with its yearly haul of just 149 million individual returns—to shame. Internal

---

[14] https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

Revenue Service, *SOI Tax Stats - Tax Stats at a Glance* (2016).[15] "[A]ny authority within the executive branch" engaged in such far-reaching conduct is "appropriately subject to the requirements of the APA." *Armstrong*, 924 F.2d at 291; *cf. Meyer*, 981 F.2d at 1298 (Wald, J., dissenting) ("Congress contemplated that 'agency' would encompass entities, like the Task Force, which are created solely by executive order.").

Defendant Charles C. Herndon, Director of White House Information Technology ("D-WHIT"), also oversees an "authority of the Government" that is a "center of gravity in the exercise of administrative power."[16] Def. Resp. to Pl. Mot. to Amend, ECF No. 32. The D-WHIT and his staff enjoy "primary authority to establish and coordinate the necessary policies and procedures for operating and maintaining the information resources and information systems provided to the President, Vice President, and EOP." Memorandum on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology § 1, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015), JA 215. This authority includes:

---

[15] https://www.irs.gov/uac/soi-tax-stats-tax-stats-at-a-glance.

[16] The White House Office ("WHO"), of which the Director is a part, also qualifies as an agency. The WHO is charged with the authority to "facilitate[] and maintain[] communication with the Congress, the heads of executive agencies, the press and other information media, and the general public." *The Executive Office of the President*, *supra*.

> [providing] policy coordination and guidance for, and periodically review[ing], all activities relating to the information resources and information systems provided to the President, Vice President, and EOP by the Community, including expenditures for, and procurement of, information resources and information systems by the Community. Such activities shall be subject to the Director's coordination, guidance, and review in order to ensure consistency with the Director's strategy and to strengthen the quality of the Community's decisions through integrated analysis, planning, budgeting, and evaluating process.

*Id.* § 2(c), JA 216. The D-WHIT may also "advise and confer with appropriate executive departments and agencies, individuals, and other entities as necessary to perform the Director's duties . . . ." *Id.* § 2(d), JA 216. These grants of authority and responsibility are quintessential features of an APA agency.

Indeed, the actions of the EOP and its component offices have long been subject to APA review. *Pub. Citizen*, 5 F.3d at 551 ("Public Citizen must rest its claim for judicial review [of USTR's] action] on the Administrative Procedure Act."); *Armstrong*, 924 F.2d at 291 ("[W]e find that there is APA review of the NSC's recordkeeping guidelines and instructions . . . ."); *Armstrong v. Exec. Office of the President*, 810 F. Supp. 335, 338 (D.D.C. 1993) (citing *Armstrong*, 924 F.2d at 291–293) ("The Court of Appeals . . . approved of this Court's holding that the APA provides for limited review of the adequacy of the NSC's and EOP's recordkeeping guidelines and instructions pursuant to the FRA."); *CREW*, 587 F. Supp. 2d at 57–58, 63 (holding that the EOP was properly named as a defendant in an APA and Federal Records Act suit); *Pub. Citizen Health Research Grp.*, 724 F.

36

Supp. at 1023 (reviewing OMB inaction under the APA). Indeed, the only part of

the EOP that courts have categorically excluded from APA review is the President

himself—an official who is not named in this suit. *Franklin v. Massachusetts*, 505

U.S. 788, 800–01 (1992).

Notably, even if the Defendant subcomponents of EOP did not qualify as

agencies themselves, the EOP would be answerable for their actions under the APA

because it is a parent agency. *N. Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C.

Cir. 1980) (ascribing actions by National Oceanic and Atmospheric Administration

to parent agency Secretary of the Interior in an APA case); *Nat'l Wildlife Fed'n v.

Burford*, 835 F.2d 305, 308 (D.C. Cir. 1987) (ascribing actions by Bureau of Land

Management to parent agency Department of the Interior in an APA case); *Beverly

Health & Rehab. Servs., Inc. v. Thompson*, 223 F. Supp. 2d 73, 75 (D.D.C. 2002);

(ascribing actions by Health Care Financing Administration to parent agency

Department of Health and Human Services in an APA case); *Indian River Cty. v.

Rogoff*, 201 F. Supp. 3d 1, 19 (D.D.C. 2016) (ascribing actions by Federal Railroad

Administration to parent agency Department of Transportation in an APA case).

And even if the Commission were solely an advisory committee—which, to

be clear, it is not—the EOP would remain a parent agency for the purposes of both

the APA and the FACA. *See* TRO Hr'g Tr. 29:14–17, JA 94 (statement of Elizabeth

J. Shapiro that Commission is located in "the Office of the Vice President, since the

37

vice president is chair of the Committee"); *Executive Office of the President*, *supra* (identifying the Office of the Vice President as a subcomponent of the EOP). The EOP would thus be subject to APA review for the Commission's unlawful nondisclosure of records under FACA. *Ctr. for Biological Diversity v. Tidwell*, No. CV 15-2176, 2017 WL 943902, at *9 (D.D.C. Mar. 9, 2017) ("[T]he Court finds that Plaintiff has pleaded a viable claim under the APA for a violation of section 10(b), as the Complaint plausibly alleges that the [committee] was a FACA advisory committee, and that the [parent agency] failed to disclose the materials required by section 10(b).").

If Congress intended for the APA and FOIA definitions of "agency" to be coextensive, it has had ample opportunity to amend the APA since the 1974 FOIA amendments were enacted. It has not done so. There is no basis in statute, legislative history, or case law to apply the *Soucie* test to the APA's definition of "agency," and there are no grounds to insulate the actions of the EOP, the Commission, or the D-WHIT from judicial review. The Supreme Court has previously rejected interpretations that have "no basis in the text, context, or purpose," of the statute. *Milner v. Dep't of Navy*, 562 U.S. 562, 580 (2011) (overturning the "High 2" interpretation of FOIA Exemption 2 adopted in *Crooker v. ATF*, 670 F.2d 1051 (D.C. Cir. 1981)). This Court should as well.

**B.      The Defendant EOP and its subcomponents are also agencies under the *Soucie* test.**

The EOP, the Commission, and the D-WHIT do far more than just "advise and assist the President." *Soucie*, 448 F.2d at 1075. Thus even if the *Soucie* test controls the meaning of "agency" in the APA's judicial review provisions, these entities would still fit within the statutory definition. Under the *Soucie* test, "the APA inquiry into agency status is . . . focused on the functions of the entity, and flexible enough to encompass the 'myriad organizational arrangements for getting the business of government done. . . ." *Meyer*, 981 F.2d at 1304 (quoting *Washington Research Proj., Inc. v. HEW,* 504 F.2d 238, 246 (D.C. Cir. 1974)). "The important consideration is whether [an entity] has any authority in law to make decisions," *Washington Research Project, Inc. v. HEW*, 504 F.2d at 248, and whether the entity is a "center of gravity in the exercise of administrative power." *Dong*, 125 F.3d at 881–82 (quoting *Lombardo v. Handler*, 397 F. Supp. 792, 796 (D.D.C. 1975)).

The EOP, as noted, carries out a wide array of functions that extend well beyond the immediate needs of the President. *See supra* Part II.A. The EOP consists of numerous subcomponents that oversee and carry out vital government functions, many of which—including the NSC, the OMB, and the USTR—have been deemed agencies under the APA in their own right. *See id*. Moreover, the EOP is *expressly named* as an agency by the FOIA definition from which the *Soucie* test arises. 5

39

U.S.C. § 552(f). It cannot be seriously contended that the EOP eludes the APA's definition of "agency."

The same is true of the Director's office. As noted, the Director and his staff enjoy "*primary authority* to establish and coordinate the necessary policies and procedures for operating and maintaining the information resources and information systems provided to the President, Vice President, *and EOP*." Memorandum on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology § 1, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015) (emphases added), JA 215. An entity that has primary authority to set policy and procedures for an *agency* is doing far more than just assisting the President. The Director's authority even extends beyond the EOP. The Director is required to "provide policy coordination and guidance for, and periodically review, all activities relating to the information resources and information systems provided to" both the EOP and the Presidential Information Technology Community ("the Community"), including "expenditures for, and procurement of, information resources and information systems by the Community." *Id.* § 2(c). The Community, in turn, consists of multiple high-level officials: "the Assistant to the President for Management and Administration; the Executive Secretary of the National Security Council; the Director of the Office of Administration; the Director of the United States Secret Service; and the Director of

40

the White House Military Office." *Id.* Notably, the Director of the Secret Service is

a Department of Homeland Security official. *Overview*, United States Secret

Service.[17] Given the broad, interagency reach of the Director's oversight authority,

the "sole function" exception is likewise inapplicable to his office.

Finally, the Commission's functions also extend well beyond "advis[ing] and

assist[ing]" the President. Here, as in *Energy Research Foundation v. Defense

Nuclear Facilities Safety Board*, the Commission satisfies the definition of

"agency" because it (1) investigates, (2) evaluates, and (3) makes recommendations.

917 F.2d 581, 585 (D.C. Cir. 1990) (citing *Soucie*, 448 F.2d at 1075) ("The Board

of course performs precisely these functions. It investigates, evaluates and

recommends[.]"); *see* Kobach Decl. ¶¶ 1, 3 (Commission is charged with "studying

registration and voting processes"), JA 50–51; Kobach Decl. ¶ 1, JA 50

(Commission's report is to identify "which laws, rules, policies, activities,

strategies, and practices that enhance or undermine Americans' confidence in the

integrity of the federal election process"). Of course, the Commission does a great

deal more than that. It has announced plans to collect, store, and publish the

personal data of every registered voter in the country, thereby implicating every

voter's individual privacy rights. Kobach Decl. ¶ 4, JA 51. The Commission cannot

credibly characterize this behavior as incidental to its advisory role: it is acting with

---

[17] https://www.secretservice.gov/about/overview/ (last visited June 13, 2017).

the force and effect of an agency. "The record evidence regarding [the Commission]'s actual functions" proves it to be so. *Citizens for Responsibility & Ethics in Washington (CREW) v. Office of Admin.*, 559 F. Supp. 2d 9, 26 (D.D.C. 2008), *aff'd*, 566 F.3d 219.

Thus the *Soucie* test, even if applicable to the APA, poses no bar to judicial review of Defendants' actions.

### C.    The Defendant GSA, which is an agency, has a mandatory, nondiscretionary duty to participate in the Commission's collection activities.

None of the above analysis would be necessary if the General Services Administration ("GSA") had provided the equipment and facilities for the Commission's proposed data collection as required under both the Executive Order and the Commission's Charter. The court has jurisdiction under 5 U.S.C. § 706(1) to compel GSA to conduct and publish a PIA because the agency has a "mandatory, nondiscretionary duty" to take part in the Commission's proposed collection, which triggers the requirements of Section 208 of the E-Government Act. *See Hamandi v. Chertoff*, 550 F. Supp. 2d 46 (D.D.C. May 6, 2008) (compelling adjudication where USCIS had a "mandatory, nondiscretionary duty" to act). The Charter states that the GSA is the "Agency Responsible for Providing Support" to the Commission. Charter ¶ 6, JA 58. This is consistent with the Executive Order, which assigns to the GSA—and no other entity—responsibility for providing "facilities," "equipment,"

42

and "other support services" as "may be necessary to carry out [the Commission's] mission." Order § 7(a), JA 56. As the "Agency Responsible for Providing Support" to the Commission, it is the GSA, not the White House, that should be facilitating collection and storage of any data that the Commission obtains.

The APA authorizes this Court to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Such a claim may proceed "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wildlife Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). The GSA is obligated to comply with the Executive Order. *See Legal Aid Soc. of Alameda County v. Brennan*, 608 F.2d 1319 (9th Cir. 1979) (agency's noncompliance with an executive order is subject to judicial review under the APA). Under the Executive Order, the GSA is required to facilitate the collection of data for the Commission. As the GSA is undeniably an agency, it must conduct a PIA before initiating the collection. *AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233 (D.C. Cir. 1987) (applying both the APA and the FOIA to the GSA); E-Government Act § 208. An agency's failure to comply with the PIA requirements of the E-Government Act is reviewable under both provisions of APA § 706. *Fanin v. Dep't of Veteran Affairs*, 572 F.3d 868, 875 (11th Cir. 2009).

43

**III.    The lower court erred in concluding that the irreparable harm, equitable and public interest factors do not favor EPIC.**

The lower court's conclusion that the remaining preliminary injunction factors—irreparable harm, balance of the equities, and public interest—did not favor EPIC was based on the same incorrect conclusion as the likelihood of success on the merits analysis. Because the Commission's collection of personal voter data clearly involves "agency action" reviewable under the APA and the "collection of information" by an "agency" under Section 208 of the E-Government Act, the other injunction factors favor EPIC. First, EPIC will suffer irreparable harm as a result of the Commission's refusal to conduct and disclose a Privacy Impact Assessment prior to the collection of personal voter data. Second, the equities do not favor the Commission's unlawful refusal to comply with the E-Government Act. And third, there is a strong public interest both in the Commission's compliance with the PIA requirement and in the disclosure of information about how the Commission intends to collect and handle sensitive personal information in the state voter records.

The lower court recognized that "the non-disclosure of information to which a plaintiff is entitled, under certain circumstances itself constitutes an irreparable harm; specifically where the information is highly relevant to an ongoing and highly public matter." Mem. Op. 34, JA 47. The likelihood of irreparable harm based on an agency's refusal to produce relevant records in a timely fashion has been repeatedly recognized by courts in this Circuit. *See, e.g.*, *EPIC v. DOJ*, 416 F.

44

Supp. 2d 30, 41 (D.D.C. 2006); *Washington Post v. DHS*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006). This Circuit has also found that even with the possibility of future disclosure, the present harm from non-disclosure can be "irreparable." *See Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999). In cases such as this, "stale information is of little value." *Payne Enters, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).

The lower court only concluded that EPIC would not suffer an irreparable injury because the court found that the Commission was not an agency—and thus, that EPIC was "not presently entitled to the information that it [sought]." Mem. Op. 33–34, JA 46–47. But this conclusion was in error as explained in Part II, *supra*. Under the lower court's logic, the second injunction factor favors EPIC because the Commission is in fact obligated to disclose a Privacy Impact Assessment prior to the collection of personal voter data.

The lower court also erred when it held that the "equitable and public interest factors are in equipoise." Mem. Op. 35, JA 48. The only "factor" that the court identified as "balancing" in favor of the Commission was "the interest of advisory committees to engage in their work." Mem. Op. 35, JA 48. But even the lower court recognized that "the disclosure of a Privacy Impact Assessment may very well be in the equitable and public interest." Mem. Op. 35, JA 48.

45

The Commission's interest in engaging in "work" cannot justify unlawful agency action or the refusal to provide EPIC and the public with information to which they are entitled. Where a plaintiff has a substantial likelihood of success, that is a "strong indicator that a preliminary injunction would serve the public interest. There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Indeed, there is a "substantial public interest 'in having government agencies abide by the federal laws that govern their existence and operations.'" *Id*. (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

The entire purpose of the E-Government Act is to protect the public interest by requiring agencies to be transparent and accountable in their handling of digital records and personal information. E-Government Act § 2(b)(9) (stating that one of the purposes of the Act is "[t]o make the Federal Government more transparent and accountable."). That is precisely what EPIC seeks to do in this case. The Court should accordingly grant EPIC's motion for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the lower court and grant Appellant's motion for a preliminary injunction.

Respectfully Submitted,

/s/ Marc Rotenberg

MARC ROTENBERG
ALAN BUTLER
CAITRIONA FITZGERALD
JERAMIE SCOTT
JOHN DAVISSON
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff-Appellant*

Dated: August 18, 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). The brief is composed in a 14-point proportional typeface, Times New Roman, and complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e), because it contains 10,881 words, excluding parts of the brief exempted under Fed. R. App. P. 32(a)(7)(B)(iii).

   /s/ Marc Rotenberg
MARC ROTENBERG

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

**Statutes:**

5 U.S.C. § 551 ...........................................................................ADD 1
5 U.S.C. § 552 ...........................................................................ADD 1
5 U.S.C. § 701 ...........................................................................ADD 2
5 U.S.C. § 702 ...........................................................................ADD 3
5 U.S.C. § 704 ...........................................................................ADD 4
5 U.S.C. § 706 ...........................................................................ADD 4
40 U.S.C. § 11101 .....................................................................ADD 5
44 U.S.C. § 3502 .......................................................................ADD 6
Administrative Procedure Act,
    Pub. L. No. 79-404  ............................................................ADD 7
E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 .................................ADD 8
Federal Advisory Committee Act,
    5 U.S.C. app. 2....................................................................ADD 15
Federal Register Act,
    Pub. L. No. 74-220, 49 Stat. 500 (1935) ...........................ADD 24
Federal Reports Act of 1942,
    Pub. L. No. 77-831, 56 Stat. 1078 (1942) .........................ADD 26
Freedom of Information Act,
    Pub. L. 93-502, 88 Stat. 1561 (1974) ................................ADD 28
Government Organization and Employees,
    Pub. L. 89-554, 80 Stat. 387 (1966) ..................................ADD 30

**Other Materials Included for the Convenience of the Court:**

By-Laws and Operating Procedures, Presidential Advisory
    Commission on Election Integrity (July 18, 2017) ....................................ADD 34
Letter from Kris Kobach, Vice Chair, Presidential Advisory Commission on
    Election Integrity, to Alex Padilla, Secretary of State,
    California (July 26, 2017)........................................................ADD 38

## 5 U.S.C. § 551 – Definitions

For the purpose of this subchapter-

(1)    "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include-

   (A)    the Congress;

   (B)    the courts of the United States;

   (C)    the governments of the territories or possessions of the United States;

   (D) the government of the District of Columbia;

 or except as to the requirements of section 552 of this title-

   (E)    agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

   (F)    courts martial and military commissions;

   (G)    military authority exercised in the field in time of war or in occupied territory; or

   (H)    functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

## 5 U.S.C. § 552 – Public information; agency rules, opinions, orders, records, and proceedings

\* \* \*

(f)    For purposes of this section, the term-

ADD 000001

(1)    "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2)    "record" and any other term used in this section in reference to information includes-

    (A)    any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

    (B)    any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

## 5 U.S.C. § 701 – Application; definitions

* * *

(b)    For the purpose of this chapter-

(1)    "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include-

    (A)    the Congress;

    (B)    the courts of the United States;

    (C)    the governments of the territories or possessions of the United States;

    (D)    the government of the District of Columbia;

(E)    agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F)    courts martial and military commissions;

(G)    military authority exercised in the field in time of war or in occupied territory; or

(H)    functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

## 5 U.S.C. § 702 – Right of Review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief

if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## 5 U.S.C. § 704 – Actions Reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## 5 U.S.C. § 706 – Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be-

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    contrary to constitutional right, power, privilege, or
       immunity;

(C)    in excess of statutory jurisdiction, authority, or
       limitations, or short of statutory right;

(D)    without observance of procedure required by law;

(E)    unsupported by substantial evidence in a case subject
       to sections 556 and 557 of this title or otherwise
       reviewed on the record of an agency hearing provided by
       statute; or

(F)    unwarranted by the facts to the extent that the facts are
       subject to trial de novo by the reviewing court.

### 40 U.S.C. § 11101 – Definitions

In this subtitle, the following definitions apply:

* * *

(6)    Information technology.-The term "information technology"-

(A)    with respect to an executive agency means any equipment or
       interconnected system or subsystem of equipment, used in the
       automatic acquisition, storage, analysis, evaluation,
       manipulation, management, movement, control, display,
       switching, interchange, transmission, or reception of data or
       information by the executive agency, if the equipment is used
       by the executive agency directly or is used by a contractor
       under a contract with the executive agency that requires the use-

       (i)    of that equipment; or

       (ii)   of that equipment to a significant extent in the
              performance of a service or the furnishing of a product;

ADD 000005

(B)    includes computers, ancillary equipment (including imaging peripherals, input, output, and storage devices necessary for security and surveillance), peripheral equipment designed to be controlled by the central processing unit of a computer, software, firmware and similar procedures, services (including support services), and related resources; but

(C)    does not include any equipment acquired by a federal contractor incidental to a federal contract.

### 44 U.S.C. § 3502 – Definitions

As used in this subchapter-

* * *

(9)    the term "information technology" has the meaning given that term in section 11101 of title 40 but does not include national security systems as defined in section 11103 of title 40;

# ADMINISTRATIVE PROCEDURE ACT

[Public Law 404—79th Congress]

[Chapter 324—2d Session]

[S. 7]

AN ACT To improve the administration of justice by prescribing fair administrative procedure

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## TITLE

Section 1. This Act may be cited as the "Administrative Procedure Act".

### Definitions

Sec. 2. As used in this Act—

(a) Agency.—"Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. Nothing in this Act shall be construed to repeal delegations of authority as provided by law. Except as to the requirements of section 3, there shall be excluded from the operation of this Act (1) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them, (2) courts martial and military commissions, (3) military or naval authority exercised in the field in time of war or in occupied territory, or (4) functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947, and the functions conferred by the following statutes: Selective Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus Property Act of 1944.

(b) Person and party.—"Person" includes individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies. "Party" includes any person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any agency proceeding; but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes.

(c) Rule and rule making.—"Rule" means the whole or any part of any agency statement of general or particular applicability

**1**

PUBLIC LAW 107–347—DEC. 17 2002          116 STAT. 2899

Public Law 107–347
107th Congress

## An Act

To enhance the management and promotion of electronic Government services and processes by establishing a Federal Chief Information Officer within the Office of Management and Budget, and by establishing a broad framework of measures that require using Internet-based information technology to enhance citizen access to Government information and services, and for other purposes.

Dec. 17, 2002
[H.R. 2458]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

E-Government Act of 2002.

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "E-Government Act of 2002".

44 USC 101 note.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Findings and purposes.

TITLE I—OFFICE OF MANAGEMENT AND BUDGET ELECTRONIC GOVERNMENT SERVICES

Sec. 101. Management and promotion of electronic government services.
Sec. 102. Conforming amendments.

TITLE II—FEDERAL MANAGEMENT AND PROMOTION OF ELECTRONIC GOVERNMENT SERVICES

Sec. 201. Definitions.
Sec. 202. Federal agency responsibilities.
Sec. 203. Compatibility of executive agency methods for use and acceptance of electronic signatures.
Sec. 204. Federal Internet portal.
Sec. 205. Federal courts.
Sec. 206. Regulatory agencies.
Sec. 207. Accessibility, usability, and preservation of government information.
Sec. 208. Privacy provisions.
Sec. 209. Federal information technology workforce development.
Sec. 210. Share-in-savings initiatives.
Sec. 211. Authorization for acquisition of information technology by State and local governments through Federal supply schedules.
Sec. 212. Integrated reporting study and pilot projects.
Sec. 213. Community technology centers.
Sec. 214. Enhancing crisis management through advanced information technology.
Sec. 215. Disparities in access to the Internet.
Sec. 216. Common protocols for geographic information systems.

TITLE III—INFORMATION SECURITY

Sec. 301. Information security.
Sec. 302. Management of information technology.
Sec. 303. National Institute of Standards and Technology.
Sec. 304. Information Security and Privacy Advisory Board.
Sec. 305. Technical and conforming amendments.

TITLE IV—AUTHORIZATION OF APPROPRIATIONS AND EFFECTIVE DATES

Sec. 401. Authorization of appropriations.

USCA Case #17-5171    Document #1689465    Filed: 08/18/2017    Page 70 of 101

Sec. 402. Effective dates.

TITLE V—CONFIDENTIAL INFORMATION PROTECTION AND STATISTICAL
EFFICIENCY

Sec. 501. Short title.
Sec. 502. Definitions.
Sec. 503. Coordination and oversight of policies.
Sec. 504. Effect on other laws.

Subtitle A—Confidential Information Protection

Sec. 511. Findings and purposes.
Sec. 512. Limitations on use and disclosure of data and information.
Sec. 513. Fines and penalties.

Subtitle B—Statistical Efficiency

Sec. 521. Findings and purposes.
Sec. 522. Designation of statistical agencies.
Sec. 523. Responsibilities of designated statistical agencies.
Sec. 524. Sharing of business data among designated statistical agencies.
Sec. 525. Limitations on use of business data provided by designated statistical agencies.
Sec. 526. Conforming amendments.

44 USC 3601 note.

## SEC. 2. FINDINGS AND PURPOSES.

(a) FINDINGS.—Congress finds the following:

(1) The use of computers and the Internet is rapidly transforming societal interactions and the relationships among citizens, private businesses, and the Government.

(2) The Federal Government has had uneven success in applying advances in information technology to enhance governmental functions and services, achieve more efficient performance, increase access to Government information, and increase citizen participation in Government.

(3) Most Internet-based services of the Federal Government are developed and presented separately, according to the jurisdictional boundaries of an individual department or agency, rather than being integrated cooperatively according to function or topic.

(4) Internet-based Government services involving interagency cooperation are especially difficult to develop and promote, in part because of a lack of sufficient funding mechanisms to support such interagency cooperation.

(5) Electronic Government has its impact through improved Government performance and outcomes within and across agencies.

(6) Electronic Government is a critical element in the management of Government, to be implemented as part of a management framework that also addresses finance, procurement, human capital, and other challenges to improve the performance of Government.

(7) To take full advantage of the improved Government performance that can be achieved through the use of Internet-based technology requires strong leadership, better organization, improved interagency collaboration, and more focused oversight of agency compliance with statutes related to information resource management.

(b) PURPOSES.—The purposes of this Act are the following:

(1) To provide effective leadership of Federal Government efforts to develop and promote electronic Government services and processes by establishing an Administrator of a new Office of Electronic Government within the Office of Management and Budget.

PUBLIC LAW 107–347—DEC. 17 2002          116 STAT. 2901

(2) To promote use of the Internet and other information technologies to provide increased opportunities for citizen participation in Government.

(3) To promote interagency collaboration in providing electronic Government services, where this collaboration would improve the service to citizens by integrating related functions, and in the use of internal electronic Government processes, where this collaboration would improve the efficiency and effectiveness of the processes.

(4) To improve the ability of the Government to achieve agency missions and program performance goals.

(5) To promote the use of the Internet and emerging technologies within and across Government agencies to provide citizen-centric Government information and services.

(6) To reduce costs and burdens for businesses and other Government entities.

(7) To promote better informed decisionmaking by policy makers.

(8) To promote access to high quality Government information and services across multiple channels.

(9) To make the Federal Government more transparent and accountable.

(10) To transform agency operations by utilizing, where appropriate, best practices from public and private sector organizations.

(11) To provide enhanced access to Government information and services in a manner consistent with laws regarding protection of personal privacy, national security, records retention, access for persons with disabilities, and other relevant laws.

# TITLE I—OFFICE OF MANAGEMENT AND BUDGET ELECTRONIC GOVERNMENT SERVICES

### SEC. 101. MANAGEMENT AND PROMOTION OF ELECTRONIC GOVERNMENT SERVICES.

(a) IN GENERAL.—Title 44, United States Code, is amended by inserting after chapter 35 the following:

### "CHAPTER 36—MANAGEMENT AND PROMOTION OF ELECTRONIC GOVERNMENT SERVICES

"Sec.
"3601. Definitions.
"3602. Office of Electronic Government.
"3603. Chief Information Officers Council.
"3604. E-Government Fund.
"3605. Program to encourage innovative solutions to enhance electronic Government services and processes.
"3606. E-Government report.

### "§ 3601. Definitions

"In this chapter, the definitions under section 3502 shall apply, and the term—

"(1) 'Administrator' means the Administrator of the Office of Electronic Government established under section 3602;

116 STAT. 2910       PUBLIC LAW 107–347—DEC. 17 2002

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of chapters for title 44, United States Code, is amended by inserting after the item relating to chapter 35 the following:

**"36. Management and Promotion of Electronic Government Services 3601".**

**SEC. 102. CONFORMING AMENDMENTS.**

(a) ELECTRONIC GOVERNMENT AND INFORMATION TECHNOLOGIES.—

(1) IN GENERAL.—Chapter 3 of title 40, United States Code, is amended by inserting after section 304 the following new section:

**"§ 305. Electronic Government and information technologies**

"The Administrator of General Services shall consult with the Administrator of the Office of Electronic Government on programs undertaken by the General Services Administration to promote electronic Government and the efficient use of information technologies by Federal agencies.".

(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 3 of such title is amended by inserting after the item relating to section 304 the following:

"305. Electronic Government and information technologies.".

(b) MODIFICATION OF DEPUTY DIRECTOR FOR MANAGEMENT FUNCTIONS.—Section 503(b) of title 31, United States Code, is amended—

(1) by redesignating paragraphs (5), (6), (7), (8), and (9), as paragraphs (6), (7), (8), (9), and (10), respectively; and

(2) by inserting after paragraph (4) the following:

"(5) Chair the Chief Information Officers Council established under section 3603 of title 44.".

(c) OFFICE OF ELECTRONIC GOVERNMENT.—

(1) IN GENERAL.—Chapter 5 of title 31, United States Code, is amended by inserting after section 506 the following:

**"§ 507. Office of Electronic Government**

"The Office of Electronic Government, established under section 3602 of title 44, is an office in the Office of Management and Budget.".

(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 5 of title 31, United States Code, is amended by inserting after the item relating to section 506 the following:

"507. Office of Electronic Government.".

# TITLE II—FEDERAL MANAGEMENT AND PROMOTION OF ELECTRONIC GOVERNMENT SERVICES

44 USC 3501 note.

**SEC. 201. DEFINITIONS.**

Except as otherwise provided, in this title the definitions under sections 3502 and 3601 of title 44, United States Code, shall apply.

PUBLIC LAW 107–347—DEC. 17 2002          116 STAT. 2921

(III) the transfer of technology among Federal agencies and between Federal agencies and non-Federal entities; and

(IV) access by policymakers and the public to information concerning Federal research and development activities.

(B) OVERSIGHT.—The Director of the Office of Management and Budget shall issue any guidance determined necessary to ensure that agencies provide all information requested under this subsection.

Guidelines.

(2) AGENCY FUNCTIONS.—Any agency that funds Federal research and development under this subsection shall provide the information required to populate the repository in the manner prescribed by the Director of the Office of Management and Budget.

(3) COMMITTEE FUNCTIONS.—Not later than 18 months after the date of enactment of this Act, working with the Director of the Office of Science and Technology Policy, and after consultation with interested parties, the Committee shall submit recommendations to the Director on—

Deadline.

(A) policies to improve agency reporting of information for the repository established under this subsection; and

(B) policies to improve dissemination of the results of research performed by Federal agencies and federally funded research and development centers.

(4) FUNCTIONS OF THE DIRECTOR.—After submission of recommendations by the Committee under paragraph (3), the Director shall report on the recommendations of the Committee and Director to Congress, in the E-Government report under section 3606 of title 44 (as added by this Act).

Reports.

(5) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for the development, maintenance, and operation of the Governmentwide repository and website under this subsection—

(A) $2,000,000 in each of the fiscal years 2003 through 2005; and

(B) such sums as are necessary in each of the fiscal years 2006 and 2007.

## SEC. 208. PRIVACY PROVISIONS.

44 USC 3501 note.

(a) PURPOSE.—The purpose of this section is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government.

(b) PRIVACY IMPACT ASSESSMENTS.—

(1) RESPONSIBILITIES OF AGENCIES.—

(A) IN GENERAL.—An agency shall take actions described under subparagraph (B) before—

(i) developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form; or

(ii) initiating a new collection of information that—

(I) will be collected, maintained, or disseminated using information technology; and

(II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements

116 STAT. 2922          PUBLIC LAW 107–347—DEC. 17 2002

imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government.

(B) AGENCY ACTIVITIES.—To the extent required under subparagraph (A), each agency shall—

(i) conduct a privacy impact assessment;

(ii) ensure the review of the privacy impact assessment by the Chief Information Officer, or equivalent official, as determined by the head of the agency; and

(iii) if practicable, after completion of the review under clause (ii), make the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means.

*Public information. Federal Register, publication.*

(C) SENSITIVE INFORMATION.—Subparagraph (B)(iii) may be modified or waived for security reasons, or to protect classified, sensitive, or private information contained in an assessment.

(D) COPY TO DIRECTOR.—Agencies shall provide the Director with a copy of the privacy impact assessment for each system for which funding is requested.

(2) CONTENTS OF A PRIVACY IMPACT ASSESSMENT.—

(A) IN GENERAL.—The Director shall issue guidance to agencies specifying the required contents of a privacy impact assessment.

(B) GUIDANCE.—The guidance shall—

(i) ensure that a privacy impact assessment is commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form in that system, and the risk of harm from unauthorized release of that information; and

(ii) require that a privacy impact assessment address—

(I) what information is to be collected;

(II) why the information is being collected;

(III) the intended use of the agency of the information;

(IV) with whom the information will be shared;

(V) what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;

(VI) how the information will be secured; and

(VII) whether a system of records is being created under section 552a of title 5, United States Code, (commonly referred to as the "Privacy Act").

(3) RESPONSIBILITIES OF THE DIRECTOR.—The Director shall—

*Guidelines.*

(A) develop policies and guidelines for agencies on the conduct of privacy impact assessments;

(B) oversee the implementation of the privacy impact assessment process throughout the Government; and

(C) require agencies to conduct privacy impact assessments of existing information systems or ongoing collections of information that is in an identifiable form as the Director determines appropriate.

(c) PRIVACY PROTECTIONS ON AGENCY WEBSITES.—

PUBLIC LAW 107–347—DEC. 17 2002          116 STAT. 2923

(1) PRIVACY POLICIES ON WEBSITES.—
(A) GUIDELINES FOR NOTICES.—The Director shall develop guidance for privacy notices on agency websites used by the public.
(B) CONTENTS.—The guidance shall require that a privacy notice address, consistent with section 552a of title 5, United States Code—
(i) what information is to be collected;
(ii) why the information is being collected;
(iii) the intended use of the agency of the information;
(iv) with whom the information will be shared;
(v) what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;
(vi) how the information will be secured; and
(vii) the rights of the individual under section 552a of title 5, United States Code (commonly referred to as the "Privacy Act"), and other laws relevant to the protection of the privacy of an individual.
(2) PRIVACY POLICIES IN MACHINE-READABLE FORMATS.— The Director shall issue guidance requiring agencies to translate privacy policies into a standardized machine-readable format.

Guidelines.

(d) DEFINITION.—In this section, the term "identifiable form" means any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means.

## SEC. 209. FEDERAL INFORMATION TECHNOLOGY WORKFORCE DEVELOPMENT.

44 USC 3501 note.

(a) PURPOSE.—The purpose of this section is to improve the skills of the Federal workforce in using information technology to deliver Government information and services.
(b) WORKFORCE DEVELOPMENT.—
(1) IN GENERAL.—In consultation with the Director of the Office of Management and Budget, the Chief Information Officers Council, and the Administrator of General Services, the Director of the Office of Personnel Management shall—
(A) analyze, on an ongoing basis, the personnel needs of the Federal Government related to information technology and information resource management;
(B) identify where current information technology and information resource management training do not satisfy the personnel needs described in subparagraph (A);
(C) oversee the development of curricula, training methods, and training priorities that correspond to the projected personnel needs of the Federal Government related to information technology and information resource management; and
(D) assess the training of Federal employees in information technology disciplines in order to ensure that the information resource management needs of the Federal Government are addressed.
(2) INFORMATION TECHNOLOGY TRAINING PROGRAMS.—The head of each Executive agency, after consultation with the Director of the Office of Personnel Management, the Chief

FEDERAL ADVISORY COMMITTEE ACT

FEDERAL ADVISORY COMMITTEE ACT

5 U.S.C. app.

As Amended

§1.  Short title

This Act may be cited as the "Federal Advisory Committee Act Amendments."

§2.  Findings and purpose

(a)  The Congress finds that there are numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government and that they are frequently a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government.

(b)  The Congress further finds and declares that--

(1)  the need for many existing advisory committees has not been adequately reviewed;

(2)  new advisory committees should be established only when they are determined to be essential and their number should be kept to the minimum necessary;

(3)  advisory committees should be terminated when they are no longer carrying out the purposes for which they were established;

(4)  standards and uniform procedures should govern the establishment, operation, administration, and duration of advisory committees;

(5)  the Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees; and

(6)  the function of advisory committees should be advisory only, and that all matters under their consideration should be determined, in accordance with law, by the official, agency, or officer involved.

§3.  Definitions

For the purpose of this Act--

(1)  The term "Administrator" means the Administrator of General Services.

(2)  The term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as "committee"), which is--

(A)  established by statute or reorganization plan, or

(B)  established or utilized by the President, or

(C)  established or utilized by one or more agencies,

FEDERAL ADVISORY COMMITTEE ACT

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government, and (ii) any committee that is created by the National Academy of Sciences or the National Academy of Public Administration.

(3)  The term "agency" has the same meaning as in section 551(1) of Title 5, United States Code.

(4)  The term "Presidential advisory committee" means an advisory committee which advises the President.

§4.  Applicability; restrictions

(a)  The provisions of this Act or of any rule, order, or regulation promulgated under this Act shall apply to each advisory committee except to the extent that any Act of Congress establishing any such advisory committee specifically provides otherwise.

(b)  Nothing in this Act shall be construed to apply to any advisory committee established or utilized by--

(1)  the Central Intelligence Agency;

(2)  the Federal Reserve System; or

(3)  the Office of the Director of National Intelligence, if the Director of National Intelligence determines that for reasons of national security such advisory committee cannot comply with the requirements of this Act.

(c)  Nothing in this Act shall be construed to apply to any local civic group whose primary function is that of rendering a public service with respect to a Federal program, or any State or local committee, council, board, commission, or similar group established to advise or make recommendations to State or local officials or agencies.

§5.  Responsibilities of Congressional committees; review; guidelines

(a)  In the exercise of its legislative review function, each standing committee of the Senate and the House of Representatives shall make a continuing review of the activities of each advisory committee under its jurisdiction to determine whether such advisory committee should be abolished or merged with any other advisory committee, whether the responsibilities of such advisory committee should be revised, and whether such advisory committee performs a necessary function not already being performed.  Each such standing committee shall take appropriate action to obtain the enactment of legislation necessary to carry out the purpose of this subsection.

(b)  In considering legislation establishing, or authorizing the establishment of any advisory committee, each standing committee of the Senate and of the House of Representatives shall determine, and report such determination to the Senate or to the House of Representatives, as the case may be, whether the functions of the proposed advisory committee are being or could be performed by one or more agencies or by an advisory committee already in existence, or by enlarging the mandate of an existing advisory committee.  Any such legislation shall--

(1)  contain a clearly defined purpose for the advisory committee;

(2)  require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;

(3)  contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by

**FEDERAL ADVISORY COMMITTEE ACT**

any special interest, but will instead be the result of the advisory committee's independent judgment;

(4)  contain provisions dealing with authorization of appropriations, the date for submission of reports (if any), the duration of the advisory committee, and the publication of reports and other materials, to the extent that the standing committee determines the provisions of section 10 of this Act to be inadequate; and

(5)  contain provisions which will assure that the advisory committee will have adequate staff (either supplied by an agency or employed by it), will be provided adequate quarters, and will have funds available to meet its other necessary expenses.

(c)  To the extent they are applicable, the guidelines set out in subsection (b) of this section shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee.

§6.  Responsibilities of the President; report to Congress; annual report to Congress; exclusion

(a)  The President may delegate responsibility for evaluating and taking action, where appropriate, with respect to all public recommendations made to him by Presidential advisory committees.

(b)  Within one year after a Presidential advisory committee has submitted a public report to the President, the President or his delegate shall make a report to the Congress stating either his proposals for action or his reasons for inaction, with respect to the recommendations contained in the public report.

(c)  [Annual report] Repealed by the Federal Reports Elimination and Sunset Act of 1995, Pub. L. No. 104-66, § 3003, 109 Stat. 707, 734-36 (1995), amended by Pub. L. No. 106-113, § 236, 113 Stat. 1501, 1501A-302 (1999) (changing effective date to May 15, 2000).

§7.  Responsibilities of the Administrator of General Services; Committee Management Secretariat, establishment; review; recommendations to President and Congress; agency cooperation; performance guidelines; uniform pay guidelines; travel expenses; expense recommendations

(a)  The Administrator shall establish and maintain within the General Services Administration a Committee Management Secretariat, which shall be responsible for all matters relating to advisory committees.

(b)  The Administrator shall, immediately after October 6, 1972, institute a comprehensive review of the activities and responsibilities of each advisory committee to determine--

(1)  whether such committee is carrying out its purpose;

(2)  whether, consistent with the provisions of applicable statutes, the responsibilities assigned to it should be revised;

(3)  whether it should be merged with other advisory committees; or

(4)  whether it should be abolished.

The Administrator may from time to time request such information as he deems necessary to carry out his functions under this subsection.  Upon the completion of the Administrator's review he shall make recommendations to the President and to either the agency head or the Congress with respect to action he believes should be taken.  Thereafter, the Administrator shall carry out a similar review annually.  Agency heads shall cooperate with the Administrator in making the reviews required by this subsection.

(c)  The Administrator shall prescribe administrative guidelines and management controls applicable to advisory committees, and, to the maximum extent feasible, provide advice, assistance, and

## FEDERAL ADVISORY COMMITTEE ACT

guidance to advisory committees to improve their performance.  In carrying out his functions under this subsection, the Administrator shall consider the recommendations of each agency head with respect to means of improving the performance of advisory committees whose duties are related to such agency.

(d)(1)   The Administrator, after study and consultation with the Director of the Office of Personnel Management, shall establish guidelines with respect to uniform fair rates of pay for comparable services of members, staffs, and consultants of advisory committees in a manner which gives appropriate recognition to the responsibilities and qualifications required and other relevant factors. Such regulations shall provide that--

> (A)   no member of any advisory committee or of the staff of any advisory committee shall receive compensation at a rate in excess of the rate specified for GS-18 of the General Schedule under section 5332 of Title 5, United States Code;

> (B)   such members, while engaged in the performance of their duties away from their homes or regular places of business, may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of Title 5, United States Code, for persons employed intermittently in the Government service; and

> (C)   such members--

> > (i)   who are blind or deaf or who otherwise qualify as handicapped individuals (within the meaning of section 501 of the Rehabilitation Act of 1973 (29 U.S.C. §794)), and

> > (ii)   who do not otherwise qualify for assistance under section 3102 of Title 5, United States Code, by reason of being an employee of an agency (within the meaning of section 3102(a)(1) of such Title 5),

> may be provided services pursuant to section 3102 of such Title 5 while in performance of their advisory committee duties.

(2)   Nothing in this subsection shall prevent--

> (A)   an individual who (without regard to his service with an advisory committee) is a full-time employee of the United States, or

> (B)   an individual who immediately before his service with an advisory committee was such an employee,

from receiving compensation at the rate at which he otherwise would be compensated (or was compensated) as a full-time employee of the United States.

(e)   The Administrator shall include in budget recommendations a summary of the amounts he deems necessary for the expenses of advisory committees, including the expenses for publication of reports where appropriate.

§8.  Responsibilities of agency heads; Advisory Committee Management Officer, designation

(a)   Each agency head shall establish uniform administrative guidelines and management controls for advisory committees established by that agency, which shall be consistent with directives of the Administrator under section 7 and section 10.  Each agency shall maintain systematic information on the nature, functions, and operations of each advisory committee within its jurisdiction.

(b)   The head of each agency which has an advisory committee shall designate an Advisory Committee Management Officer who shall--

FEDERAL ADVISORY COMMITTEE ACT

(1)  exercise control and supervision over the establishment, procedures, and accomplishments of advisory committees established by that agency;

(2)  assemble and maintain the reports, records, and other papers of any such committee during its existence; and

(3)  carry out, on behalf of that agency, the provisions of section 552 of Title 5, United States Code, with respect to such reports, records, and other papers.

§9.  Establishment and purpose of advisory committees; publication in Federal Register; charter: filing, contents, copy

(a)  No advisory committee shall be established unless such establishment is--

(1)  specifically authorized by statute or by the President; or

(2)  determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law.

(b)  Unless otherwise specifically provided by statute or Presidential directive, advisory committees shall be utilized solely for advisory functions.  Determinations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made solely by the President or an officer of the Federal Government.

(c)  No advisory committee shall meet or take any action until an advisory committee charter has been filed with (1) the Administrator, in the case of Presidential advisory committees, or (2) with the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency. Such charter shall contain the following information:

(A)  the committee's official designation;

(B)  the committee's objectives and the scope of its activity;

(C)  the period of time necessary for the committee to carry out its purposes;

(D)  the agency or official to whom the committee reports;

(E)  the agency responsible for providing the necessary support for the committee;

(F)  a description of the duties for which the committee is responsible, and, if such duties are not solely advisory, a specification of the authority for such functions;

(G)  the estimated annual operating costs in dollars and man-years for such committee;

(H)  the estimated number and frequency of committee meetings;

(I)  the committee's termination date, if less than two years from the date of the committee's establishment; and

(J)  the date the charter is filed.

A copy of any such charter shall also be furnished to the Library of Congress.

## FEDERAL ADVISORY COMMITTEE ACT

§10.  Advisory committee procedures; meetings; notice, publication in Federal Register; regulations; minutes; certification; annual report; Federal officer or employee, attendance

(a)(1)  Each advisory committee meeting shall be open to the public.

(2)  Except when the President determines otherwise for reasons of national security, timely notice of each such meeting shall be published in the Federal Register, and the Administrator shall prescribe regulations to provide for other types of public notice to insure that all interested persons are notified of such meeting prior thereto.

(3)  Interested persons shall be permitted to attend, appear before, or file statements with any advisory committee, subject to such reasonable rules or regulations as the Administrator may prescribe.

(b)  Subject to section 552 of Title 5, United States Code, the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

(c)  Detailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee. The accuracy of all minutes shall be certified to by the chairman of the advisory committee.

(d)  Subsections (a)(1) and (a)(3) of this section shall not apply to any portion of an advisory committee meeting where the President, or the head of the agency to which the advisory committee reports, determines that such portion of such meeting may be closed to the public in accordance with subsection (c) of section 552b of Title 5, United States Code.  Any such determination shall be in writing and shall contain the reasons for such determination.  If such a determination is made, the advisory committee shall issue a report at least annually setting forth a summary of its activities and such related matters as would be informative to the public consistent with the policy of section 552(b) of Title 5, United States Code.

(e)  There shall be designated an officer or employee of the Federal Government to chair or attend each meeting of each advisory committee.  The officer or employee so designated is authorized, whenever he determines it to be in the public interest, to adjourn any such meeting. No advisory committee shall conduct any meeting in the absence of that officer or employee.

(f)  Advisory committees shall not hold any meetings except at the call of, or with the advance approval of, a designated officer or employee of the Federal Government, and in the case of advisory committees (other than Presidential advisory committees), with an agenda approved by such officer or employee.

§11.  Availability of transcripts; "agency proceeding"

(a)  Except where prohibited by contractual agreements entered into prior to the effective date of this Act, agencies and advisory committees shall make available to any person, at actual cost of duplication, copies of transcripts of agency proceedings or advisory committee meetings.

(b)  As used in this section "agency proceeding" means any proceeding as defined in section 551(12) of Title 5, United States Code.

§12.  Fiscal and administrative provisions; record-keeping; audit; agency support services

(a)  Each agency shall keep records as will fully disclose the disposition of any funds which may be at the disposal of its advisory committees and the nature and extent of their activities.  The

FEDERAL ADVISORY COMMITTEE ACT

General Services Administration, or such other agency as the President may designate, shall maintain financial records with respect to Presidential advisory committees. The Comptroller General of the United States, or any of his authorized representatives, shall have access, for the purpose of audit and examination, to any such records.

(b)  Each agency shall be responsible for providing support services for each advisory committee established by or reporting to it unless the establishing authority provides otherwise. Where any such advisory committee reports to more than one agency, only one agency shall be responsible for support services at any one time. In the case of Presidential advisory committees, such services may be provided by the General Services Administration.

§13. Responsibilities of Library of Congress; reports and background papers; depository

Subject to section 552 of Title 5, United States Code, the Administrator shall provide for the filing with the Library of Congress of at least eight copies of each report made by every advisory committee and, where appropriate, background papers prepared by consultants. The Librarian of Congress shall establish a depository for such reports and papers where they shall be available to public inspection and use.

§14. Termination of advisory committees; renewal; continuation

(a)(1)  Each advisory committee which is in existence on the effective date of this Act shall terminate not later than the expiration of the two-year period following such effective date unless--

(A)  in the case of an advisory committee established by the President or an officer of the Federal Government, such advisory committee is renewed by the President or that officer by appropriate action prior to the expiration of such two-year period; or

(B)  in the case of an advisory committee established by an Act of Congress, its duration is otherwise provided for by law.

(2)  Each advisory committee established after such effective date shall terminate not later than the expiration of the two-year period beginning on the date of its establishment unless--

(A)  in the case of an advisory committee established by the President or an officer of the Federal Government such advisory committee is renewed by the President or such officer by appropriate action prior to the end of such period; or

(B)  in the case of an advisory committee established by an Act of Congress, its duration is otherwise provided for by law.

(b)(1)  Upon the renewal of any advisory committee, such advisory committee shall file a charter in accordance with section 9(c).

(2)  Any advisory committee established by an Act of Congress shall file a charter in accordance with such section upon the expiration of each successive two-year period following the date of enactment of the Act establishing such advisory committee.

(3)  No advisory committee required under this subsection to file a charter shall take any action (other than preparation and filing of such charter) prior to the date on which such charter is filed.

(c)  Any advisory committee which is renewed by the President or any officer of the Federal Government may be continued only for successive two-year periods by appropriate action taken by the President or such officer prior to the date on which such advisory committee would otherwise terminate.

FEDERAL ADVISORY COMMITTEE ACT

§15.  Requirements relating to the National Academy of Sciences and the National Academy of Public Administration

>(a) In General- An agency may not use any advice or recommendation provided by the National Academy of Sciences or National Academy of Public Administration that was developed by use of a committee created by that academy under an agreement with an agency, unless--

>>(1)  the committee was not subject to any actual management or control by an agency or an officer of the Federal Government;

>>(2)  in the case of a committee created after the date of the enactment of the Federal Advisory Committee Act Amendments of 1997, the membership of the committee was appointed in accordance with the requirements described in subsection (b)(1); and

>>(3)  in developing the advice or recommendations, the academy compiled with--

>>>(A)  subsection (b)(2) through (6), in the case of any advice or recommendation provided by the National Academy of Sciences; or

>>>(B)  subsection (b)(2) and (5), in the case of any advice or recommendation provided by the National Academy of Public Administration.

>(b)  Requirements- The requirements referred to in subsection (a) are as follows:

>>(1)  The Academy shall determine and provide public notice of the names and brief biographies of individuals that the Academy appoints or intends to appoint to serve on the committee.  The Academy shall determine and provide a reasonable opportunity for the public to comment on such appointments before they are made or, if the Academy determines such prior comment is not practicable, in the period immediately following the appointments.  The Academy shall make its best efforts to ensure that (A) no individual appointed to serve on the committee has a conflict of interest that is relevant to the functions to be performed, unless such conflict is promptly and publicly disclosed and the Academy determines that the conflict is unavoidable, (B) the committee membership is fairly balanced as determined by the Academy to be appropriate for the functions to be performed, and (C) the final report of the Academy will be the result of the Academy's independent judgment.  The Academy shall require that individuals that the Academy appoints or intends to appoint to serve on the committee inform the Academy of the individual's conflicts of interest that are relevant to the functions to be performed.

>>(2)  The Academy shall determine and provide public notice of committee meetings that will be open to the public.

>>(3)  The Academy shall ensure that meetings of the committee to gather data from individuals who are not officials, agents, or employees of the Academy are open to the public, unless the Academy determines that a meeting would disclose matters described in section 552(b) of Title 5, United States Code.  The Academy shall make available to the public, at reasonable charge if appropriate, written materials presented to the committee by individuals who are not officials, agents, or employees of the Academy, unless the Academy determines that making material available would disclose matters described in that section.

>>(4)  The Academy shall make available to the public as soon as practicable, at reasonable charge if appropriate, a brief summary of any committee meeting that is not a data gathering meeting, unless the Academy determines that the summary would disclose matters described in section 552(b) Title 5, United States Code.  The summary shall identify the committee members present, the topics discussed, materials made available to the committee, and such other matters that the Academy determines should be included.

**FEDERAL ADVISORY COMMITTEE ACT**

(5)  The Academy shall make available to the public its final report, at reasonable charge if appropriate, unless the Academy determines that the report would disclose matters described in section 552(b) of Title 5, United States Code.  If the Academy determines that the report would disclose matters described in that section, the Academy shall make public an abbreviated version of the report that does not disclose those matters.

(6)  After publication of the final report, the Academy shall make publicly available the names of the principal reviewers who reviewed the report in draft form and who are not officials, agents, or employees of the Academy.

(c)  Regulations- The Administrator of General Services may issue regulations implementing this section.

§16.  Effective Date

Except as provided in section 7(b), this Act shall become effective upon the expiration of ninety days following October 6, 1972.

USCA Case #17-5171    Document #1689465    Filed: 08/18/2017    Page 85 of 101

*Proviso.*
Obligations of old Board.

Rules and regulations.

Separability clause.

Duration of Act.

the Board at the grades and salaries specified in their respective examinations: *Provided*, That this section shall not be construed to impair any obligation incurred by the old Board.

SEC. 7. The Board with the approval of the Committee is authorized to prescribe rules and regulations to carry out the provisions of this Act.

SEC. 8. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provisions to other persons or circumstances, shall not be affected thereby.

SEC. 9. This Act shall cease to be in effect and the agencies established hereunder shall cease to exist at the expiration of five years after the date of enactment of this Act.

Approved, July 25, 1935.

---

[CHAPTER 417.]

AN ACT

July 26, 1935.
[H. R. 6323.]
[Public, No. 220.]

To provide for the custody of Federal proclamations, orders, regulations, notices, and other documents, and for the prompt and uniform printing and distribution thereof.

Federal Register Act.
Proclamations, Executive orders, etc.; custody and publication.
Division to be established in the National Archives Establishment.

Director; appointment; salary.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Archivist of the United States, acting through a division established by him in the National Archives Establishment, hereinafter referred to as the "Division", is charged with the custody and, together with the Public Printer, with the prompt and uniform printing and distribution of the documents required or authorized to be published under section 5. There shall be at the head of the Division a director, appointed by the President, who shall act under the general direction of the Archivist of the United States in carrying out the provisions of this Act and the regulations prescribed hereunder, who shall receive a salary, to be fixed by the President, not to exceed $5,000 a year.

Original documents and copies; filing.
*Post,* p. 1110.

Notation thereon.

*Proviso.*
When issued outside of District of Columbia.

Availability of copy for public inspection.

Of original document.

Copy for printing; transmission.

SEC. 2. The original and two duplicate originals or certified copies of any document required or authorized to be published under section 5 shall be filed with the Division, which shall be open for that purpose during all hours of the working days when the Archives Building shall be open for official business. The Director of the Division shall cause to be noted on the original and duplicate originals or certified copies of each document the day and hour of filing thereof: *Provided*, That when the original is issued, prescribed, or promulgated outside of the District of Columbia and certified copies are filed before the filing of the original, the notation shall be of the day and hour of filing of the certified copies. Upon such filing, at least one copy shall be immediately available for public inspection in the office of the Director of the Division. The original shall be retained in the archives of the National Archives Establishment and shall be available for inspection under regulations to be prescribed by the Archivist. The Division shall transmit immediately to the Government Printing Office for printing, as provided in this Act, one duplicate original or certified copy of each document required or authorized to be published under section 5. Every Federal agency shall cause to be transmitted for filing as herein required the original and the duplicate originals or certified copies of all such documents issued, prescribed, or promulgated by the agency.

Federal Register;
printing and distribution.

SEC. 3. All documents required or authorized to be published under section 5 shall be printed and distributed forthwith by the Government Printing Office in a serial publication designated the "Federal

Register." It shall be the duty of the Public Printer to make available the facilities of the Government Printing Office for the prompt printing and distribution of the Federal Register in the manner and at the times required in accordance with the provisions of this Act and the regulations prescribed hereunder.  The contents of the daily <span style="float:right">Contents; indexing.</span> issues shall be indexed and shall comprise all documents, required or authorized to be published, filed with the Division up to such time of the day immediately preceding the day of distribution as shall be fixed by regulations hereunder.  There shall be printed with <span style="float:right">Copy of notation.</span> each document a copy of the notation, required to be made under section 2, of the day and hour when, upon filing with the Division, such document was made available for public inspection.  Distribution shall be made by delivery or by deposit at a post office at such <span style="float:right">Distribution of.</span> time in the morning of the day of distribution as shall be fixed by such regulations prescribed hereunder.  The prices to be charged <span style="float:right">Charges for.</span> for the Federal Register may be fixed by the administrative committee established by section 6 without reference to the restrictions placed upon and fixed for the sale of Government publications by <span style="float:right">Vol. 42, p. 511; Vol. 47, p. 409.</span> section 1 of the Act of May 11, 1922, and section 307 of the Act of June 30, 1932 (U. S. C., title 44, secs. 72 and 72a), and any amend- <span style="float:right">U. S. C., p. 1933.</span> ments thereto.

SEC. 4. As used in this Act, unless the context otherwise requires, <span style="float:right">Definitions.</span> the term "document" means any Presidential proclamation or Exec- <span style="float:right">"Document."</span> utive order and any order, regulation, rule, certificate, code of fair competition, license, notice, or similar instrument issued, prescribed, or promulgated by a Federal agency; the terms "Federal agency" or <span style="float:right">"Federal agency"; "agency."</span> "agency" mean the President of the United States, or any executive department, independent board, establishment, bureau, agency, institution, commission, or separate office of the administrative branch of the Government of the United States but not the legislative or judicial branches of the Government; and the term "person" means <span style="float:right">"Person."</span> any individual, partnership, association, or corporation.

SEC. 5. (a) There shall be published in the Federal Register (1) <span style="float:right">Documents to be published.</span> all Presidential proclamations and Executive orders, except such as have no general applicability and legal effect or are effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof; (2) such documents or classes of documents as the President shall determine from time to time have general applicability and legal effect; and (3) such documents or classes of documents as may be required so to be published by Act of the Congress: *Provided,* That for the purposes of this Act every docu- <span style="float:right">*Proviso.* When penalty provisions prescribed.</span> ment or order which shall prescribe a penalty shall be deemed to have general applicability and legal effect.

(b) In addition to the foregoing there shall also be published in <span style="float:right">Authorization to publish additional documents.</span> the Federal Register such other documents or classes of documents as may be authorized to be published pursuant hereto by regulations prescribed hereunder with the approval of the President, but in no <span style="float:right">News items; comments.</span> case shall comments or news items of any character whatsoever be authorized to be published in the Federal Register.

SEC. 6. There is established a permanent Administrative Com- <span style="float:right">Administrative Committee; composition.</span> mittee of three members consisting of the Archivist or Acting Archivist, who shall be chairman, an officer of the Department of Justice designated by the Attorney General, and the Public Printer or Acting Public Printer.  The Director of the Division shall act as secretary <span style="float:right">Secretary.</span> of the committee.  The committee shall prescribe, with the approval <span style="float:right">Regulations to be prescribed.</span> of the President, regulations for carrying out the provisions of this Act.  Such regulations shall provide, among other things: (a) The manner of certification of copies required to be certified under section 2, which certification may be permitted to be based upon con-

[Public Law 831—77th Congress]

[Chapter 811—2d Session]

[S. 1666]

AN ACT

To coordinate Federal reporting services, to eliminate duplication and reduce the cost of such services, and to minimize the burdens of furnishing information to Federal agencies.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Federal Reports Act of 1942".

Sec. 2. It is hereby declared to be the policy of the Congress that information which may be needed by the various Federal agencies should be obtained with a minimum burden upon business enterprises (especially small business enterprises) and other persons required to furnish such information, and at a minimum cost to the Government, that all unnecessary duplication of efforts in obtaining such information through the use of reports, questionnaires, and other such methods should be eliminated as rapidly as practicable; and that information collected and tabulated by any Federal agency should insofar as is expedient be tabulated in a manner to maximize the usefulness of the information to other Federal agencies and the public.

Sec. 3. (a) With a view to carrying out the policy of this Act, the Director of the Bureau of the Budget (hereinafter referred to as the "Director") is directed from time to time (1) to investigate the needs of the various Federal agencies for information from business enterprises, from other persons, and from other Federal agencies; (2) to investigate the methods used by such agencies in obtaining such information; and (3) to coordinate as rapidly as possible the information-collecting services of all such agencies with a view to reducing the cost to the Government of obtaining such information and minimizing the burden upon business enterprises and other persons, and utilizing, as far as practicable, the continuing organization, files of information and existing facilities of the established Federal departments and independent agencies.

(b) If, after any such investigation, the Director is of the opinion that the needs of two or more Federal agencies for information from business enterprises and other persons will be adequately served by a single collecting agency, he shall fix a time and place for a hearing at which the agencies concerned and any other interested persons shall have an opportunity to present their views. After such hearing, the Director may issue an order designating a collecting agency to obtain such information for any two or more of the agencies concerned, and prescribing (with reference to the collection of such information) the duties and functions of the collecting agency so designated and the Federal agencies for which it is to act as agent. Any such order may be modified from time to time by the Director as circumstances may require, but no such modification

3–35739                  ADD 000026

[PUB. LAW 831.]                                   2

consent to the release of it to a second agency by the agency to which the information was originally supplied; or (4) the Federal agency to which another Federal agency shall release the information has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information.

SEC. 5. No Federal agency shall conduct or sponsor the collection of information, upon identical items, from ten to more persons (other than Federal employees considered as such) unless, in advance of adoption or revision of any plans or forms to be used in such collection,

(a) The agency shall have submitted to the Director such plans or forms, together with copies of such pertinent regulations and other related materials as the Director shall specify; and

(b) The Director shall have stated that he does not disapprove the proposed collection of information.

SEC. 6. The Director is authorized to make such rules and regulations as may be necessary to carry out the provisions of this Act.

SEC. 7. As used in this Act—

(a) The term "Federal agency" means any executive department, commission, independent establishment, corporation owned or controlled by the United States, board, bureau, division, service, office, authority, or administration in the executive branch of the Government; but such terms shall not include the General Accounting Office nor the governments of the District of Columbia and of the Territories and possessions of the United States, and the various subdivisions of such governments.

(b) The term "person" means any individual, partnership, association, corporation, business trust, or legal representative, any organized group of persons, any State or Territorial government or branch thereof, or any political subdivision of any State or Territory or any branch of any such political subdivision.

(c) The term "information" means facts obtained or solicited by the use of written report forms, application forms, schedules, questionnaires, or other similar methods calling either (1) for answers to identical questions from ten or more persons other then agencies, instrumentalities, or employees of the United States or (2) for answers to questions from agencies, instrumentalities, or employees of the United States which are to be used for statistical compilations of general public interest.

SEC. 8. Any person failing to furnish information required by any such agency shall be subject to such penalties as are specifically prescribed by law, and no other penalty shall be imposed either by way of fine or imprisonment or by the withdrawal or denial of any right, privilege, priority, allotment, or immunity, except when the right, privilege, priority, allotment, or immunity, is legally conditioned on facts which would be revealed by the information requested.

SEC. 9. There are hereby authorized to be appropriated annually, out of any money in the Treasury not otherwise appropriated, such sums as may be necessary to carry out the provisions of this Act.

Approved, December 24, 1942.

ADD 000027

any defense, right, or benefit under any provision of a statute or constitution of a State or of a territory of the United States, or of any law of the District of Columbia, regulating or limiting the rate of interest which may be charged, taken, received, or reserved, and any such provision is hereby preempted, and no civil or criminal penalty which would otherwise be applicable under such provision shall apply to such member or nonmember association, institution, bank, or affiliate or to any other person."

Sec. 304. The amendments made by this title shall apply to any deposit made or obligation issued in any State after the date of enactment of this title, but prior to the earlier of (1) July 1, 1977 or (2) the date (after such date of enactment) on which the State enacts a provision of law which limits the amount of interest which may be charged in connection with deposits or obligations referred to in the amendments made by this title.

*Effective date.*
*12 USC 371b-1*
*note.*

Approved October 29, 1974.

Public Law 93-502

## AN ACT

To amend section 552 of title 5, United States Code, known as the Freedom of Information Act.

*November 21, 1974*
*[H. R. 12471]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) the fourth sentence of section 552(a)(2) of title 5, United States Code, is amended to read as follows: "Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication.".

*Public informa-*
*tion.*

*Indexes, publica-*
*tion and distribu-*
*tion.*

*Publication in*
*Federal Register.*

(b)(1) Section 552(a)(3) of title 5, United States Code, is amended to read as follows:

*Records, avail-*
*ability to public.*

"(3) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.".

(2) Section 552(a) of title 5, United States Code, is amended by redesignating paragraph (4), and all references thereto, as paragraph (5) and by inserting immediately after paragraph (3) the following new paragraph:

*Document search*
*and duplication*
*fees, regula-*
*tions.*

"(4)(A) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying a uniform schedule of fees applicable to all constituent units of such agency. Such fees shall be limited to reasonable standard charges for document search and duplication and provide for recovery of only the direct costs of such search and duplication. Documents shall be furnished without charge or at a reduced charge where the agency determines that waiver or reduction of the fee is in the public interest because furnishing the information can be considered as primarily benefiting the general public.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

ADD 000028

the life or physical safety of law enforcement personnel;".

Segregable portions of records.

(c) Section 552(b) of title 5, United States Code, is amended by adding at the end the following: "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.".

Reports to Speaker of the House and President of the Senate.

Sec. 3. Section 552 of title 5, United States Code, is amended by adding at the end thereof the following new subsections:

"(d) On or before March 1 of each calendar year, each agency shall submit a report covering the preceding calendar year to the Speaker of the House of Representatives and President of the Senate for referral to the appropriate committees of the Congress. The report shall include—

Contents.

"(1) the number of determinations made by such agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

*Ante*, p. 1562.

"(2) the number of appeals made by persons under subsection (a) (6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information;

"(3) the names and titles or positions of each person responsible for the denial of records requested under this section, and the number of instances of participation for each;

"(4) the results of each proceeding conducted pursuant to subsection (a) (4) (F), including a report of the disciplinary action taken against the officer or employee who was primarily responsible for improperly withholding records or an explanation of why disciplinary action was not taken;

"(5) a copy of every rule made by such agency regarding this section;

"(6) a copy of the fee schedule and the total amount of fees collected by the agency for making records available under this section; and

"(7) such other information as indicates efforts to administer fully this section.

Annual report.

The Attorney General shall submit an annual report on or before March 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subsections (a) (4)

*Ante*, p. 1561.

(E), (F), and (G). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

"Agency." 5 USC 551.

"(e) For purposes of this section, the term 'agency' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.".

Effective date. 5 USC 552 note.

Sec. 4. The amendments made by this Act shall take effect on the ninetieth day beginning after the date of enactment of this Act.

CARL ALBERT

*Speaker of the House of Representatives.*

JAMES O. EASTLAND

*President of the Senate pro tempore.*

378                    PUBLIC LAW 89-554—SEPT. 6, 1966                [80 STAT.

Public Law 89-554

AN ACT

September 6, 1966
[H. R. 10 104]

To enact title 5, United States Code, "Government Organization and Employees", codifying the general and permanent laws relating to the organization of the Government of the United States and to its civilian officers and employees.

Title 5, USC,
Government Or-
ganization and
Employees.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the laws relating to the organization of the Government of the United States and to its civilian officers and employees, generally, are revised, codified, and enacted as title 5 of the United States Code, entitled "Government Organization and Employees", and may be cited as "5 U.S.C., §    ", as follows:

# TITLE 5—GOVERNMENT ORGANIZATION AND EMPLOYEES

PART                                                                    Sec.
  I. THE AGENCIES GENERALLY_____ 101
 II. THE UNITED STATES CIVIL SERVICE COMMISSION_____ 1101
III. EMPLOYEES _____ 2101

## PART I—THE AGENCIES GENERALLY

CHAPTER                                                                 Sec.
1. ORGANIZATION _____ 101
3. POWERS_____ 301
5. ADMINISTRATIVE PROCEDURE_____ 501
7. JUDICIAL REVIEW _____ 701
9. EXECUTIVE REORGANIZATION _____ 901

## CHAPTER 1—ORGANIZATION

Sec.
101. Executive departments.
102. Military departments.
103. Government corporation.
104. Independent establishment.
105. Executive agency.

## § 101. Executive departments

The Executive departments are:

The Department of State.
The Department of the Treasury.
The Department of Defense.
The Department of Justice.
The Post Office Department.
The Department of the Interior.
The Department of Agriculture.
The Department of Commerce.
The Department of Labor.
The Department of Health, Education, and Welfare.

## § 102. Military departments

The military departments are:

The Department of the Army.
The Department of the Navy.
The Department of the Air Force.

## § 103. Government corporation

For the purpose of this title—

(1) "Government corporation" means a corporation owned or controlled by the Government of the United States; and


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

ADD 000030

## SUBCHAPTER III—ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

Sec.
571. Purpose.
572. Definitions.
573. Administrative Conference of the United States.
574. Powers and duties of the Conference.
575. Organization of the Conference.
576. Appropriations.

## SUBCHAPTER I—GENERAL PROVISIONS

### § 501. Advertising practice; restrictions

An individual, firm, or corporation practicing before an agency of the United States may not use the name of a Member of either House of Congress or of an individual in the service of the United States in advertising the business.

### § 502. Administrative practice; Reserves and National Guardsmen

Membership in a reserve component of the armed forces or in the National Guard does not prevent an individual from practicing his civilian profession or occupation before, or in connection with, an agency of the United States.

### § 503. Witness fees and allowances

(a) For the purpose of this section, "agency" has the meaning given it by section 5721 of this title.

(b) A witness is entitled to the fees and allowances allowed by statute for witnesses in the courts of the United States when—

 (1) he is subpenaed under section 304(a) of this title; or

 (2) he is subpenaed to and appears at a hearing before an agency authorized by law to hold hearings and subpena witnesses to attend the hearings.

## SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

### § 551. Definitions

For the purpose of this subchapter—

 (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

  (A) the Congress;

  (B) the courts of the United States;

  (C) the governments of the territories or possessions of the United States;

  (D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

  (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

  (F) courts martial and military commissions;

  (G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41; or sections 1622, 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency—

(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

(B) withholding of relief;

(C) imposition of penalty or fine;

(D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a license; or

(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—

(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section; and

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701. Application; definitions.
702. Right of review.
703. Form and venue of proceeding.
704. Actions reviewable.
705. Relief pending review.
706. Scope of review.

### § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41; or sections 1622, 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

(2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of

# Presidential Advisory Commission on Election Integrity
## By-Laws and Operating Procedures

The following By-Laws and Operating Procedures ("By-Laws") will govern the operations of the Presidential Advisory Commission on Election Integrity ("Commission").

### Section I: Purpose, Organization, and Operation

Pursuant to Executive Order 13799 of May 11, 2017, the Commission shall, consistent with applicable law, study the registration and voting processes used in Federal elections. The Commission shall be solely advisory and shall submit a report to the President that identifies those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections; those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of voting processes used in Federal elections; and those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting. The Commission shall provide its advice and recommendations, analysis, and information directly to the President.

### Section II: Authority

The Commission was established by Executive Order 13799 of May 11, 2017, and by the authority vested in the President of the United States by the Constitution and the laws of the United States of America. The Commission has voluntarily agreed to operate in accordance with the Federal Advisory Committee Act, as amended (5 U.S.C. App.) ("FACA"). The Commission filed a charter on June 23, 2017, with the General Service Administration's Committee Management Secretariat.

### Section III: Membership

**(A) In General.** The Commission shall be composed of the Vice President and not more than fifteen (15) additional members ("Members"). The Members shall be appointed by the President and shall represent a bipartisan set of perspectives and experience in elections, election management, election fraud detection, and voter integrity efforts, and may include any other individuals with knowledge or experience determined by the President to be of value to the Commission. The Members of the Commission may include both regular Government Employees and Special Government Employees.

**(B) Chair and Vice Chair.** The Vice President shall chair the Commission. The Vice President may select a Vice Chair from among those Members appointed by the President, who may perform the duties of the Chair if so directed by the Vice President.

**(C) Commission Staff.** The Vice President may select an Executive Director of the Commission and any additional staff he determines necessary to support the Commission.

**(D) Designated Federal Officer.** The Designated Federal Officer ("DFO") will be a full-time officer or employee of the Federal Government appointed by the GSA Administrator, pursuant to 41 CFR § 102-3.105 and in consultation with the Chair of the Commission. The DFO will approve or call all Commission meetings, prepare all meeting agendas, attend all meetings, and adjourn any meeting when the DFO determines adjournment to be in the public interest. Should the Chair designate any subcommittees, the DFO will similarly approve or call all subcommittee meetings,

1

prepare all subcommittee meeting agendas, attend all subcommittee meetings, and adjourn any subcommittee meeting when the DFO determines adjournment to be in the public interest. In the DFO's discretion, the DFO may utilize other Federal employees as support staff to assist the DFO in fulfilling these responsibilities.

## Section IV: Meetings

**(A) In General.** The Commission shall meet as frequently as needed and called and approved by the DFO. The Chair will preside at all Commission meetings, unless the Chair directs the Vice Chair to perform the duties of the Chair. Members who cannot attend meetings in person may participate by means of conference telephone or similar communications equipment if all Members can hear one another at the same time and members of the public entitled to hear them can do so. A Member who participates by such means will be counted as present for purposes of a quorum, and the Member may participate in any votes and other business as if the Member were physically present at the meeting.

**(B) Notice**. A notice of each Commission meeting will be published in the Federal Register at least 15 calendar days before the meeting, except in exceptional circumstances. The notice will include (1) the name of the Commission; (2) the time, date, place, and purpose of the meeting; (3) a summary of the agenda, and/or topics to be discussed; (4) a statement as to whether all or part of the meeting is open to the public and, if any part is closed, a statement as to why, citing the specific exemption(s) of the Government in the Sunshine Act (5 U.S.C. § 552b(c)) ("GISA") as the basis for closure; and (5) the name and telephone number of the DFO or other official who may be contacted for additional information concerning the meeting.

**(C) Agenda.** The Chair or, at the Chair's direction, the Vice Chair, shall establish the agenda for all Commission meetings. The DFO will prepare and distribute the agenda to the Members before each meeting and will make available copies of the agenda to members of the public. Items for the agenda may be submitted to the Chair by any Member. Items may also be suggested by any member of the public.

**(D) Quorum.** Commission meetings will be held only when a quorum is present. For this purpose, a quorum is defined as a simple majority of the Members (including the Chair) then serving on the Commission.

**(E) Open Meetings.** Unless otherwise determined in advance, all Commission meetings will be open to the public either in person as space permits or through electronic means as permitted by FACA and its implementing regulations. Once an open meeting has begun, it will not be closed for any reason. However, if, during the course of an open meeting, matters inappropriate for public disclosure arise during discussion, the Chair shall order such discussion to cease and will schedule the matter for closed session in accordance with FACA. All materials brought before, or presented to, the Commission during the conduct of an open meeting will be made available to the public. All such materials will be made available on the Commission's webpage as soon as practicable.

**(F) Activities Not Subject to Notice and Open Meeting Requirements**. Consistent with 41 CFR §102-3.160, the following activities of the Commission are excluded from the procedural requirements contained in Sections IV(B) and (E):

    i.   Preparatory work. Meetings of two or more Commission Members or subcommittee Members convened solely to gather information, conduct research, or analyze relevant

issues and facts in preparation for a Commission meeting, or to draft position papers for deliberation by the Commission; and

ii.   Administrative work. Meetings of two or more Commission Members or subcommittee Members convened solely to discuss administrative matters of the Commission or to receive administrative information from a Federal officer or agency.

**(G) Closed Meetings.** Meetings of the Commission will be closed only in limited circumstances and in accordance with applicable law. Where the DFO has determined in advance that a Commission meeting will disclose matters inappropriate for public disclosure, an advance notice of a closed meeting will be published in the Federal Register in accordance with GISA.

**(H) Hearings.** The Commission may hold hearings to receive testimony or oral comments, recommendations, and expressions of concern from the public. The Commission may hold hearings at open meetings or in closed session in accordance with the standards in these By-Laws for closing meetings to the public. The Chair may specify reasonable guidelines and procedures for conducting orderly hearings, such as requirements for submitting requests to testify and written testimony in advance and placing limitations on the number of persons who may testify and the duration of their testimony.

**(I) Minutes.** The DFO will prepare minutes of each meeting, distribute copies to each Member, and ensure that the Chair certifies the accuracy of all minutes within 90 calendar days of the meeting to which they relate. Minutes of open or closed meetings will be available to the public, subject to the withholding of matters which are exempt from disclosure under applicable law. The minutes will include: (1) the time, date, and place of the Commission meeting; (2) a list of the persons who were present at the place of the meeting; (3) an accurate description of each matter discussed and the resolution, if any, made by the Commission regarding such matter; and (4) a copy of each report or other document received, issued, or approved by the Commission at the meeting.

**(J) Public Comment.** Subject to Section IV(E), members of the public may, at the determination of the Chair, offer oral comment at any meeting open to the public. The Chair may decide in advance to exclude oral public comment during a meeting, in which case the meeting announcement published in the Federal Register will note that oral comment from the public is excluded and will invite written comment as an alternative. Members of the public may submit written statements to the Commission at any time.

## Section V: Voting

**(A) In General.** When a decision or recommendation of the Commission is required, the Chair shall request or accept a motion for a vote. Any Member, including the Chair, may make a motion for a vote. No second after a proper motion will be required to bring any issue or recommendation to a vote. A quorum must be present when a vote is taken.

**(B) Voting Eligibility.** Only the Members, including the Chair, may vote on a motion.

**(C) Voting Procedures.** Votes will ordinarily be taken and tabulated by a show of hands or by voice vote.

**Section VI: Subcommittees**

The Chair of the Commission, in consultation with the DFO, is authorized to create subcommittees as necessary to support the Commission's work. Subcommittees may not incur costs or expenses without prior written approval of the Chair or the Chair's designee and the DFO. Subcommittees must report directly to the Commission, and must not provide advice or work products directly to the President or any other official or agency.

**Section VII: Administrative Support and Funding**

Pursuant to Executive Order 13799, to the extent permitted by law, and subject to the availability of appropriations, the General Services Administration shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission, to the extent permitted by law and on a reimbursable basis. However, the President's designee will be responsible for fulfilling the requirements of subsection 6(b) of the FACA.

**Section VIII: Records**

The records of the Commission and its subcommittees shall be handled in accordance with the Presidential Records Act of 1978 and FACA.

**Section IX: Termination**

The Commission shall terminate no more than two (2) years from the date of the Executive Order establishing the Commission, unless extended by the President, or thirty (30) days after it presents its final report to the President, whichever occurs first.

**Section X: Amendment of By-Laws**

Amendments to the By-Laws must conform to the requirements of the Executive Order, charter establishing the Commission, and FACA, and be agreed to by two-thirds of the Members. The DFO must ensure that all Members receive a copy of the proposed amendment before any vote is taken on it.

4

## Presidential Advisory Commission on Election Integrity

July 26, 2017

Office of the Secretary of State of California
The Honorable Alex Padilla, Secretary of State
1500 11th Street
Sacramento, CA 95814

Dear Secretary Padilla,

In my capacity as Vice Chair of the Presidential Advisory Commission on Election Integrity, I wrote to you on June 28, 2017, to request publicly available voter registration records. On July 10, 2017, the Commission staff requested that you delay submitting any records until the U.S. District Court for the District of Columbia ruled on a motion from the Electronic Privacy Information Center that sought to prevent the Commission from receiving the records. On July 24, 2017, the court denied that motion. In light of that decision in the Commission's favor, I write to renew the June 28 request, as well as to answer questions some States raised about the request's scope and the Commission's intent regarding its use of the registration records. I appreciate the cooperation of chief election officials from more than 30 States who have already responded to the June 28 request and either agreed to provide these publicly available records, or are currently evaluating what specific records they may provide in accordance with their State laws.

Like you, I serve as the chief election official of my State. And like you, ensuring the privacy and security of any non-public voter information is a high priority. My June 28 letter only requested information that is already available to the public under the laws of your State, which is information that States regularly provide to political candidates, journalists, and other interested members of the public. As you know, federal law requires the States to maintain certain voter registration information and make it available to the public pursuant to the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA). The Commission recognizes that State laws differ regarding what specific voter registration information is publicly available.

I want to assure you that the Commission will not publicly release any personally identifiable information regarding any individual voter or any group of voters from the voter registration records you submit. Individuals' voter registration records will be kept confidential and secure throughout the duration of the Commission's existence. Once the Commission's analysis is

complete, the Commission will dispose of the data as permitted by federal law. The only information that will be made public are statistical conclusions drawn from the data, other general observations that may be drawn from the data, and any correspondence that you may send to the Commission in response to the narrative questions enumerated in the June 28 letter. Let me be clear, the Commission will not release any personally identifiable information from voter registration records to the public.

In addition, to address issues raised in recent litigation regarding the data transfer portal, the Commission is offering a new tool for you to transmit data directly to the White House computer system.  To securely submit your State's data, please have a member of your staff contact Ron Williams on the Commission's staff at ElectionIntegrityStaff@ovp.eop.gov and provide his or her contact information. Commission staff will then reach out to your point of contact to provide detailed instructions for submitting the data securely.

The Commission will approach all of its work without preconceived conclusions or prejudgments.  The Members of this bipartisan Commission are interested in gathering facts and going where those facts lead.  We take seriously the Commissions' mission pursuant to Executive Order 13799 to identify those laws, rules, policies, activities, strategies, and practices that either enhance or undermine the integrity of elections processes.  I look forward to working with you in the months ahead to advance those objectives.

Sincerely,

Kris W. Kobach
Vice Chair
Presidential Advisory Commission on Election Integrity

## CERTIFICATE OF SERVICE

I, Marc Rotenberg, hereby certify that on August 18, 2017, I electronically

filed the foregoing document with the Clerk of the Court for the United States Court

of Appeals for the D.C. Circuit by using the CM/ECF system. The following

participants in the case who are registered CM/ECF users will be served by the

CM/ECF system:

    Daniel Tenny
    Email: daniel.tenny@usdoj.gov
    U.S. Department of Justice
    (DOJ) Civil Division, Appellate Staff
    Firm: 202-514-2000
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001

    Mark B. Stern, Attorney
    Email: mark.stern@usdoj.gov
    U.S. Department of Justice
    (DOJ) Civil Division, Appellate Staff
    Firm: 202-514-2000
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001

          /s/ Marc Rotenberg
          MARC ROTENBERG