No. 17-5171

# In the U.S. Court of Appeals for the District of Columbia Circuit

ELECTRONIC PRIVACY INFORMATION CENTER,
*Plaintiff-Appellant,*

v.

PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY,
*ET AL.*,
*Defendants-Appellees.*

APPEAL FROM U.S. DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA, No. 1:17-cv-1320-CKK (HON. COLLEEN KOLLAR-KOTELLY)

**BRIEF FOR *AMICUS CURIAE* EAGLE FORUM EDUCATION
& LEGAL DEFENSE FUND IN SUPPORT OF APPELLEES
IN SUPPORT OF AFFIRMANCE**

Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave, NW, Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

Counsel for *Amicus Curiae* Eagle Forum
Education & Legal Defense Fund

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1 and Circuit Rule 26.1, counsel for *amicus curiae* Eagle Forum Education & Legal Defense Fund ("EFELDF") states that (a) EFELDF is a non-profit, tax-exempt corporation under §501(c)(3) of the Internal Revenue Code with no parent corporation; (b) no publicly traded entity – or any other entity – holds a ten-percent ownership interest in EFELDF; and (c) EFELDF is an education and legal defense fund that advocates for traditional American values and constitutional government, including – as relevant here for the elections on which the Nation has based its political community – governmental efforts both to reduce voter fraud and to maximize voter confidence in the electoral process.

Dated: September 21, 2017                Respectfully submitted,

/s/ Lawrence J. Joseph

Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave. NW
    Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae Eagle Forum Education & Legal Defense Fund*

i

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for *amicus curiae* Eagle Forum Education & Legal Defense Fund ("EFELDF") presents the following certificate as to parties, rulings, and related cases.

**A.      Parties and *Amici***

EFELDF adopts the appellees' statement of parties and *amici,* with the addition of EFELDF's appearing as an *amicus* in this appeal.

**B.      Rulings under Review**

EFELDF adopts appellees' statement of rulings under review.

**C.      Related Cases**

EFELDF adopts the appellees' statement of related cases.

Dated: September 21, 2017                    Respectfully submitted,

                                  /s/ Lawrence J. Joseph
                                  _____
                                  Lawrence J. Joseph, DC Bar #464777
                                  1250 Connecticut Av NW Suite 200
                                  Washington, DC 20036
                                  Telephone: (202) 355-9452
                                  Facsimile: (202) 318-2254
                                  Email: ljoseph@larryjoseph.com

                                  *Counsel for Amicus Eagle Forum Education
                                  & Legal Defense Fund*

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................i

Certificate as to Parties, Rulings, and Related Cases ............................... ii

    A.    Parties and *Amici* .......................................................... ii

    B.    Rulings under Review ...................................................... ii

    C.    Related Cases ................................................................ ii

Table of Contents ................................................................................ iii

Table of Authorities ..............................................................................v

Glossary................................................................................................x

Identity, Interest and Authority to File ...................................................1

Statement of the Case............................................................................1

    Constitutional Background ......................................................2

    Statutory Background .............................................................3

    Factual Background ...............................................................4

Standard of Review ...............................................................................5

Summary of Argument ..........................................................................6

Argument..............................................................................................8

I.    EPIC lacks standing to challenge the Commission's operations. ..................8

    A.    EPIC's informational-injury theory is simply an end run around the constitutional mandate for a particularized injury in fact. .......................................................8

    B.    EPIC's diverted-resources injuries are both inadequate under Circuit precedent and invalid as self-inflicted. ...........................9

II.    EPIC is unlikely to prevail on the merits......................................12

A.    The Commission is not an agency under the E-Government Act or APA. ..................................................12

      1.    The Commission lacks sufficient independent authority for EOP agency status under *Soucie* and its progeny. ...................................................13

      2.    The Commission is not an investigative "agency" because it lacks any delegated investigative authority and its recommendations have no regulatory effect. ...................................................15

      3.    APA's definition of agency in §701(b)(2) requires the same "substantial independent authority" that *Soucie* required. ...........................................16

B.    The Director's involvement does not trigger the E-Government Act's requirement for a privacy impact assessment. ..............................................19

C.    GSA's status as an agency is irrelevant because GSA is not involved in the Commission's information collection. ................20

III.    EPIC cannot make a compelling showing on any of the other preliminary-injunction factors. ...................................................21

    A.    EPIC does not suffer irreparable harm. ..............................21

    B.    The balance of equities tips to the Commission. ................22

    C.    The public interest favors the Commission. .......................23

Conclusion .....................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Action Alliance of Senior Citizens v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986) .......................................................................12

*Armstrong v. Executive Office of the President*,
   90 F.3d 553 (D.C. Cir. 1996).........................................................................14

*Ass'n of Data Processing Serv. Org., Inc. v. Camp*,
   397 U.S. 150 (1970) ........................................................................................2

*Burford v. Sun Oil Co.*,
   319 U.S. 315 (1943) ................................................................................. 23-24

*Citizens for Responsibility & Ethics in Washington v. Office of Admin.*,
   566 F.3d 219 (D.C. Cir. 2009) .......................................................................14

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ..........................................................................................8

*Clapper v. Amnesty Int'l USA*,
   133 S.Ct. 1138 (2013) ...................................................................................10

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
   543 U.S. 157 (2004) ................................................................................. 17-18

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990) ................................................................................... 5-6

\*   *Dong v. Smithsonian Inst.*,
   125 F.3d 877 (D.C. Cir. 1997).................................................................. 18-19

\*   *Energy Research Found. v. Def. Nuclear Facilities Safety Bd.*,
   917 F.2d 581 (D.C. Cir. 1990).................................................................. 15-16

*Florida Audubon Soc'y v. Bentsen*,
   25 ELR 21207 (D.C. Cir. 1995) ......................................................................9

\*   *Florida Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) (*en banc*) ................................................. 6, 8-9

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ........................................................................8

*Gladstone, Realtors v. Bellwood*,
   441 U.S. 91 (1979) ........................................................................................10

*Harrisonville v. W.S. Dickey Clay Mfg. Co.*,
   289 U.S. 334 (1933) ....................................................................5

\* *Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)............................................. 6, 10-12

*In re Navy Chaplaincy*,
   534 F.3d 756 (D.C. Cir. 2008) ....................................21

*Kissinger v. Reporters Comm. for Freedom of Press*,
   445 U.S. 136 (1980) ....................................................14

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ......................................................3

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)......................................23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................3

\* *Meyer v. Bush*,
   981 F.2d 1288 (1993) ................................................13

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ....................................................21

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ................................11

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ....................................................17

*Pacific Legal Found. v. Council on Envt'l Quality*,
   636 F.2d 1259 (D.C. Cir. 1980) ........................14, 16

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) ....................................................10

\* *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*,
   797 F.3d 1087 (D.C. Cir. 2015)................................10

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ........................................................22

*Rushforth v. Council of Econ. Advisers*,
   762 F.2d 1038 (D.C. Cir. 1985) ..............................14

*Sierra Club v. Andrus*,
   581 F.2d 895 (D.C. Cir. 1978) ................................14

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ....................................................................10

\* *Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971)........................................ 6, 13-20

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) ....................................................................18

*Sweetland v. Walters,*
    60 F.3d 852 (D.C. Cir. 1995)......................................................14

*Taylor v. Resolution Trust Corp.,*
    56 F.3d 1497 (D.C. Cir. 1995) ...................................................21

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..................................................................11

\* *Washington Research Project, Inc. v. Dep't of Health, Educ. & Welfare,*
    504 F.2d 238 (D.C. Cir. 1974)........................................12, 16, 19

*Waters v. Churchill,*
    511 U.S. 661 (1994) ..................................................................18

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ....................................................................5

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................5

\* *Wisconsin Gas Co. v. Fed'l Energy Regulatory Comm'n,*
    758 F.2d 669 (D.C. Cir. 1985)....................................................22

*Yakus v. U.S.,*
    321 U.S. 414 (1944) ..................................................................24

## STATUTES

U.S. CONST. art. III...............................................2-3, 6, 8, 10-11, 21

U.S. Const. art. III, §2 .................................................................2

Administrative Procedure Act,
    5 U.S.C. §§551-706 ............................... 2, 4, 6-7, 12-13, 16-18, 20

5 U.S.C. §551(1) .............................................................. 4, 16-17

5 U.S.C. §551(13) ........................................................................4

Freedom of Information Act,
    5 U.S.C. §552...............................................................5, 10, 13, 17

5 U.S.C. §552(f) ................................................................ 16-17

5 U.S.C. §701(b)(1) ........................................................ 4, 16-17

5 U.S.C. §701(b)(2) ........................................................... 4, 16

5 U.S.C. §702 ......................................................................... 4

5 U.S.C. §703 ......................................................................... 4

5 U.S.C. §704 ......................................................................... 4

42 U.S.C. §2286a(b)(3) ......................................................... 16

National Environmental Policy Act,
    42 U.S.C. §§4321-4335 ..................................................... 9

42 U.S.C. §4332(2)(C) ........................................................... 9

42 U.S.C. §4344(5) .............................................................. 16

44 U.S.C. §3502(1) ................................................................ 3

Federal Advisory Committee Act,
    5 U.S.C. app. 2 ................................................................ 13

Federal Advisory Committee Act §3(2),
    5 U.S.C. app. 2 ................................................................ 13

E-Government Act of 2002,
    PUB. L. NO. 107-347, 116 Stat. 2899 ......... 2-3, 5-6, 8-10, 12-13, 19

PUB. L. NO. 107-347, §2(b)(9),
    116 Stat. 2899, 2901 (2002) ........................................... 3-4

PUB. L. NO. 107-347, §201,
    116 Stat. 2899, 2910 (2002) .............................................. 3

PUB. L. NO. 107-347, §208,
    116 Stat. 2899, 2921 (2002) ........................................... 2, 4

PUB. L. NO. 107-347, §208(a),
    116 Stat. 2899, 2921 (2002) .............................................. 4

PUB. L. NO. 107-347, §208(b)(1)(A),
    116 Stat. 2899, 2921 (2002) ......................................... 19, 21

PUB. L. NO. 107-347, §208(b)(1)(A)(i),
    116 Stat. 2899, 2921 (2002) .......................................... 3, 19

PUB. L. NO. 107-347, §208(b)(1)(A)(ii),
    116 Stat. 2899, 2921 (2002) .......................................... 3, 19

# LEGISLATIVE HISTORY

H.R. CONF. REP. NO. 93-1380 (1974) ................................................................ 13-14

## RULES AND REGULATIONS

FED. R. APP. P. 29(c)(5) ........................................................................................1

40 C.F.R. §1502.19(c) ...........................................................................................9

40 C.F.R. §1502.19(d) ...........................................................................................9

Exec. Order No. 13,799,
      82 Fed. Reg. 22,389 (2017) .....................................................................4, 20

## OTHER AUTHORITIES

Robert Barnes, *Split on Supreme Court aids challenges to voter-ID laws*,
      WASH. POST, Sept. 7, 2016, at A01 ............................................................23

Alan Blinder & Ken Otterbourg, *Election Practices at Stake in North Carolina
      as Voter ID Law Trial Begins*, N.Y. TIMES, Jan 26, 2016, at A12.......... 22-23

11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,
      FED. PRAC. & PROC. Civ.2d §2948.4 ...........................................................23

## **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §§551-706 |
| EFELDF | Eagle Forum Education & Legal Defense Fund |
| EIA | Environmental Impact Assessment |
| EOP | Executive Office of the President |
| EPIC | Electronic Privacy Information Center |
| FACA | Federal Advisory Committee Act, 5 U.S.C. app. 2 |
| FOIA | Freedom of Information Act, 5 U.S.C. §552 |
| GSA | General Services Administration |
| IT | Information Technology |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§4321-4335 |
| PIA | Privacy Impact Assessment |

## IDENTITY, INTEREST AND AUTHORITY TO FILE

*Amicus curiae* Eagle Forum Education & Legal Defense Fund ("EFELDF"), a nonprofit corporation headquartered in Saint Louis, Missouri, seeks the Court's leave to file this brief as set forth in the accompanying motion.[1] Since its founding in 1981, EFELDF has consistently defended not only the Constitution's federalist structure, but also its limits on both state and federal power and the separation of powers. In the context of the integrity of the elections on which the Nation has based its political community, EFELDF has supported efforts both to reduce voter fraud and to maximize voter confidence in the electoral process. For all the foregoing reasons, EFELDF has a direct and vital interest in the issues before this Court.

## STATEMENT OF THE CASE

The Electronic Privacy Information Center ("EPIC") has sued the Presidential Advisory Commission on Election Integrity and its officers (the "Commission"), the Director of White House Information Technology (the "Director"), the Executive Office of the President ("EOP"), the General Services Administration ("GSA"), and various other governmental entities to enjoin the collection of publicly available voter data until the preparation and dissemination of a "privacy impact assessment"

---

[1]     Pursuant to FED. R. APP. P. 29(c)(5), the undersigned counsel certifies that: counsel for *amicus* authored this brief in whole; no counsel for a party authored this brief in any respect; and no person or entity – other than *amicus*, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

under §208 of the E-Government Act of 2002, PUB. L. NO. 107-347, 116 Stat. 2899.[2]
The District Court denied EPIC's motion for a preliminary injunction, prompting this appeal.

Because EPIC – which itself suffers no privacy injury – lacks standing to enforce §208 and because §208 does not apply in any event, this Court should affirm the denial of interim relief. Moreover, because the Commission is not an "agency" whose actions fall under the judicial-review provisions of the Administrative Procedure Act ("APA"), EPIC also lacks a cause of action for judicial review of the Commission's data collection.

## Constitutional Background

To establish the case or controversy that Article III requires for federal-court jurisdiction, U.S. Const. art. III, §2, a plaintiff must show that: (1) the challenged action constitutes an "injury in fact," (2) the injury is "arguably within the zone of interests to be protected or regulated" by the relevant statutory or constitutional provision, and (3) nothing otherwise precludes judicial review. *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970). An "injury in fact" is (1) an actual or imminent invasion of a constitutionally cognizable interest,

---

[2]     Although several related cases challenge the Commission's formation and operations, *see* EPIC Br. at iii-iv (listing related cases), *amicus* EFELDF understands that this is the only litigation pressing §208 of the E-Government Act as a basis for judicial intervention.

(2) which is causally connected to the challenged conduct, and (3) which likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992). In addition to this constitutional baseline, standing doctrine also includes prudential elements, including not only the foregoing zone-of-interests test, but also the need for those seeking to assert absent third parties' rights to have their own Article III standing and a close relationship with the absent third parties, whom a sufficient "hindrance" keeps from asserting their own rights. *Kowalski v. Tesmer*, 543 U.S. 125, 128-30 (2004).

**Statutory Background**

Section 208 of the E-Government Act requires privacy impact assessments when a federal "agency" develops or procures new information technology ("IT") to collect, maintain, or disseminate certain information on individuals or, alternatively, initiates a new collection of such information that will be collected, maintained, or disseminated on IT. PUB. L. NO. 107-347, §208(b)(1)(A)(i)-(ii), 116 Stat. at 2921. "Agency" is defined in pertinent part as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." *Id.* §201, 116 Stat. at 2910 (*incorporating inter alia* 44 U.S.C. §3502(1)). Although the E-Government Act's general purposes include "mak[ing] the Federal Government more transparent

3

and accountable," *Id.* §2(b)(9), 116 Stat. at 2901, the specific "purpose of [§208] is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government." *Id.* §208(a), 116 Stat. at 2921.

In pertinent part, APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include [the legislative and judicial branches or sub-national government such as the District of Columbia, territories, and possessions]." 5 U.S.C. §§551(1), 701(b)(1). APA authorizes judicial review of "agency action," 5 U.S.C. §§702-704, but that term means "the whole or a part of an *agency* rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §§551(13), 701(b)(2) (emphasis added).

**Factual Background**

The President established the Commission by executive order, Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (2017) (JA:55), as a "solely advisory" body, *id.* §3, to study and report on circumstances that either enhance or undermine confidence in electoral integrity and on vulnerabilities that could lead to improper voter registration and improper voting in federal elections. *Id.* §3(a)-(c). To meet this mission, the Commission requested publicly available voter data from all fifty states and the District of Columbia, limiting the request to only the data that are public under the relevant state's laws. *See* Comm'n Br. at 5-6. Although the initial proposed

4

data collection relied on other means, the Commission now will rely on the Director to develop a secure means of obtaining data from the States using an existing White House IT system. Mem. Op. 8 (JA:21).

EPIC lacks both its own privacy concerns and members with privacy concerns over the Commission's information-collection actions. Instead, EPIC claims injury in the form of the denial of the privacy impact assessment that the E-Government Act allegedly requires and in the allegedly resulting need to incur costs in the form of Freedom of Information Act ("FOIA") requests to learn about the Commission's actions. Decl. of Eleni Kyriakides (JA:236); Mem. Op. 25-26 (JA:38-39).

## STANDARD OF REVIEW

In seeking to reverse the District Court's denial of a preliminary injunction, EPIC must meet a familiar – and strict – test for that extraordinary remedy:[3]

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Appellate courts review the grant or denial of preliminary relief for abuse of discretion, but a "court would necessarily abuse its discretion if it based its ruling on an erroneous

---

[3]    As an "extraordinary" remedy, a preliminary injunction "is not a remedy which issues as of course." *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-38 (1933); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982).

view of the law." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

## SUMMARY OF ARGUMENT

While it concurs with the Commission's arguments against EPIC's standing, EFELDF makes two additional arguments against EPIC's standing under Article III. First, EPIC's claim of informational standing conflicts the *en banc* Court's finding in *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664-65 (D.C. Cir. 1996) (*en banc*), that – notwithstanding an informational injury that would arise *if the desired report were produced but withheld* – a plaintiff must have a particularized injury under the statute requiring the report's production to assert the procedural injury of an agency's not producing the purportedly required report (Section I.A). Second, Article III does not contemplate self-inflicted injuries like EPIC's diverted resources and nothing in the E-Government Act suggests otherwise, unlike unusual statutes such as the Fair Housing Act that legislatively dispense with prudential standing doctrines such as the zone-of-interests test in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372-73 (1982) (Section I.B).

EPIC is unlikely to prevail on the merits because the Commission is not an agency under either the E-Government Act or APA because it lacks any delegated governmental power, and thus *a fortiori* lacks the "substantial independent authority" that *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971), and its progeny require for agency status (Section II.A.1). EPIC cannot rely on decisions

6

that find "agency" status in investigative powers because those decisions rely on the delegated legislative power of investigation, which is inherently different from the Commission's efforts to acquire and study publicly available voter information (Section II.A.2). Finally, EPIC cannot establish that the various "agency" definitions vary based on the negative implication of decisions that allowed APA review without questioning "agency" status: negative implications are not holdings (Section II.A.3). Similarly, the Director is not sufficiently involved to trigger the need for a privacy impact assessment, and he is not an "agency" actor because he simply serves as EOP's IT director, without any governmental powers, just as any similarly sized private entity would have an IT director (Section II.B). Finally, GSA is not involved in the Commission's information-collection activity, and EPIC lacks an enforceable mechanism to compel GSA's involvement (Section II.C).

On the other preliminary-injunction factors, EPIC lacks irreparable harm because the absence of a report is insufficiently important, given EPIC's lack of any privacy concerns of its own and the fact that the data in question already are publicly available (Section III.A). Given the relative lack of irreparable harm to EPIC versus the alternative of delaying an important presidential inquiry, the balance of equities tips against EPIC (Section III.B). Finally, the public-interest factor collapses into the merits (and thus against EPIC), especially for litigation that would impair governmental functions (Section III.C).

## ARGUMENT

### I.     EPIC LACKS STANDING TO CHALLENGE THE COMMISSION'S OPERATIONS.

Before a federal court can even consider the underlying merits, plaintiffs must establish their standing to obtain a preliminary injunction. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). The District Court found not only informational standing to seek a privacy impact statement but also organizational standing for the resources directed to counteract the absence of a privacy impact statement. Mem. Op. 16–26 (JA:29-39). Neither form of standing is consistent with Article III or with binding Supreme Court and Circuit precedent. While *amicus* EFELDF fully supports the Commission's arguments on standing, Comm'n Br. at 14-22, EFELDF writes separately here to emphasize how both forms of EPIC's purported standing should fail under binding Supreme Court or *en banc* Circuit precedent.

### A.     EPIC's informational-injury theory is simply an end run around the constitutional mandate for a particularized injury in fact.

The District Court premised EPIC's informational standing on the failure to conduct a PIA, which the E-Government Act would then have required to be publicly available, relying on *Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016). Mem. Op. 16 (JA:29). While there is no question that EPIC could compel release of any PIAs that exist, that is not the same thing as compelling the production of a PIA that does not exist. In *Florida Audubon Society*, 94 F.3d at 664-65, the *en banc* Court held that a plaintiff seeking to compel production of impact assessments "must show

8

not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest," without regard to the informational interest the plaintiff would have in the public availability of such assessments.

Like privacy impact assessments in the E-Government Act, an environmental impact assessment ("EIA") – from which PIAs appear to get their name – under the National Environmental Policy Act, 42 U.S.C. §§4321-4335 ("NEPA") is publicly available *if it is prepared*. 42 U.S.C. §4332(2)(C); 40 C.F.R. §1502.19(c)-(d). Further, like EPIC here, the *Florida Audubon* plaintiffs claimed an informational injury in the denial of the EIA, 94 F.3d at 674 n.2 Rogers, J., dissenting); *Florida Audubon Soc'y v. Bentsen,* 25 ELR 21207, 21208 (D.C. Cir. 1995) (plaintiffs "further claimed that the Secretary's failure to prepare an [environmental impact statement] deprived them of information they needed to protect the areas in question") (panel decision), which this Court *en banc* held insufficient to require the agency to undertake the procedure of conducting an assessment that did not already exist. *Amicus* EFELDF respectfully submits that this case is no different and that EPIC's lack of any underlying privacy-based injury denies EPIC standing here.

## B. EPIC's diverted-resources injuries are both inadequate under Circuit precedent and invalid as self-inflicted.

The District Court premised EPIC's organizational standing on the theory that the withheld PIA injured EPIC's interests and that EPIC therefore used its own

9

resources to counteract that injury, here by using FOIA requests, relying on *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) ("*PETA*"). Mem. Op. 24-26 (JA:37-39). Because EPIC's diverted-resources injury is entirely self-inflicted and outside the E-Government Act's zone of interests, *amicus* EFELDF respectfully submits that it does not suffice.

This type of diverted-resources standing derives from *Havens*; as Judge Millett explained in her *PETA* dissent, "[t]he problem is not *Havens*[; the] problem is what our precedent has done with *Havens*." 797 F.3d at 1100-01 (Millett, J., dissenting). Under the unique statutory and factual situation in *Havens*, a housing-rights organization's diverted resources provided it standing, but in most other settings such diverted resources are mere self-inflicted injuries. *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1152-53 (2013); *Pennsylvania v. New Jersey,* 426 U.S. 660, 664 (1976). Moreover, if mere spending could manufacture standing, any private advocacy group could establish standing against any government action. But that clearly is not the law. *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (organizations lack standing to defend "abstract social interests"). To avoid overstepping its constitutional authority, this Court must reconsider the diverted-resources rationale for Article III standing.

Relying on *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 102-09 (1979), *Havens* held that the Fair Housing Act at issue there extends "standing under § 812

10

… to the full limits of Art. III," so that "courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section," 455 U.S. at 372, thereby collapsing the standing inquiry into the question of whether the alleged injuries met the Article III minimum of injury in fact. *Id.* The typical organizational plaintiff and typical statute lack several critical criteria from *Havens*.

First, the *Havens* organization had a statutory right (backed by a statutory cause of action) to truthful information that the defendants denied to it. Because "Congress may create a statutory right … the alleged deprivation of [those rights] can confer standing." *Warth v. Seldin,* 422 U.S. 490, 514 (1975). Under a typical statute, a typical organizational plaintiff has no claim to any rights related to its own voluntarily diverted resources.

Second, and related to the first issue, the injury that an organizational plaintiff claims must align with the other components of its standing, *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996), including the allegedly cognizable right. In *Havens,* the statutorily protected right to truthful housing information aligned with the alleged injury (costs to counteract false information, in violation of the statute). By contrast, under a typical statute, there will be no rights even *remotely* related to a third-party organization's spending.

Third, and most critically, the *Havens* statute eliminated prudential standing, so the zone-of-interest test did not apply. When a plaintiff – whether individual or

organizational – sues under a statute that does not eliminate prudential standing, that plaintiff cannot bypass the zone-of-interest test or other prudential limits on standing.[4] Typically, it would be fanciful to suggest that a statute has private, third-party spending in its zone of interests. Here, this Court might – or might not – find that the E-Government Act sought to ease EPIC's mission, but that is not uniformly true for all statutes or all institutional plaintiffs. It is important for any federal court to ask the prudential questions, if only to assure itself of its jurisdiction.

## II.    EPIC IS UNLIKELY TO PREVAIL ON THE MERITS.

The first preliminary-injunction factor is EPIC's likelihood of prevailing on the merits. Because the Commission is not an agency, the E-Government Act does not require a privacy impact assessment, and APA does not provide judicial review. Similarly, neither the Director's involvement nor GSA's noninvolvement change the lack of either the PIA underlying obligation or an action for judicial review.

### A.    The Commission is not an agency under the E-Government Act or APA.

Simply put, "advisory committees … performing staff functions through the medium of outside consultancy … are not agencies." *Washington Research Project,*

---

[4]    For example, applying *Havens* to diverted resources in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 939 (D.C. Cir. 1986) (R.B. Ginsburg, J.), then-Judge Ginsburg correctly recognized the need to ask whether those diverted resources fell within the zone of interests of the Age Discrimination Act. 789 F.2d at 939. There was no such inquiry here or in most diverted-resource decisions.

*Inc. v. Dep't of Health, Educ. & Welfare*, 504 F.2d 238, 246 (D.C. Cir. 1974). Indeed, even a task force comprised entirely of high-ranking Executive-Branch agency officers is not an "agency" when it merely investigates and makes recommendations to the President. *Meyer v. Bush*, 981 F.2d 1288, 1297-98 (1993).[5] This Court has never found an advisory committee with no delegated regulatory or investigative powers to constitute an "agency" under the various definitions of that term at issue here. EPIC's arguments to the contrary simply misconstrue or misapply the authorities on which EPIC seeks to rely.

### 1.  The Commission lacks sufficient independent authority for EOP agency status under *Soucie* and its progeny.

Even before Congress added EOP to the definition of "agency" in FOIA and the Paperwork Reduction Act (and, by incorporation, to the E-Government Act), this Court read the then-common APA definition of "agency" to require "substantial independent authority" before an EOP entity could qualify as an "agency." *Soucie*, 448 F.2d at 1073. Since then, both Congress and the Supreme Court have ratified the *Soucie* approach: "the President's immediate personal staff or units in [EOP] whose sole function is to advise and assist the President" fall outside the term "agency." H.R. CONF. REP. NO. 93-1380, at 14-15 (1974) ("the conferees intend the

---

[5]     Because all members were Government employees, the Federal Advisory Committee Act did not apply to the *Meyer* task force. *See* 5 U.S.C. app. 2, §3(2).

result reached in *Soucie v. David*"); *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 156 (1980). Moreover, a series of decisions here have applied the *Soucie* rationale to determine which EOP entities are agencies and which are mere presidential staff. Under this line of cases,[6] the Commission cannot be an agency because it lacks any authority whatsoever.

Because the Commission briefs this issue well, Comm'n Br. at 29-30, *amicus* EFELDF has nothing significant to add beyond the obvious. The instances where this Court has found an EOP entity to qualify as an "agency" all involve delegations of regulatory or investigative authority to that entity. While the Commission has no such authority itself, it also bears emphasis that neither does the President, as far as voting policy or voting irregularities are concerned. The Commission's only tasks and goals are informational, drawing on public sources of information; while the President may refer the Commission's work to Congress or perhaps even to a relevant agency such as the independent Election Assistance Commission or Federal

---

[6]     *See*, *e.g.*, *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219 (D.C. Cir. 2009) (Office of Administration is not an agency); *Pacific Legal Found. v. Council on Envt'l Quality*, 636 F.2d 1259 (D.C. Cir. 1980) (Council on Environmental Quality is an agency); *Armstrong v. Executive Office of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996) (National Security Council not an agency); *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) (Office of Management and Budget is an agency); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 (D.C. Cir. 1985) (Council of Economic Advisors is not an agency); *cf. Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995) (White House residence staff are not an agency).

Election Commission, the President himself has no authority to take binding action on the Commission's recommendations.

> **2.     The Commission is not an investigative "agency" because it lacks any delegated investigative authority and its recommendations have no regulatory effect.**

EPIC also finds the Commission to fall within the functional "investigates, evaluates and recommends" definition of agency in *Energy Research Found. v. Def. Nuclear Facilities Safety Bd.*, 917 F.2d 581, 585 (D.C. Cir. 1990), based on the goal of studying electoral and voting issues and making recommendations. *See* EPIC Br. at 40-41. As EPIC admits, this theory of agency status derives from *Soucie*, *id.*, but EPIC fails to describe the specific underpinnings of this theory, which require either or both of delegated investigative authority or regulatory impact for the resulting recommendations. Relying upon the general public's right of access to publicly available voting data and making recommendations only to the President, the Commission does not meet either prong.

"The power of investigation has long been recognized as an incident of legislative power," but "Congress has often delegated portions of its investigatory power to administrative agencies." *Soucie*, 448 F.2d at 1075 n.27. Indeed, "Congress approved the plan [that created the *Soucie* entity in EOP] with the understanding that it was 'delegating [the *Soucie* entity in EOP] some of its own broad power of inquiry in order to improve the information on federal scientific programs available to the

15

legislature.'" *Washington Research Project*, 504 F.2d at 247 (*quoting Soucie*, 448 F.2d at 1075). Here, the Commission does not have any delegated authority to conduct its investigation.

By contrast, the Board in *Energy Research Foundation* has "access to … design and operational data, including safety analysis reports, from any Department of Energy defense nuclear facility," 42 U.S.C. §2286a(b)(3),[7] and "formally evaluates the Energy Department's standards relating to defense nuclear facilities and it *forces* public decisions about health and safety." *Energy Research Found.*, 917 F.2d at 584 (emphasis added). In its investigative capacity, the Commission is no more an "agency" than EFELDF or any member of the public who might acquire publicly available data on voters.

### 3.     APA's definition of agency in §701(b)(2) requires the same "substantial independent authority" that *Soucie* required.

EPIC relies on instances where this Court has allowed APA review of EOP entities without a *Soucie*–based analysis of the entities' status as an "agency" under APA's definition. *See* EPIC Br. at 26-32. EPIC's theory here is that decisions "interpreting the term 'agency' under 5 U.S.C. §§ 552(f) and 551(1)" somehow do not "control the meaning of that term under 5 U.S.C. § 701(b)(1)." *Id.* at 26. This

---

[7]     Similarly, the Council on Environmental Quality at issue in *Pacific Legal*, 636 F.2d 1259, also had statutory investigative authority, 42 U.S.C. §4344(5), in addition to delegated power to issue regulations. *See* Comm'n Br. at 24.

analysis has several flaws, all fatal to EPIC's argument.

First, while acknowledging that the agency definition in §551(1), §552(f)(1), and §701(b)(1) grew out of an initially common APA definition of agency, *id.* at 31-32, EPIC argues that the privilege-based rationale for *Soucie* under FOIA does not apply to the availability of APA review, which allows this Court to interpret agency under §701(b)(1) without regard to *Soucie*. This ahistorical reading fails to consider that Congress has taken no steps to alter or expand the limitations that the original APA definition placed on what are essentially the same words that *Soucie* interpreted *before* the definitions diverged: "repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal [is] clear and manifest." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 662 (2007) (alteration in original, interior quotations and citations omitted). Both when *Soucie* was decided and now, the limiting features of APA's "agency" definition require "substantial independent authority," *Soucie*, 448 F.2d at 1073, for an entity to be an APA agency.

Second, EPIC asks this Court to infer a holding from a prior panel's simply not having discussed an issue, *id.* at 29-30 (collecting cases), which is not enough. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157,

170 (2004) (interior quotations omitted); *Waters v. Churchill,* 511 U.S. 661, 678 (1994) ("cases [cited by EPIC] cannot be read as foreclosing an argument that they never dealt with") (plurality). Indeed, to the extent that the definition of "agency" goes to the waiver of sovereign immunity – and thus to jurisdiction – the assumption of jurisdiction without addressing this issue – *i.e.*, "drive-by jurisdictional rulings" that reach merits issues without considering a particular jurisdictional issue – "have no precedential effect" on that jurisdictional issue. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94-95 (1998). The negative inferences that EPIC seeks to make are not precedents.

Third, EPIC fails to distinguish the one decision interpreting the definition's "core phrase" (namely, "authority of the Government of the United States") to require independent authority to take binding action. *Dong v. Smithsonian Inst.*, 125 F.3d 877, 880-81 (D.C. Cir. 1997) (citing, *inter alia*, *Soucie*). Although EPIC deems the Commission as "the very epicenter of gravity in the exercise of administrative power," EPIC Br. at 31 (*citing Dong*, 125 F.3d 877, 881-82, interior quotations and alterations omitted), that is not what *Dong* requires. The Commission's request goes only to public information that *anyone* could request. *Dong*, 125 F.3d 877, 882 ("every private organization possesses the power to order its own affairs and carry out transactions with others within the limits set by law"). Instead, to qualify as an APA "agency," *Dong* requires that an entity assert "public authority" (*i.e.*, delegated

authority to take *governmental* action). *Id.* The Commission lacks that authority.

### B.    The Director's involvement does not trigger the E-Government Act's requirement for a privacy impact assessment.

The Director's using an *existing* White House IT system for information collection, Mem. Op. 8 (JA:21), does not trigger §208(b)(1)(A)'s first prong, and the Director himself will not initiate the challenged information-collection activity under §208(b)(1)(A)'s second prong. *See* PUB. L. NO. 107-347, §208(b)(1)(A)(i)-(ii), 116 Stat. at 2921. As such, it would not matter whether the Director is an EOP agency or non-agency under the *Soucie* line of cases because his actions would not trigger the need for a privacy impact assessment if he were an agency actor.

In any event, even if the Director's actions fell within one of §208(b)(1)(A)'s two prongs, he is not an "agency" actor under *Soucie*. As EPIC acknowledges, the "important consideration" is whether the entity "has any authority *in law* to make decisions," EPIC Br. at 39 (*quoting Washington Research Project*, 504 F.2d at 248) (emphasis added), and constitutes "center of gravity in the exercise of *administrative power*." *Id.* (*quoting Dong*, 125 F.3d at 881-82) (emphasis added). The Director has no such *governmental* power. *Dong*, 125 F.3d at 882. Instead, the Director merely heads EOP's IT department, something "every [comparably sized] private organization possesses." *Id.* At all times, the Director is acting for or on behalf of the President, JA:215 ("to maintain the President's exclusive control of the information resources and information systems"); *id.* (Director acts "on behalf of the

19

President"), which makes him the President's staff.[8] As such, under the *Soucie* line of cases, the Director is not an "agency" actor within EOP.

### C.  GSA's status as an agency is irrelevant because GSA is not involved in the Commission's information collection.

Because GSA is an Executive-Branch agency under APA and GSA supports the Commission, EPIC argues that the executive order *required* GSA to provide Commission resources, such that GSA or the Commission is acting unlawfully when a non-GSA entity or person provides support for the Commission. *See* EPIC Br. at 42-43. Reasoning that courts can compel agency action unlawfully withheld, EPIC asked the District Court to compel GSA to support the Commission, consistent with the Commission charter, so that EPIC can then have GSA perform a privacy impact assessment. *Id.* EPIC's arguments here are misplaced.

EFELDF respectfully submits that, in seeking to enforce the unstated implication that GSA's support precludes the Commission's obtaining support from the Director, EPIC both reads the Commission's charter as preclusive where it is not and, more importantly, seeks to enforce that allegedly preclusive language when the charter itself creates no such rights. Exec. Order No. 13,799, §7(g), 82 Fed. Reg. at

---

[8]     EPIC considers it relevant that the Director coordinates, guides, and reviews "all activities relating to the information resources and information systems provided to *both the EOP and the Presidential Information Technology Community*," EPIC Br. at 40 (interior quotations omitted, emphasis added), but EPIC misrepresents its cited source, which refers to systems provided to EOP *by* the Community (JA:215).

22,390 (JA:56). Moreover, as indicated with regard to the Director, GSA could use an *existing* file-transfer protocol to allow the Commission to initiate its information-collection activities, without *GSA's* triggering either prong of §208(b)(1)(A).

### III. EPIC CANNOT MAKE A COMPELLING SHOWING ON ANY OF THE OTHER PRELIMINARY-INJUNCTION FACTORS.

Assuming *arguendo* that an Article III case or controversy existed, this Court nonetheless would need to affirm the denial of a preliminary injunction because none of the required factors weigh in EPIC's favor.

#### A. EPIC does not suffer irreparable harm.

The second preliminary-injunction factor is the irreparable harm to plaintiffs if interim relief is withheld. EPIC – which has no privacy interests at issue – merely wants to assure receipt of a privacy impact assessment. But even if privacy concerns were at issue, none would be irreparably harmed here because the Commission only seeks *publicly available* information from the states.

Although the irreparable-harm and standing inquiries overlap, *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995), plaintiffs must show even more to establish irreparable harm. *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) ("to show irreparable harm, a plaintiff must do more than merely allege harm sufficient to establish standing") (internal quotations and alternations omitted). Indeed, injuries that qualify as sufficiently immediate under Article III can nonetheless fail to qualify under the higher bar for irreparable harm. *Monsanto Co.*

*v. Geertson Seed Farms*, 561 U.S. 139, 149-50, 162 (2010). Finally, the "the injury must be both certain and great." *Wisconsin Gas Co. v. Fed'l Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). EPIC cannot meet the high bar that irreparable harm requires because the information that the Commission seeks and – according to EPIC – might negligently disclose is already *public*.[9]

### B.     The balance of equities tips to the Commission.

The third preliminary-injunction criterion is the balance of equities, which tips against EPIC due to its weak showing on irreparable harm. Although EPIC questions the need for the Commission's work, EPIC Br. at 16, even a Commission report that finds electoral fraud *not occurring* would improve voter confidence in elections. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("[v]oter fraud … breeds distrust of our government"). Thus, delaying the Commission's work might alleviate EPIC's perceived harms, but delay would cause its own harms.

Unfortunately, the electoral-integrity issue is one of many that divide the electorate along recognizable lines. Opponents deny that voter fraud and noncitizen voting even occur and thus view ballot-integrity measures as "a solution in search of a problem," Alan Blinder & Ken Otterbourg, *Election Practices at Stake in North*

---

[9]     To be sure, EPIC warns of foreign and domestic attacks on our voting system, EPIC Br. at 14, but surely the international spies and criminal masterminds of the world already have or easily could obtain publicly available information.

*Carolina as Voter ID Law Trial Begins*, N.Y. TIMES, Jan 26, 2016, at A12, whereas

proponents "can only wonder if the intent [behind opposing ballot-integrity

measures] is to reopen the door for voter fraud, potentially allowing … Democrat

politicians … to steal the election." Robert Barnes, *Split on Supreme Court aids*

*challenges to voter-ID laws*, WASH. POST, Sept. 7, 2016, at A01. The balance of

equities does not require impeding a duly elected government's pursuit of its lawful

agenda on the possibility that a report may later be produced, all to minimize the risk

of accidentally releasing information that already is publicly available.

### C.    The public interest favors the Commission.

The fourth preliminary-injunction criterion is the public interest. In litigation

like this, where the parties dispute the lawfulness of governmental action, this last

criterion collapses into the merits, 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER

& MARY KAY KANE, FED. PRAC. & PROC. Civ.2d §2948.4, because there is "a

substantial public interest in having governmental agencies abide by the federal laws

that govern their existence and operations." *League of Women Voters of the United*

*States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotations omitted). By

the same token, the public interest also contemplates the potential to improperly

frustrate governmental progress:

> It is in the public interest that federal courts of equity
> should exercise their discretionary power with proper
> regard for the rightful independence of … governments in
> carrying out their domestic policy.

*Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943). In such public-injury cases, equitable relief that affects competing public interests "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. U.S.*, 321 U.S. 414, 440 (1944). Given that EPIC is unlikely to prevail on the merits and does not suffer meaningful harm, *amicus* ELELDF respectfully submits that this final criterion favors the Commission and affirming the District Court's denial of interim relief.

## <u>CONCLUSION</u>

This Court should affirm the District Court's denial of a preliminary injunction.

Dated: September 21, 2017                    Respectfully submitted,


/s/ Lawrence J. Joseph
_____
Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave. NW
     Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae Eagle Forum*
*Education & Legal Defense Fund*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32</u>

1.    The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 5,695 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32.2.

2.    The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

Dated: September 21, 2017          Respectfully submitted,


                                        /s/ Lawrence J. Joseph
                                    Lawrence J. Joseph, D.C. Bar #464777
                                    1250 Connecticut Ave. NW
                                         Suite 200
                                    Washington, DC 20036
                                    Tel: 202-355-9452
                                    Fax: 202-318-2254
                                    Email: ljoseph@larryjoseph.com

                                    *Counsel for Amicus Curiae Eagle Forum
                                    Education & Legal Defense Fund*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of September, 2017, I electronically filed the foregoing document – in conjunction with the accompanying motion for leave to file – with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, causing the service on counsel for the parties to this action via electronic means.

/s/  Lawrence J. Joseph
_____
Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave, NW, Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae Eagle Forum Education & Legal Defense Fund*