[ORAL ARGUMENT SCHEDULED FOR NOVEMBER 21, 2017]

No. 17-5171

**IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

_____

ELECTRONIC PRIVACY INFORMATION CENTER
*Plaintiff-Appellant,*

v.

PRESIDENTIAL ADVISORY COMMISSION
ON ELECTION INTEGRITY, *et al.*,
*Defendants-Appellees.*

_____

**On Appeal from an Order of the
U.S. District Court for the District of Columbia
Case No. 17-cv-1320(CKK)**

_____

# REPLY BRIEF FOR APPELLANT

_____

MARC ROTENBERG
ALAN BUTLER
CAITRIONA FITZGERALD
JERAMIE SCOTT
JOHN DAVISSON
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

GLOSSARY ............................................................................................... v

ARGUMENT ............................................................................................. 1

    I.    The lower court properly held that EPIC has standing to pursue
        statutory claims under the E-Government Act, the FACA, and the
        APA. ...................................................................................... 2

        A.    EPIC has established both informational and organizational
            standing to pursue statutory claims against the Defendants
            for failure to complete and make available a Privacy Impact
            Assessment prior to collection of personal information. ....... 3

        B.    The Court has the authority under 5 U.S.C. § 705 to preserve
            the status quo pending resolution of EPIC's claims. ........... 10

    II.    The Commission and its co-defendants are subject to the E-
        Government Act, and their actions are subject to judicial review
        under 5 U.S.C. § 706. ........................................................... 13

        A.    The Commission is an establishment of the government
            subject to the E-Government Act. ........................................ 13

        B.    The Court has authority to set aside Defendants' unlawful
            action under the APA. ........................................................... 17

        C.    There is no "clear and convincing" evidence that Congress
            intended to preclude judicial review of the Commission's
            compliance with the E-Government Act. ............................. 21

        D.    The Commission misunderstands the GSA's mandatory duty
            to conduct a Privacy Impact Assessment. ............................ 23

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES[*]

**Cases**

*Am. Friends Serv. Comm. v. Webster*,
  720 F.2d 29 (D.C. Cir. 1983) ............................................................... 8

*Byrd v. EPA*,
  174 F.3d 239 (D.C. Cir. 1999) ............................................................ 5

*DaimlerChrysler Corp. v. Cuono*,
  547 U.S. 332 (2006) ........................................................................ 11

*Eldred v. Reno*,
  239 F.3d 372 (D.C. Cir. 2001) ............................................................ 3

*EPIC v. DEA*,
  208 F. Supp. 3d 108 (D.D.C. 2016) ................................................... 5

*EPIC v. FBI*,
  235 F. Supp. 3d 207 (D.D.C. 2017) ................................................... 5

*FEC v. Akins*,
  524 U.S. 11 (1998) ............................................................................ 3

* *Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016) ..................................................... 4, 6

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) ............................................................ 6

*Honeycutt v. United States*,
  137 S. Ct. 1626 n.2 (2017) ............................................................... 14

*Jerome Stevens Pharm., Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) ......................................................... 4

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
  583 F.3d 871 (D.C. Cir. 2009) ......................................................... 13

*Kissinger v. Reporters Comm. for the Freedom of the Press*,
  445 U.S. 136 (1980) ........................................................................ 14

*Kuzma v. U.S. Postal Serv.*,
  798 F.2d 29 (2d Cir. 1986) ............................................................... 17

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................... 1

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................ 11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*,
  567 U.S. 209 (2012) ........................................................................ 19

---

[*] Authorities principally relied upon are designated by an asterisk (*).

*Nader v. FEC*,
   725 F.3d 226 (D.C. Cir. 2013) ........................................................ 8
\* *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ................................................. 3, 5, 9
\* *Public Citizen v. U.S. Dep't of Justice*,
   491 U.S. 440 (1989) ..................................................................... 3, 9
*Puerto Rico v. Franklin California Tax-free Trust*,
   136 S. Ct. 1938 (2016) .................................................................. 15
\* *Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ...................................... 13, 21, 23
*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ...................................................................... 12
\* *Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017) .................................................................. 11
\* *United States v. Espy*,
   145 F.3d 1369 (D.C. Cir 1998) ........................................ 14, 17, 22
*United States v. Hite*,
   769 F.3d 1154 (D.C. Cir. 2014) .................................................... 18
*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001) ...................................................................... 21
*Zivotofsky v. Sec'y of State*,
   444 F.3d 614 (D.C. Cir. 2006) ........................................................ 4

**Statutes**
   18 U.S.C. § 6 .................................................................................. 17
\* E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 ...... 1, 13, 15, 17
   § 2(b)(9) .......................................................................................... 7
\*  § 208 ..................................................................................... 7, 9, 24
   § 208(b) ........................................................................................... 6
   44 U.S.C. § 3501 note .................................................................... 24
   Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1–16 ........ 21, 24
   Federal Reports Act of 1942, Pub. L. No. 77-831, § 7(a), 56 Stat. 1078 ............. 16
   Freedom of Information Act, Pub. L. 93-502, 88 Stat. 1561 (1974)
   § 552(f) .............................................................. 14, 15, 19, 23
\* Government Organization and Employees, Pub. L. 89-554, 80 Stat. 387 (1966)
\*  5 U.S.C. § 551(1) ............................................................ 15, 19, 23
   5 U.S.C. §§ 701 *et seq.* ............................................................ 19, 20
   5 U.S.C. § 701(a) ........................................................................... 19
\*  5 U.S.C. § 701(b) ................................... 1, 13, 17, 18, 19, 21, 23
   5 U.S.C. § 702 .......................................................................... 19, 21

5 U.S.C. § 703 ................................................................................ 19

5 U.S.C. § 704 ................................................................................ 19

5 U.S.C. § 705 ................................................................................ 10

5 U.S.C. § 706(1) ........................................................................... 24

\* Paperwork Reduction Act, Pub. L. No. 96-511, 94 Stat. 2812 (codified as
amended at 44 U.S.C. §§ 3501–3521)................................. 7, 13, 15, 16

44 U.S.C. § 3502(1) .............................................. 13, 14, 15, 16

**Other Authorities**

48 Fed. Reg. 13,666 (1983)............................................................ 16

5 C.F.R. Part 1320.8(d) ................................................................... 8

\* Black's Law Dictionary (7th ed. 1999)...................................... 15, 18

EPIC, *Department of Homeland Security Releases Revised Privacy Impact
Assessments* (Mar. 23, 2012).................................................... 7

EPIC, *DHS Releases Revised PIA on Internet Monitoring* (Apr. 24, 2013).......... 7

\* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) .................... 18, 24

H.R. Rep. No. 96-835 (1980)......................................................... 16

Joshua B. Bolten, Director, Office of Mgmt. & Budget, Executive Office of the
President, M-03-22, Memorandum for Heads of Executive Departments and
Agencies, Attachment A (Sept. 26, 2003)....................................... 8

Memorandum on Establishing the Director of White House Information
Technology and the Executive Committee for Presidential Information
Technology § 1, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015) .............. 18

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Commission | Presidential Advisory Commission on Election Integrity |
| D-WHIT | Director of White House Information Technology |
| E-Government Act | E-Government Act of 2002 |
| EOP | Executive Office of the President |
| EPIC | Electronic Privacy Information Center |
| FOIA | Freedom of Information Act |
| GSA | General Services Administration |
| JA ___ | Citation to the Joint Appendix |
| NSC | National Security Council |
| OMB | Office of Management and Budget |
| OVP | Office of the Vice President |
| PIA | Privacy Impact Assessment |
| PWRA | Paperwork Reduction Act |

## ARGUMENT

This case concerns three key legal conclusions in the lower court's opinion and order denying EPIC's motion for a preliminary injunction, which the Court reviews *de novo* on appeal. *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). These issues are: (1) the meaning of "agency," 5 U.S.C. § 701(b)(1); (2) Administrative Procedure Act ("APA") review of actions by the Presidential Advisory Commission on Election Integrity ("the Commission"); and (3) whether the General Services Administration ("GSA") is the only entity under the plain text of the Executive Order that could collect state voter data. The Commission's brief largely ignores the issues presented on appeal and instead (1) challenges the authority of courts to issue preliminary injunctive relief; (2) disputes the lower court's findings concerning EPIC's informational and organizational injuries; and (3) contests the scope of the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (an issue the lower court did not address). The Commission has simply failed to provide an adequate opposition to the issues that EPIC has raised on appeal.

EPIC is likely to succeed on the merits of its statutory claims, and the lower court order should be reversed for three reasons. First, the Commission clearly falls within the scope of the E-Government Act yet has failed to produce a Privacy Impact Assessment ("PIA") as required by law prior to initiating a new collection of

personal information. Second, Congress did not intend to preclude judicial review of violations of the E-Government Act; the APA provides a cause of action. And third, the refusal to produce a Privacy Impact Assessment to EPIC creates cognizable informational and organizational injuries sufficient to establish standing under Article III.

**I.      The lower court properly held that EPIC has standing to pursue statutory claims under the E-Government Act, the FACA, and the APA.**

The issues raised by EPIC on appeal arise from three claims set out in the Second Amended Complaint ("the Statutory Claims"). JA 143–44.[2] Apart from these issues, the lower court properly held that EPIC had established both informational and organizational standing to bring these claims and to seek an injunction requiring the Commission to conduct and release a Privacy Impact Assessment. JA 29–39. Now, the Commission contends that this Court does not have inherent authority to craft a preliminary injunction necessary to preserve the status quo in this case. Not only is the Commission's argument unsupported by any of the cases on Article III standing, the argument misunderstands the basic nature of judicial authority. There is not, and has never been, a requirement that federal

---

[2] The Government's brief includes arguments responding to the lower court's analysis of EPIC's associational standing to assert the constitutional claims in the Second Amended Complaint. Appellees' Br. 14–16. These arguments are not related to any issue on appeal and are outdated and irrelevant given that EPIC has continued to pursue the constitutional claims in the lower court based on a more fully developed record. *See* Pl.'s Opp'n, ECF No. 52.

courts address Article III standing at every stage of a case, once the plaintiff's

standing to pursue specific claims has been established. Given that EPIC has

standing to pursue an injunction to remedy the Statutory Claims, the Court has

jurisdiction under Article III.

> **A.** **EPIC has established both informational and organizational standing to pursue statutory claims against the Defendants for failure to complete and make available a Privacy Impact Assessment prior to collection of personal information.**

The Commission's argument that EPIC—the *Electronic Privacy Information*

*Center*—lacks a "cognizable informational interest" in the disclosure of Privacy

Impact Assessments, Appellees' Br. 19–22, is illogical and contrary to the Supreme

Court's holdings in *FEC v. Akins*, 524 U.S. 11 (1998), and *Public Citizen v. U.S.*

*Dep't of Justice*, 491 U.S. 440 (1989).[3] The Commission similarly fails to

distinguish EPIC's organizational injury claim from the claim upheld by the Court

in *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d

1087 (D.C. Cir. 2015). Not only is the Commission's view contrary to precedent; it

--------

[3] EPIC is aware that the Eagle Forum Education & Legal Defense Fund has submitted a motion for leave to file an *amicus curiae* brief in support of affirmance. However, this Court has previously made clear, in response to a previous filing by the Eagle Forum, that arguments presented by an amicus are "not properly before [the Court]" where they have been "rejected by the actual parties to [the] case." *Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001), *aff'd sub nom. Eldred v. Ashcroft*, 537 U.S. 186 (2003). The Eagle Forum's proposed brief not only attempts to improperly "expand the scope" of this appeal, it includes "repetition of facts [and] legal arguments" prohibited by Circuit Rule 29.

would undermine a core purpose of the E-Government Act, which is to promote the transparency of record systems containing personal data that are created by a government entity.

EPIC has properly asserted standing based on the well-pled allegation that Defendants' failure to release a Privacy Impact Assessment for the proposed collection of state voter data would cause an informational injury to EPIC and directly impact EPIC's organizational mission and public education functions. Second Am. Compl. ¶¶ 5, 67–76.[4] As the Court recently explained in *Friends of Animals v. Jewell*, 824 F.3d 1033 (D.C. Cir. 2016), a plaintiff who is denied access to information can establish informational injury where "a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" 824 F.3d at 1040–41; *see also Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006). EPIC easily satisfies the *Friends of Animals* standard based on the E-Government Act PIA requirement and EPIC's longstanding role of educating the public about emerging privacy and civil liberties issues and seeking the disclosure of Privacy

---

[4] EPIC's Second Amended Complaint alleges adequate facts to establish informational standing. But even if this were not so, the "Court 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The Commission already concedes that the materials on EPIC's website are relevant to the standing issue. *See, e.g.*, Appellees' Br. 14–15.

Impact Assessments. *See, e.g.*, *EPIC v. DEA*, 208 F. Supp. 3d 108 (D.D.C. 2016) (seeking disclosure of unpublished Privacy Impact Assessments); *EPIC v. FBI*, 235 F. Supp. 3d 207 (D.D.C. 2017) (same). Further, denial of "timely access" to information constitutes an "informational injury" to which the government can "make no serious challenge to the injury and causation elements . . . of standing." *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999).

EPIC has established that the Commission's failure to release a Privacy Impact Assessment "directly conflict[s] with [EPIC's] mission of public education" and investigations into government privacy practices, just as the plaintiffs did in *PETA v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015). Organizational and informational injury in this case is self-evident because EPIC's core mission is to "focus public attention on emerging privacy and civil liberties issues" by conducting "oversight and analysis of government activities," Second Am. Compl. ¶ 5; *see also* JA 30 (quoting *About EPIC*, EPIC.org[5] ("This injury is particular to Plaintiff, given that it is an organization that was 'established . . . to focus public attention on emerging privacy and civil liberties issues and to protect privacy, freedom of expression, and democratic values in the information age.'"). By refusing to release a Privacy Impact Assessment as required by law, the Commission has forced EPIC to conduct its "oversight and analysis" in a more

---

[5] https://www.epic.org/epic/about.html.

costly and resource-intensive way that would not otherwise be necessary. *See, e.g.*, Decl. of Eleni Kyriakides, JA 236–37.

EPIC's claim to informational standing is even stronger than that of plaintiff in *Friends of Animals* because the E-Government Act requires the agency to "make the privacy impact assessment publicly available" *prior* to "initiating a new collection of [personal] information." E-Government Act § 208. In *Friends of Animals*, the Court held that the plaintiff had standing to bring statutory claims based on the disclosure provision in Section 10 of the Endangered Species Act, which requires the Secretary of Interior to disclose any "information it receives in connection with any Section 10 permit." 824 F.3d at 1041; *cf. Friends of Animals v. Jewell ("Friends of Animals II")*, 828 F.3d 989, 993 (D.C. Cir. 2016) (holding that section 4 of the ESA did not grant a right to information). The Court found that Friends of Animals "regularly participates in and requests such information," which enables them to "meaningfully participate" in the agency process and was sufficient to establish informational standing. *Friends of Animals*, 824 F.3d at 1041.

The Commission does not attempt to distinguish *Friends of Animals* and instead argues that EPIC lacks a "cognizable" interest in the disclosure of Privacy Impact Assessments under the E-Government Act based on a misreading of the statute's purpose and structure. Appellees' Br. 20–21. The purpose of the E-Government Act is, at bottom, to "make the Federal Government more transparent

6

and accountable." E-Government Act § 2(b)(9). One critical system of

accountability is the requirement that agencies complete, review, and publish

Privacy Impact Assessments prior to "developing or procuring information

technology that collects" personal information or "initiating a new collection" of

personal information. E-Government Act § 208. EPIC routinely monitors the

issuance of agency Privacy Impact Assessments, disseminates information about

agencies' collection of personal information to the public, and facilitates

transparency and accountability for data collection practices. *See, e.g.*, EPIC, *DHS*

*Releases Revised PIA on Internet Monitoring* (Apr. 24, 2013);[6] EPIC, *Department*

*of Homeland Security Releases Revised Privacy Impact Assessments* (Mar. 23,

2012).[7] What the Commission fails to realize is that the entire purpose of the

Privacy Impact Assessment publication requirement is to enable external oversight

by organizations such as EPIC. The Office of Management and Budget ("OMB")

regulations implementing the E-Government Act make clear that the Privacy

Impact Assessment requirements are built upon and intertwined with the

requirements of the Paperwork Reduction Act, Pub. L. No. 96-511, 94 Stat. 2812

(codified as amended at 44 U.S.C. §§ 3501–3521) ("PWRA"). *See* Joshua B.

Bolten, Director, Office of Mgmt. & Budget, Executive Office of the President, M-

---

[6] https://epic.org/2013/04/dhs-releases-revises-privacy-i.html.
[7] https://epic.org/2012/03/department-of-homeland-securit-1.html.

03-22, Memorandum for Heads of Executive Departments and Agencies,

Attachment A (Sept. 26, 2003), JA 152. The Paperwork Reduction Act regulations

are specifically designed to enable the public to review and respond to any new

proposed collection of information. *See* 5 C.F.R. Part 1320.8(d) ("Before an agency

submits a collection of information to OMB for approval . . . the agency shall

provide 60-day notice in the Federal Register, and otherwise consult with members

of the public and affected agencies concerning each proposed collection of

information, to solicit comment . . . .").

Given the structure and purpose of the E-Government Act and the Paperwork

Reduction Act, the Commission cannot credibly argue that EPIC lacks a "concrete

interest in the information sought." *Nader v. FEC*, 725 F.3d 226, 229 (D.C. Cir.

2013); *see also Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 57 (D.C. Cir.

1983) (finding plaintiffs in an APA suit "[met] the 'zone of interests' test for

standing" because the agency's violations of a records statute obstructed the

"public's expected access to records"). Unlike the plaintiff in *Nader*, EPIC seeks

disclosure of a Privacy Impact Assessment to assess the privacy risks presented by

the proposed collection of state voter records from across the country. Congress

8

enacted § 208 of the E-Government Act to help ensure public oversight of record systems created by federal agencies containing personal data.[8]

A favorable decision would redress EPIC's informational injury by forcing the Commission to comply with its recording and disclosure obligations. Second Am. Compl. ¶¶ 67–76, p. 15 ¶ D. Even if the Commission seeks to duck its obligation to record a Privacy Impact Assessment—thereby denying EPIC the ability to review such a document—*Public Citizen* is explicit that EPIC's "potential gains [would] undoubtedly [be] sufficient to give [it] standing" to demand disclosure. *Pub. Citizen*, 491 U.S. at 451.

The Commission's attempt to argue against the lower court's finding that EPIC has established an organizational injury sufficient to satisfy Article III is similarly unavailing. Appellees' Br. 21–22. The Commission's only effort to distinguish EPIC's claim from the claim upheld by the Court in *PETA*, 797 F.3d 1087, is to emphasize that PETA "regularly relied on a particular category of agency report." Appellees' Br. 22. But as the lower court already recognized, EPIC has a "long-standing mission to educate the public regarding privacy rights, and engages in this process by obtaining information from the government." JA 38.

---

[8] On appeal, the Commission has abandoned its earlier argument, presented to the district court, that EPIC cannot seek disclosure of the Privacy Impact Assessment because the agency has not yet conducted it. The lower court rejected that argument, finding that it was inconsistent with the holding in *Public Citizen*. JA 35.

EPIC specifically seeks public disclosure of Privacy Impact Assessments to help ensure oversight of government programs that involve the collection of personal data. EPIC is not equivalent to just "[a]ny organizational plaintiff asserting an interest in educating the public." Appellees' Br. 21. EPIC is arguably the leading organization in the United States on this particular issue. The Commission's refusal to produce a Privacy Impact Assessment prior to initiating collection of personal data concerning American voters directly harms EPIC's interest in educating the public about the government's activities. As a direct result of the Commission's refusal to produce the Privacy Impact Assessment, EPIC has had to expend organizational resources to obtain information about the collection of personal data through other means. *See* JA 236; JA 38–39.

**B.     The Court has the authority under 5 U.S.C. § 705 to preserve the status quo pending resolution of EPIC's claims.**

The Commission also argues that the Court lacks jurisdiction to enter a preliminary injunction that "would not redress plaintiff's asserted informational injury." Appellees' Br. 12. That argument misunderstands the purpose of a preliminary injunction and 5 U.S.C. § 705, which authorizes a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." A preliminary injunction is an "exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal

issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Id.* (internal citations omitted).

A preliminary injunction is not a distinct "form of relief" that requires a separate standing analysis, and if it were, courts would similarly have to evaluate standing to carry out other essential court functions such as discovery orders, stay orders, hearing orders, and procedural motions. That is not the law.

None of the cases cited by the Commission stand for the proposition that a court must evaluate standing separately to grant preliminary injunctive relief. The Court in *DaimlerChrysler Corp. v. Cuono*, 547 U.S. 332 (2006) held that the plaintiffs lacked standing to assert additional claims and, as a result, that the court did not have Article III jurisdiction despite its "supplemental jurisdiction" over state-law claims. 547, U.S. at 351–52. *DaimlerChrysler* did not concern standing to pursue preliminary injunctive relief. The Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), is similarly irrelevant because the Court held that plaintiffs could not establish an injury-in-fact necessary to pursue *any* claims or relief. 504 U.S. at 578. Unlike the plaintiffs in those cases, EPIC has established both informational and organizational standing as to the Statutory Claims for the Commission's completion and disclosure of a Privacy Impact Assessment.

11

The Commission's reliance on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), is especially puzzling given that the factual and procedural background of that case makes clear that courts have both jurisdiction and broad authority to issue preliminary injunctions to ensure agency compliance with procedural requirements under the APA. In *Summers*, a group of plaintiffs filed suit to challenge the Forest Service's failure to give prior notice and provide a period for public comment prior to approving a salvage sale of timber in the Sequoia National Forest. 555 U.S. at 491. As the Supreme Court explained, the "District Court granted a preliminary injunction against the Burnt Ridge salvage-timber sale," and the parties subsequently "settled their dispute" over the approval of that project. *Id.* The fact that the plaintiffs had not alleged an injury-in-fact based on any *other* project—as necessary to challenge the ongoing application of the Forest Service regulations—was irrelevant to the issue of whether the lower court had jurisdiction to enter a preliminary injunction blocking the sale (which no one disputed in that case). *See id.*

In this case, EPIC has clearly established an injury-in-fact as necessary to pursue its Statutory Claims and to seek injunctive relief to obtain a Privacy Impact Assessment concerning the Commission's proposed collection of personal voter data. *See Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C.

Cir. 2009) (finding that the Article III injury requirement is satisfied where an agency refuses to disclose information that the law requires to be revealed); JA 37.

## II.   The Commission and its co-defendants are subject to the E-Government Act, and their actions are subject to judicial review under 5 U.S.C. § 706.

The Commission's arguments as to the APA and E-Government Act fail in four respects. First, the Commission erroneously argues that the Freedom of Information Act's idiosyncratic definition of "agency" dictates the meaning of that term under the E-Government Act and the Paperwork Reduction Act. Second, the Commission wrongly assumes that 5 U.S.C. § 701(b)(1) contains a hidden exemption for the conduct of government officials and entities who happen to advise the President. Third, the Commission mistakenly imports the holding of *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)—a FOIA case—into the APA's judicial review provisions. Finally, the Commission fails to acknowledge that the General Services Administration has a mandatory duty to conduct a Privacy Impact Assessment as part of the GSA's supporting role with respect to the Commission.

### A.   The Commission is an establishment of the government subject to the E-Government Act.

The Commission contends—in flagrant contradiction with the text of 44 U.S.C. § 3502(1)—that the Commission, the Executive Office of the President ("EOP"), and the Director of White House Information Technology ("D-WHIT") are exempt from the E-Government Act. Appellees' Br. 23–27. To reach this

13

strained conclusion, the Commission asks the Court read the words "any . . . establishment in the executive branch of the Government (including the Executive Office of the President)" as evincing Congress's secret intent to *exclude* much of the EOP. § 3502(1). This is nonsense. "[T]he Court cannot construe a statute in a way that negates its plain text[.]" *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). The Commission's reading has no basis in the language of the E-Government Act or the Paperwork Reduction Act; any cases in the D.C. Circuit interpreting these statutes; or any of the legislative history of the two Acts.

Instead, the Commission merely asserts that the definition of "agency" from the FOIA should apply because § 3502(1) is "materially indistinguishable" from 5 U.S.C. § 552(f). Yet these definitions are readily distinguishable: they contain different language, point to different lists of excluded entities, and reside in two different titles of the U.S. Code. Moreover, even if the two definitions were identical, the "substantial independent authority" test is an atextual gloss on the FOIA which (1) is based on the FOIA's peculiar and "unambiguous" legislative history, *Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136, 156 (1980), and (2) serves a unique constitutional purpose, *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir 1998). Congress, by enacting the FOIA, did not upend the basic rules of statutory interpretation.

14

An interpretation of the term "agency" in the Paperwork Reduction Act must begin "with the language of the statute itself," and "where the statute's language is plain," that "is also where the inquiry should end." *Puerto Rico v. Franklin California Tax-free Trust*, 136 S. Ct. 1938, 1946 (2016). The definition of "agency" in 44 U.S.C. § 3502(1) is clearly different than 5 U.S.C. § 552(f) (which incorporates by reference additional language from 5 U.S.C. § 551(1)). To begin with, the PWRA definition does not use—directly or indirectly—the term "authority," § 551(1), but instead uses the term "establishment":

> [T]he term "agency" means any executive department, military department, Government corporation, Government controlled corporation, or *other establishment* in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency . . .

§ 3502(1) (emphasis added). Establishment is defined as an "institution or place of business." Black's Law Dictionary 566 (7th ed. 1999). The Commission was "established" by the President in Executive Order No. 13,799. 82 Fed. Reg. 22,389 (May 11, 2017) ("Order") ("Section 1. *Establishment*. The Presidential Advisory Commission on Election Integrity (Commission) is hereby established."). The Commission does not contest that the Commission—or for that matter, the EOP and D-WHIT—are "establishment[s]" of the Government. Therefore, all three entities are subject to the E-Government Act by the text of the PWRA.

The Commission has not offered any authority that would contradict the plain meaning of the statute, relying instead on a laundry list of FOIA cases in which courts have interpreted *different* statutory language based on *different* legislative history. Appellees' Br. 23–27. Indeed, the PWRA's legislative and regulatory history confirms the plain-text meaning of § 3502(1). The PWRA was an expansion of the Federal Reports Act of 1942, Pub. L. No. 77-831, § 7(a), 56 Stat. 1078, intended to "expand and strengthen Federal information management activities," H.R. Rep. No. 96-835, at 1 (1980). Congress chose the Office of Management and Budget, an establishment within the EOP, to oversee compliance with the Paperwork Reduction Act, and the OMB regulations implementing the PWRA describe the statute in similarly expansive terms. "The purpose of the Paperwork Reduction Act and of this rule is to protect the public." 48 Fed. Reg. 13,666, 13,670 (1983). The implementing regulations promulgated by OMB made clear that "it would be entirely contrary to the spirit and intent of the Act to make its fundamental public notification mechanisms depend upon legal distinctions . . . that are in no way discernable on the face of the form or regulation." *Id.* It would certainly not be reasonable to read in to the PWRA definition of "agency" an atextual gloss imported from an entirely different statute based on an entirely different legislative history.

16

Absent clear and convincing evidence of Congressional intent to exclude a particular establishment from the PWRA, the Court should not limit the scope of that statute or of the E-Government Act. *Kuzma v. U.S. Postal Serv.*, 798 F.2d 29, 31 (2d Cir. 1986). The Court should be especially wary of importing the FOIA definition of "agency" into the E-Government Act because the FOIA definition was narrowed to serve a specific constitutional purpose: to avoid chilling discussion between the President and his close advisors. *Espy*, 145 F.3d at 1373. In *Espy*, the D.C. Circuit rejected a similar invitation to ignore a statute's plain meaning, holding that the definition of "agency" in 18 U.S.C. § 6 is not analogous to the FOIA definition:

> Espy's analogy to FOIA does not work. The Supreme Court defined "agency" narrowly under FOIA on the assumption that Congress would not have wished to chill discussion between close presidential advisors. It is by no means obvious that Congress, for analogous policy reasons, would have wished a similarly narrow definition of agency for purposes of § 1001.

*Espy*, 145 F.3d at 1373. The Court in *Espy* made clear that agency is not defined so narrowly outside of the FOIA context. There is no legal basis to smuggle an analogous limitation into the Paperwork Reduction Act or E-Government Act.

**B.     The Court has authority to set aside Defendants' unlawful action under the APA.**

The Commission urges that a hidden exemption lurks within the broad and clear-cut definition of "agency" in 5 U.S.C. § 701(b)(1)—one which would excuse

much of the Executive Office of the President from APA judicial review. Appellees' Br. 29–30. This exception is so well hidden, it seems, that neither Congress nor the courts have identified it in the five decades since § 701(b)(1) was enacted. Yet the Commission, placing its chips on inapposite FOIA cases and the FOIA's unique legislative history, now asks the Court to disregard the plain text of § 701(b)(1) and give the Defendants a pass. Appellees' Br. 29–30. The Court should decline to do so and instead exercise judicial review.

The text of the APA judicial review provisions is plain, and the "sole function of the courts is to enforce" such plain text "according to its terms." *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014). The "agency" question must therefore turn on whether the Commission and its co-defendants are "authorit[ies] of the Government of the United States." 5 U.S.C. § 701(b)(1). Authority is defined as "[t]he right or permission to act legally on another's behalf; the power delegated by a principal to an agent." Black's Law Dictionary 127 (7th Ed. 1999). The President has delegated to the Commission, the D-WHIT, the EOP, and the GSA the power to act on his behalf in different respects. *See, e.g.*, Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017); Memorandum on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology § 1, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015). Under the clear statutory text, then, the Defendants are subject to suit

18

under the APA except where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

The "evident intent" of Congress "when enacting the APA [was to] 'make agency action presumptively reviewable.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*, 567 U.S. 209 (2012) (quoting *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987)); *see also Armstrong v. Bush (Armstrong I)*, 924 F.2d 282, 290 (D.C. Cir. 1991). Chapter 7 of the APA, 5 U.S.C. §§ 701 *et seq.*, provides a "right of review" to any "person suffering legal wrong because of agency action . . . within the meaning of a relevant statute," § 702. The statute provides that "[e]xcept to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement." 5 U.S.C. § 703. Any "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704.

Contrary to the Commission's arguments based on cases interpreting § 552(f) and § 551(1), Appellees' Br. 29–30, there is no carve-out in § 701(b)(1) for the President's advisors or other entities within the EOP that lack "independence" from the President. The D.C. Circuit's decision in *Armstrong I* makes clear that even the

19

President's closest advisors can be sued under the APA for acting contrary to law.[9]

In *Armstrong I*, a group of plaintiffs sued then-President (and former Vice

President) George H. W. Bush, as well as the Archivist of the United States and

National Security Council ("NSC"), seeking an injunction to prohibit the

destruction of material stored on the NSC computer system during the final weeks

of the Reagan Administration. *Armstrong I*, 924 F.2d at 284. The National Security

Council argued that the court could not review the NSC's compliance with either

the Presidential Records Act or the Federal Records Act, but the court rejected that

argument and held that "there is APA review of the NSC's recordkeeping

guidelines and instructions." *Id*. at 291. The court explained that the NSC had not

shown "the 'clear and convincing evidence' necessary to overcome the presumption

in favor of judicial review." *Id.*

    Exempting the President's advisors from judicial review and from the waiver

of sovereign immunity in 5 U.S.C. §§ 701 *et seq.* would not only be contrary to the

---

[9] The Commission makes the bizarre claim that *Armstrong I* is inapposite because "the defendants [in that case] included entities that were indisputably agencies." Appellees' Br. 30 n.3. But the *Armstrong I* Court clearly reviewed actions and policies specific to the National Security Council. *Armstrong I*, 924 F.2d at 291 ("[W]e find that there is APA review of the NSC's recordkeeping guidelines and instructions[.]"); *accord Citizens for Responsibility & Ethics in Wash. v. Executive Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008) ("EOP is a properly named defendant[.]"). Moreover, if the presence of an "indisputable" agency defendant automatically extends APA judicial review to all co-defendants, the instant appeal is easily decided: Defendant GSA is assuredly an agency. Appellees' Br. 28.

plain text of the statute; it would produce absurd results. The officers of the

Commission could openly flout the law, even refusing to post any notices or hold

open meetings in violation of the Federal Advisory Committee Act ("FACA"), 5

U.S.C. app. 2 §§ 1–16, yet the Court would have no power to enjoin their actions.

The NSC could roll back its record retention guidelines and begin deleting backups

every two weeks as it did prior to *Armstrong I.* The § 702 waiver of sovereign

immunity would not reach those in the President's orbit, and the basic structural

balance built into our current tripartite system would be upended. Congress does not

"hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457

(2001). In this case, there is not even a mousehole; instead, there is a presumption

of judicial review of all final actions by "authorit[ies] of the Government." §

701(b)(1).

### C.  There is no "clear and convincing" evidence that Congress intended to preclude judicial review of the Commission's compliance with the E-Government Act.

The Commission's APA argument rests entirely on the view that the

Commission, EOP, and D-WHIT are not agencies under the "substantial

independent authority" test of *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)—a

FOIA case that did not involve judicial review under 5 U.S.C. §§ 701 *et seq*. The

premise of the Commission's argument is that the legislative history of the FOIA

amendments passed in 1974 can be used to interpret a statutory provision passed in

1966 in a way that directly contradicts the plain text of the original statute. Appellees' Br. 29–30. The Commission fails to justify this complete inversion of basic statutory interpretation. Indeed, the D.C. Circuit rejected similar logic in *Espy*, holding that the definition of "agency" in 18 U.S.C. § 6 is not analogous to the FOIA definition. *Espy*, 145 F.3d at 1373 ("The Supreme Court defined 'agency' narrowly under FOIA on the assumption that Congress would not have wished to chill discussion between close presidential advisors. It is by no means obvious that Congress, for analogous policy reasons, would have wished a similarly narrow definition of agency for purposes of § 1001."). The *Espy* Court made clear that "agency" is not defined so narrowly outside of the FOIA context.

The only way the action of a government "authority" can be exempt from judicial review under 5 U.S.C. §§ 701 *et seq.* is if (1) there is "clear and convincing evidence" that Congress intended to preclude judicial review or (2) the action is "committed to agency discretion by law." *Armstrong I*, 924 F.2d at 47–49. The Commission has provided no authority to suggest that Congress intended to preclude judicial review of the Commission's compliance with the E-Government Act, and the Act's PIA requirements are non-discretionary. Thus, the presumption of judicial review should stand.

The Commission nevertheless contends that *Soucie* "squarely controls the issue of whether an entity can be an agency" in this case. Appellees' Br. 30. But the

22

court in *Soucie* did not consider the definition of "agency" in § 701(b)(1), the relevant provision here. Instead, the court considered and concluded that the Office of Science and Technology could be "subject to the public information provisions of the APA, *i.e.,* the Freedom of Information Act." *Soucie,* 448 F.2d at 1073. Congress subsequently clarified the FOIA definition of agency, codified it in § 552(e) (now § 552(f)), and incorporated the *Soucie* test by "unambiguous" reference in the legislative history. While it is true that the Court in *Soucie* was considering an APA definition of agency, the Commission fails to recognize that the APA contains two different definitions of "agency"[10] and that the definition in § 701 is broader because the presumption in favor of judicial review applies.

### D.    The Commission misunderstands the GSA's mandatory duty to conduct a Privacy Impact Assessment.

The Commission badly misunderstands the GSA's nondiscretionary duty in this matter, Appellees' Br. 28-29, which is to conduct a Privacy Impact Assessment

---

[10] The Commission erroneously states that § 551(1) and 701(b)(1) are "identical." Appellees' Br. 29. In fact, while § 551(1) qualifies its last four enumerated exceptions with the words "or except as to the requirements of section 552 of this title," § 701(b)(1) includes no such language. Thus, while the § 551(1) and § 552(f) "agency" definitions are interdependent in some respects, § 701(b)(1) is entirely distinct from both. Moreover, had Congress meant § 701(b)(1) to be perfectly coextensive with the existing § 551(1) definition, it could have directly referenced § 551(1) in Chapter 7 rather than copying over much of the same definitional language. That is exactly what Congress did one line later in 5 U.S.C. § 701(b)(2): "'[P]erson', 'rule', 'order', 'license', 'sanction', 'relief', and 'agency action' have the meanings given them by section 551 of this title[.]"

if the Commission's activities implicate § 208 of the E-Government Act. The

Commission has begun the process of collecting state voter data. Letter from Kris

Kobach, Vice Chair, Presidential Advisory Comm'n on Election Integrity, to Alex

Padilla, Cal. Sec'y of State (July 26, 2017), ADD 38–39. Under the FACA, the

Executive Order which established the Commission, and the Commission Charter,

the GSA is the sole government entity permitted to pursue that activity. *See* 5

U.S.C. app. 2 §§ 7(c); Order § 7(a), JA 56; Charter, Presidential Advisory

Commission on Election Integrity ¶ 6, JA 58. And by law, the necessary first step in

the process of collecting personal data is for the GSA to create and publish a

Privacy Impact Assessment. 44 U.S.C. § 3501 note. It is the performance of this

initial step—and not the final acquisition of voter data—that the GSA has

unlawfully withheld (and which EPIC seeks to compel through injunctive relief).

*See* 5 U.S.C. § 706(1). Contra the Commission, EPIC does not seek an injunction

ordering the GSA to *actually obtain* state voter data. At issue is simply the question

whether any government entity other than the GSA could collect the state voter data

sought by the Commission. According to the plain text of the Executive Order and

the Commission Charter, only the GSA could be so authorized. The data collection

activities of the Commission must therefore be suspended, pending the completion

and publication of a Privacy Impact Assessment by the GSA.

24

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the lower court and grant Appellant's motion for a preliminary injunction.

Respectfully Submitted,

/s/ Marc Rotenberg

MARC ROTENBERG
ALAN BUTLER
CAITRIONA FITZGERALD
JERAMIE SCOTT
JOHN DAVISSON
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff-Appellant*

Dated: September 22, 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). The brief is composed in a 14-point proportional typeface, Times New Roman, and complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e), because it contains 5,990 words, excluding parts of the brief exempted under Fed. R. App. P. 32(a)(7)(B)(iii).

   /s/ Marc Rotenberg
MARC ROTENBERG

## CERTIFICATE OF SERVICE

I, Marc Rotenberg, hereby certify that on September 22, 2017, I

electronically filed the foregoing document with the Clerk of the Court for the

United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.

The following participants in the case who are registered CM/ECF users will be

served by the CM/ECF system:

Daniel Tenny
Email: daniel.tenny@usdoj.gov
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
Firm: 202-514-2000
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Mark B. Stern, Attorney
Email: mark.stern@usdoj.gov
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
Firm: 202-514-2000
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

　　　　　　　　　　/s/ Marc Rotenberg
　　　　　　　　　　MARC ROTENBERG